**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARSH USA INC. and MARSH &
MCLENNAN COMPANIES, INC.

           Plaintiffs,

    v.

CHAD W. KARASAKI

           Defendant.

Case No. _O8 Civ. 4195 (JGK)_

**COMPLAINT OF MARSH USA INC.**
**AND MARSH & MCLENNAN**
**COMPANIES, INC.**

Plaintiffs Marsh USA Inc. and Marsh & McLennan Companies, Inc. (collectively, "Marsh" or "Plaintiffs"), by and through their undersigned attorneys, as for their Complaint against Defendant Chad W. Karasaki ("Karasaki" or "Defendant"), hereby allege as follows:

## NATURE OF ACTION

1.    Marsh brings this action to enforce the contractual promises of one of its former senior executives and office heads, to safeguard Marsh's confidential, proprietary and trade secret information, to prevent unfair competition and irreparable injury to Marsh's business interests, and to protect the goodwill of its business.

2.    Marsh employed Karasaki for 22 years – most recently as Managing Director and Head of Marsh's Hawaii Office. In exchange for his agreement not to use or disclose any of Marsh's trade secrets or other confidential and proprietary information, and to refrain from soliciting, interfering with or working with Marsh's clients and employees for a reasonable time period following his separation of employment from Marsh, Marsh provided Karasaki, in addition to his substantial six-figure salary, with

valuable stock options and more than $410,000.00 in cash bonus payments between February 2004 and February 2008.

3.     Karasaki abruptly resigned from Marsh in March 2008, and announced that he was accepting a similar, senior-level position with Aon Risk Services, Inc. of Hawaii. Aon Risk Services, Inc., a wholly-owned subsidiary of Aon Corporation (hereinafter, individually or collectively referred to as "Aon") is Marsh's direct competitor in Hawaii.

4.     Despite agreeing to be bound by two non-solicitation agreements, as well as an agreement to safeguard Marsh's trade secrets and confidential information, since his resignation from Marsh, Karasaki has continually breached his contractual promises to Marsh by, among other things, directly or indirectly soliciting or otherwise causing numerous Marsh clients to defect to his new employer, and by performing or supervising the performance of services for such clients on behalf of Aon. Moreover, upon information and belief, Karasaki has, directly or indirectly, caused numerous Marsh employees – all of whom he worked closely with, or supervised during his employment at Marsh – to resign from Marsh and accept employment with Aon. Furthermore, on information and belief, Karasaki has used or disclosed and threatens to use or disclose, Marsh's trade secrets and other confidential and proprietary information in furtherance of these improper solicitations of Marsh's clients and employees. As such, Karasaki has repudiated his contractual agreements with Marsh and already has breached, and will continue to breach, his contractual, common law, and fiduciary obligations to Marsh.

## JURISDICTION AND VENUE

5.      This Court has original subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between the citizens of

different States, and the amount in controversy exceeds $75,000 exclusive of interests

and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(3) because

Karasaki is subject to personal jurisdiction in this forum pursuant to a mandatory forum

selection clause contained in a Restrictive Covenants Agreement, dated June 27, 2007,

which forum selection clause was expressly upheld and enforced by the United States

District Court for the District of Hawaii in an Order, dated April 22, 2008.

## PROCEDURAL HISTORY

7.      On March 31, 2008, Marsh filed a Complaint for Injunctive Relief and

Damages in the United States District Court for the District of Hawaii against Karasaki,

Civil Action No. 08-00149 SOM KSC (the "Hawaii Action").  The Hawaii Action – like

this action – alleged that Karasaki repudiated his contractual agreements with Marsh, and

that he breached his contractual, common law, and fiduciary obligations to Marsh.

8.      On April 14, 2008, Marsh made an emergency application for relief in the

Hawaii Action seeking to, among other things, enjoin Karasaki from further breaching his

contractual agreements with Marsh.

9.      On April 15, 2008, Karasaki moved to dismiss or alternatively, to transfer

venue of the Hawaii Action to New York solely on the grounds of improper venue.

Karasaki's motion did not address the merits of Marsh's claims in the Hawaii Action.

10.      On April 22, 2008, without addressing the merits of Marsh's application

for relief, the District of Hawaii granted Karasaki's motion to dismiss on improper venue grounds. Specifically, the Court expressly upheld the forum selection clause contained in the Restrictive Covenants Agreement between Karasaki and Marsh, dated June 27, 2007, which requires that disputes with respect to that agreement be brought exclusively in either this Court or the Supreme Court of the State of New York. On that ground alone, the Court dismissed the Hawaii Action without prejudice, specifically noting that it dismissed the action, rather than transfer it, only as a result of its desire to "leave it to [the parties] to select the precise court in New York in which to revive this dispute." *See Marsh USA, Inc. v. Karasaki*, Civ. No. 08-00149 SOM/KSC, 2008 WL 1805662, at *9 (D. Hawaii Apr. 22, 2008).

## PARTIES

11.     Plaintiff Marsh USA Inc. is, and at all relevant times was, a corporation organized under the laws of Delaware, with its principal place of business in New York City, New York.

12.     Plaintiff Marsh & McLennan Companies, Inc. is, and at all relevant times was, a corporation organized under the laws of Delaware, with its principal place of business in New York City, New York.

13.     Plaintiff Marsh USA Inc. is a wholly owned subsidiary of Plaintiff Marsh & McLennan Companies, Inc.

14.     Defendant Chad W. Karasaki is, and at all times relevant herein was, a citizen and resident of the State of Hawaii.

4

## FACTUAL ALLEGATIONS

### Karasaki's Employment with Marsh

15.    Karasaki first commenced employment with Marsh in 1986 in Marsh's
Portland, Oregon office, and transferred to Marsh's Hawaii office in 1990. From 1990 to
2003, Karasaki worked as a Client Executive. Client Executives are high-level
employees who are directly responsible for supervising client relationships at Marsh. In
November 2003, Karasaki was promoted to the corporate title of Managing Director. In
April 2005, Karasaki was promoted to the Head of Marsh's Hawaii Office and he
remained in this position until he abruptly resigned from Marsh in early March 2008.

16.    While employed at Marsh, Karasaki was engaged in the business of
insurance brokerage, which included, among other things, placing insurance requested by
Marsh clients with insurers upon the best terms available, advising clients about
structuring their insurance coverage, managing clients' insurance programs, and assisting
clients with processing of insurance claims.

17.    Over the course of many years at Marsh, Karasaki, on behalf of Marsh and
with its financial and other support, developed extensive and unique knowledge in the
area of construction insurance, including in the areas of structuring and servicing Owner
Controlled Insurance Programs ("OCIPs"), also known as construction project "wrap-
ups," whereby an owner or developer procures insurance for an entire construction
project, covering all contractors and subcontractors. These were areas in which Marsh
long enjoyed a reputation in Hawaii, and elsewhere, as an industry leader and in which
Marsh held a competitive edge vis-à-vis its competitors, including Aon. Because of
Marsh's historical strength in these areas, construction insurance ultimately became one
of the key focuses of the business plan of Marsh's Hawaii Office – a business plan that

Karasaki helped to develop. This business plan was instrumental in enabling Marsh to secure a host of clients – some of which were personally supervised by Karasaki, and all of which eventually came under Karasaki's indirect supervision in his capacity as Head of Marsh's Hawaii Office.

**Karasaki's Access to Confidential, Proprietary and Trade Secret Information**

18.    In his capacity as Head of Marsh's Hawaii Office, Karasaki had access to highly confidential, corporate and trade secret information about Marsh and its Hawaii operations, including, without limitation, information about: Marsh's current and historical revenues; its cost structure; its profitability; and its historical, current, and future marketing and business development plans and strategies, including, for example, information about areas of concentration and prospective and/or "target" clients, and the strategies Marsh would implement in an effort to develop particular business and/or clients. This information is strictly confidential and is available only to a limited number of senior level Marsh employees, and certainly not to any of Marsh's competitors. As former Head of the Hawaii Office, however, Karasaki had unfettered access to and routinely relied upon this information, including at the time of his resignation from Marsh in March of 2008. In fact, during his employment at Marsh and particularly in his capacity as Head of the Hawaii Office, Karasaki was personally involved in developing and implementing the marketing and business development plans that Marsh's Hawaii office has successfully implemented and continues to implement.

19.    As Head of the Office, Karasaki had oversight over, and managerial and supervisory responsibility for, all of the employees in the Hawaii office, each of whom reported, directly or indirectly, to him. In addition, Karasaki was responsible for

6

conducting employee performance reviews for, and played a key role in determining the compensation of, all personnel in the Hawaii office. Accordingly, as Head of the Office, he was one of a select few individuals at Marsh who had access to the personnel files of each and every employee in the Hawaii office. By virtue of such access, and by virtue of the duties described above and his direct, day-to-day dealings with the employees in the Hawaii office, Karasaki had access to such confidential, proprietary and competitively sensitive information as: employee compensation (*e.g.*, salary and bonus information); employee benefit information, including the impact to individual employees of any planned changes to Marsh's benefits policies; eligibility for stock options and other restricted grants; eligibility for, and historical and likely future receipt or deferral of, intra-office promotions; employee performance reviews and score cards; the expertise, talents, strengths and weaknesses of individual employees; and information concerning each employee's level of satisfaction or dissatisfaction with his or employment at Marsh, and the particular reasons therefor. This information is strictly confidential and is only available to a very limited number of Marsh employees, and certainly not to Marsh's competitors. As former Head of the Hawaii Office, however, and as someone who had the personnel-related privileges and responsibilities described above, Karasaki had unfettered access to and routinely relied upon this information, including at the time of his resignation from Marsh in March of 2008.

20.    Moreover, in his capacity as Head of Marsh's Hawaii Office, Karasaki had access to all information about each of Marsh's accounts in Hawaii, as well as Marsh's Hawaii clients who are, or were, serviced in Marsh's other offices on the mainland and globally. This information includes, by way of example and without limitation: all

details of such clients' insurance programs and submissions, including (but not limited

to) the expiration and renewal dates of their current insurance programs and policies;

details concerning available markets, market contacts, and the cost of each clients'

insurance programs; each client's current and historical revenues, loss exposure data, and

insurance premiums; details concerning prior bargaining and claims settlement

negotiations and experiences that each client had with historical insurers, and each

client's level of satisfaction or displeasure with particular individual or groups of carriers;

the fee structure (*i.e.*, fee or commission) utilized by Marsh with each client and the

amount of income that Marsh derived therefrom; contact details and personal information

concerning the key representatives from each of the clients; each client's level of

satisfaction with Marsh, including as described in clients' responses to confidential

annual client surveys conducted by Marsh; and which client accounts are considered "at

risk" by Marsh (*i.e.*, which accounts may be vulnerable to competition) and the reasons

therefor. This information is kept confidential by Marsh and is not readily available to

competitors and/or other client executives within the Hawaii office. As former Head of

the Hawaii Office, however, Karasaki enjoyed unfettered access to and routinely relied

upon this information, including at the time of his resignation from Marsh in March of

2008.

     21.     In addition, as Head of Marsh's Hawaii Office and a leader in Marsh's

construction insurance practice group, Karasaki had intimate knowledge of Marsh's

highly-developed practices, methodologies and "back-room" operations relating to the

structuring, placement and servicing of construction insurance and owner controlled

insurance programs ("OCIPs"), areas in which Marsh has long been viewed as the

industry leader and held a competitive advantage over its competitors in Hawaii.

**Karasaki's Contracts with Marsh**

22.     On or about November 25, 2003, in exchange for the right to receive

substantial monetary benefits under Marsh's Discretionary Bonus Plan, which he

ultimately received, Karasaki entered into two agreements with Marsh: the Marsh USA

Inc. Non-Solicitation Agreement for Participants in the Discretionary Bonus Plan (the

"Non-Solicitation Agreement") and the Marsh USA Inc. Confidentiality and Ownership

Rights Agreement (the "Confidentiality and Ownership Rights Agreement").

23.     The Non-Solicitation Agreement expressly prohibits Karasaki, for a period

of one (1) year following termination of his employment with Marsh, from, among other

things, soliciting, servicing or otherwise interfering with current, former or prospective

clients of Marsh, and from soliciting or otherwise seeking to induce Marsh employees to

leave their employment with Marsh for the purpose of competing with Marsh.

Specifically, the Non-Solicitation Agreement provides, in relevant part:

> I understand and acknowledge that without executing this
> Agreement, I would not be eligible to participate in the
> Bonus Plan. I agree that if my employment with the
> Company terminates for any reason, I will not, for a period
> of one (1) year from date of termination, directly or
> indirectly, as a sole proprietor, member of a partnership, or
> stockholder, investor, officer or director of a corporation, or
> as an employee, agent, associate or consultant of any
> person, firm or corporation except for the benefit of the
> Company:
>
> (a)     solicit or accept business of the type offered by the
> Company during my term of employment with the
> Company, or perform or supervise the performance of any
> services related to such type of business, from or for

9

    (i)     clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or

    (ii)    any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

    (b)    solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

24.    The Confidentiality and Ownership Rights Agreement prohibits Karasaki, following termination of his employment with Marsh, from using or disclosing, to any person and for any purpose whatsoever, any of Marsh's confidential, proprietary or trade secret information. Indeed, the Confidentiality and Ownership Rights Agreement specifically provides, in relevant part:

1.    <u>Acknowledgment of Confidential Nature of Work</u>.

I understand and acknowledge that:

    (i)    the nature of the Company's work is highly confidential;

    (ii)    as an employee of the Company I learn or have access to highly confidential and sensitive information about the Company and its clients;

    (iii)    providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations; and

    (iv)    I may learn or assist in developing highly sensitive data or other information relating to the Company and its operations.

\* \* \*

2.      Definition of "Confidential Information."

a.      For the purposes of this Agreement, "Confidential Information" shall consist of and include:

(i)  any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, assets, liabilities, identity, risk characteristics, insurance policy terms, conditions and rates, finances, products, discoveries, databases, computer programs, frameworks, models, marketing, selling and operating practices and information concerning the markets with which its risks are placed;

(ii)  any and all information in whatever form relating to the Company, including but not limited to, information relating to the Company's business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, policy expiration dates and other financial or risk information about clients, arrangements with insurers and other financial institutions, products, discoveries, databases, computer programs, frameworks, models, methods, and marketing, selling, operating, recruiting, and compensation practices, and information in whatever form relating to the manner in which the Company conducts its business; and

(iii)  any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public or which is disclosed to me or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party.

3.      Nondisclosure of Confidential Information

During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company. After termination of my employment by the Company, I will not for any purpose

whatsoever use, or disclose to any person, Confidential Information.

25.     In addition, Karasaki agreed to similar non-solicitation restrictions with

Marsh on or about June 27, 2007.  Specifically, in order to accept grants of equity from

Marsh & McLennan Companies, Inc. which Karasaki ultimately received, Karasaki

entered into a Restrictive Covenants Agreement (the "Restrictive Covenants

Agreement"), which provides, in relevant part:

> Non-Solicitation Of Clients.  (a)  The Employee
> acknowledges and agrees that solely by reason of
> employment by the Company, the Employee has and will
> come into contact with a significant number of the
> Company's clients and prospective clients, as well as
> confidential information and trade secrets relating thereto.
> (b)  Consequently, the Employee covenants and agrees that
> in the event of separation from employment with the
> Company, whether such separation is voluntary or
> involuntary, the Employee will not, for a period of twelve
> (12) months following such separation, directly or
> indirectly:  (i) solicit clients of the Company for the
> purpose of selling or providing products or services of the
> type sold or provided by the Employee while employed by
> the Company; or (ii) induce clients or prospective clients of
> the Company to terminate, cancel, not renew, or not place
> business with the Company; or (iii) perform or supervise
> the performance of services or provision of products of the
> type sold or provided by the Employee while he or she was
> employed by the Company on behalf of any clients or
> prospective clients of the Company.  This restriction shall
> apply only to those clients or prospective clients of the
> Company with which the Employee had contact or about
> which the Employee obtained confidential information or
> trade secrets during the last two (2) years of his or her
> employment with the Company.
>
> Non-Solicitation of Employees.  The Employee
> acknowledges and agrees that solely as a result of
> employment with the Company, and in light of the broad
> responsibilities of such employment which include working
> with other employees of the Company, the Employee has
> and will come into contact with and acquire confidential
> information and trade secrets regarding the Company's

12

other employees. Accordingly, both during employment
with the Company and for a period of twelve (12) months
thereafter, the Employee shall not, either on the
Employee's own account or on behalf of any person,
company, corporation, or other entity, directly or indirectly,
solicit, or endeavor to cause any employee of the Company
with whom the Employee, during the last two (2) years of
his or her employment with the Company, came into
contact for the purpose of soliciting or servicing business or
about whom the Employee obtained confidential
information, to leave employment with the Company.

26.     Furthermore, in order to permit Marsh to determine Karasaki's compliance

with his contractual obligations to Marsh, each of the above-referenced contracts contains

express cooperation clauses which require Karasaki, from time to time and upon

reasonable request by Marsh, to provide Marsh with information relating to his work for

any subsequent employer (the "Cooperation Clauses"). Indeed, Karasaki's Non-

Solicitation Agreement, the Confidentiality and Ownership Rights Agreement, and the

Restrictive Covenants Agreement each provide, in relevant part:

Both during my [the Employee's] employment with the
Company and after termination thereof for any reason, I
[the Employee] agree[s] to provide the Company with such
information relating to my [his or her] work for the
Company or others, as the Company may from time to time
reasonably request in order to determine my [his or her]
compliance with this Agreement. (bracketed language
found in Restrictive Covenants Agreement)

**Karasaki's Resignation from Marsh to Join Aon**

27.     On Thursday, March 6, 2008, with no advance notice or discussion,

Karasaki informed the Head of Marsh's Western U.S. Operations (which includes

Hawaii), Gregg K. Carpenter, by telephone, that Karasaki was resigning from his position

at Marsh, effective in two weeks – i.e., on March 20, 2008. Karasaki informed Carpenter

that he had a job offer to become the Chairman and Chief Executive Officer of Aon Risk

13

Services, Inc. of Hawaii, and that he would be working for Aon immediately upon his resignation from Marsh.

28.    Aon Corporation is a world-wide insurance brokerage, and is a main competitor of Marsh. Aon's Hawaii office did not have a resident OCIP team, although Aon Corporation has various OCIP specialists in its mainland offices, and, according to an Aon press release announcing Karasaki's hiring, Karasaki was a "strategic hire" designed to give Aon's construction insurance business a presence in Hawaii. In fact, according to Aon's press release and other publicly available documents, and as later confirmed by Karasaki himself, Karasaki's role at Aon was to include serving as managing director of Aon's Construction Services Group, and as a member of the group's national operating board.

29.    During a meeting between Carpenter and Karasaki on Monday, March 10, 2008, Karasaki indicated that his decision to move to Aon was firm and final, and that he fully intended to compete with Marsh as the CEO and Chairman of Aon.

30.    Despite Karasaki's initial representation to Marsh that his resignation would not become effective until March 20, 2008, Karasaki left Marsh's premises on March 10, and never returned.

31.    Upon information and belief, and as reported in *The Pacific Business News*, Karasaki commenced employment with Aon on March 12, 2008.

**Karasaki's Employment with Aon and Breach of His Obligations to Marsh**

Solicitation of Employees

32.    Almost immediately after Karasaki commenced work at Aon, a substantial number of Marsh employees – all of whom were supervised or worked directly with

Karasaki at Marsh – began receiving solicitations from Aon to resign from Marsh and to commence employment with Aon.

33.    At the time Karasaki announced his resignation from Marsh, Marsh's Hawaii office had a total of approximately 36 employees – 11 of whom (including Karasaki) were brokerage professionals (including Office Head, Department Head, Client Executives, Client Advisors, Placement Specialist, Bond Manager and Senior Consultant). Since Karasaki's resignation from Aon, seven (7) of the remaining ten (10) brokerage professionals have been solicited by Aon to commence employment there, and four (4) of those ten (10) have, in fact, commenced employment with Aon. Several other employees from the Hawaii office have also been solicited by Aon to commence employment there.

34.    On or about March 17, 2008, Jeffrey Case resigned his employment at Marsh to join Aon's Hawaii office. Upon information and belief, Karasaki, directly or indirectly, solicited Case and/or caused him to leave Marsh.

35.    The next day, on or about March 18, 2008, two Marsh broking professionals were specifically told that Aon had a "list" of Marsh employees whose employment Aon planned to solicit. This list included, among others, Janet Ng, R.K. Beers, Stephanie Tsumoto and Mei Chi Ng, all of whom worked very closely with Karasaki during his employment at Marsh. That same day, two more Client Executives – Janet Ng and Francis Wirt – resigned their employment at Marsh to join Aon's Hawaii office. During their employment at Marsh, Janet Ng and Wirt both worked closely with Karasaki on many of the clients which he serviced, and conversely, Karasaki closely supervised Janet Ng and Wirt on the client accounts that they serviced on behalf of

15

Marsh. Furthermore, Janet Ng and Wirt performed services that were integral to, and that provided key support for, Marsh's OCIP and construction insurance practice, previously headed by Karasaki. On information and belief, Karasaki, directly or indirectly, solicited Janet Ng and Wirt and/or caused them to leave Marsh.

36.    On or about March 28, 2008, Kim resigned his employment at Marsh to accept a position with Aon. On information and belief, Karasaki, directly or indirectly, solicited Kim, provided assistance to Aon in the solicitation and/or caused him to leave Marsh.

37.    During a three-day period between March 31 and April 2, 2008, the following employees from Marsh's Hawaii office were contacted by Aon concerning employment opportunities at Aon: Kathy Dang, Stephanie Tsumoto, Mei Ci Ng and Evelyn Chao Shannon. These recruiting calls from Aon occurred on or after Karasaki's receipt of cease and desist letters from plaintiffs' counsel and the filing of the complaint in the Hawaii Action. While at Marsh, Karasaki worked directly with and/or supervised all of these employees each of whom worked in the same Marsh business unit as Karasaki. None of these Marsh employees had ever previously been recruited for employment by Aon. On information and belief, Karasaki, directly or indirectly, solicited these individuals and/or provided assistance to Aon in the solicitation of these individuals in an attempt to cause these individuals to accept competitive employment with Aon.

38.    Aon's solicitation of Marsh's employees is continuing and ongoing, and has not abated since Marsh sent cease and desist letters to Karasaki, or since Marsh filed the Hawaii Action. For example, after Evelyn Shannon declined Aon's initial offer of

employment, Aon continued vigorously to pursue her. On or about April 11, 2008, Shannon received an e-mail from Peter Nelson of Aon, which included a specific offer of salary and a sign-up bonus. In addition, on or about April 18, 2008, another Marsh employee, Marissa Mandado, received an offer of employment from Aon, and was specifically told – with respect to her salary at Aon – the "sky is the limit." Upon information and belief, Karasaki, directly or indirectly, participated in these solicitations and/or provided assistance to Aon in these solicitations.

> Solicitation of Clients / Acceptance of Business From Clients / Performance of Services for Clients / Supervising the Performance of Service for Clients

39.    Since Karasaki announced his resignation, Marsh has lost at least 19 clients to Aon, as Karasaki has laid siege to his former employer, and his efforts to pry many clients remain unabated. On or about March 21, 2008, two long-term clients of Marsh – Maryl Group, Inc. and Stanford Carr Development – transferred their business from Marsh to Aon's Hawaii office. Karasaki was the Client Executive on both Maryl Group and Stanford Carr, and thus, they were directly supervised by Karasaki during his employment with Marsh. On the day that these clients transferred their business to Aon, Helen Otani of Aon drafted an e-mail that attached the "Broker of Record Notices" – *i.e.*, the documents evidencing the client's transfer of account from Marsh to Aon – for each of these clients. Notably, Otani copied Karasaki, who was employed by Aon on that date, on this e-mail. As evidenced by this e-mail, and upon information and belief, Karasaki, directly or indirectly, either solicited and/or provided assistance to Aon in the solicitation of these clients to leave Marsh, or accepted business from these clients on behalf of Aon (or both).

40.    MNS, Inc. d/b/a ABC Stores ("MNS") was a substantial, long-standing

client of Marsh dating back to the 1980s. For years, up until the time of his resignation

from Marsh, Karasaki was entrusted by Marsh to act as the Client Executive in charge of

the MNS client relationship. On or about March 26, 2008, less than two-weeks after

Karasaki resigned from Marsh, MNS notified Marsh that it was transferring its business

to Aon. On that date, Riki Morimoto of MNS left the following voice mail message for

Deborah Park at Marsh:

> "Yea, hi Debbie this is Riki Morimoto, ABC Stores. I just wanted to, to
> let you know that we're going to switch, to Aon, *with Chad*, so we're
> sending out the letters today. I wanted to give you the heads up first, I'm
> not sure how this transition thing is going to work …. OK, thank you very
> much Debbie, bye, bye."

(emphasis added). As evidenced by Morimoto's voice mail, and upon information and

belief, Karasaki, directly or indirectly, solicited and/or accepted business from MNS on

behalf of Aon.

41.    Since MNS transferred its business to Aon, it is beyond question that

Karasaki has been directly servicing MNS in violation of both the Non-Solicitation

Agreement and the Restrictive Covenants Agreement. On or about April 4, 2008, a

claims review meeting was held by MNS concerning its workers' compensation

insurance policy. A claims review meeting is a meeting – attended by representatives of

the insurer, the broker and the client – during which the status of outstanding claims

under a policy are discussed. Representatives of the broker – such as Aon or Marsh –

attend claims review meetings in the routine course of servicing the client relationship.

Karasaki personally attended the April 4 claims review meeting for MNS on behalf of

Aon. By attending the April 4 claims review meeting on behalf of Aon, Karasaki

18

breached the Non-Solicitation Agreement and the Restrictive Covenants Agreement by performing or supervising the performance of insurance brokerage services for MNS on behalf of Aon.

42.    Queen's Health Systems ("Queen's Health") is a current Marsh client which was formerly serviced by Marcus Kim (prior to Kim's resignation from Marsh to join Aon), and by Karasaki, who directly supervised Kim. On or about April 10, 2008, Dave Kahaulelio of Queen's Health received an invitation from Kim, on Aon's behalf, to attend a hospitality event being hosted by Aon during a Risk and Insurance Management Society (RIMS) conference on April 29, 2008. This was the first time that Kahaulelio had ever been invited by Aon to attend such a hospitality event. Kim told Kahaulelio that both he and Karasaki would be available to personally meet with him at the hospitality event. On April 29, 2008, Kim and Karasaki did, in fact, meet with Kahaulelio at the hospitality event, which was held at a wine and cigar bar called "Churchill's. In this social setting, Karasaki ordered a bottle of wine for himself and Kahaulelio. The totality of these facts strongly suggests that Karasaki is directly soliciting, or attempting to solicit, Queen's Health's business on behalf of Aon.

43.    The ongoing departures of Marsh clients – all of whom were serviced directly or supervised by Karasaki – to Aon has continued unabated despite Marsh's cease and desist letters to Karasaki and despite the filing of the Hawaii Action. Upon information and belief, Karasaki, directly or indirectly, solicited these clients or accepted business from these clients on behalf of Aon, and/or is presently providing insurance brokerage services to these clients, on behalf of Aon, in direct violation of his Non-Solicitation Agreement and Restrictive Covenants Agreement.

19

Use or Disclosure of Confidential Information

44.     As set forth above, Karasaki had access to and received a wealth of Marsh's confidential, proprietary and trade secret information, including, but not limited to, information concerning Marsh's personnel and clients.

45.     Upon information and belief, Karasaki has repeatedly breached the Confidentiality and Ownership Rights Agreement by using and/or disclosing trade secret and confidential information – including sensitive information such as contract renewal dates and client survey results, as well as compensation and performance review information relating to current and former Marsh personnel – in carrying out the above-described, direct or indirect, client and employee solicitations (that violated his Non-Solicitation and Restrictive Covenants Agreement).

46.     Additionally, because the position that Karasaki holds at Aon – Marsh's direct competitor – is a senior executive position with responsibilities that are substantially similar to those responsibilities held by Karasaki during his employment with Marsh, Karasaki threatens to disclose and/or use Marsh's trade secrets, or has already done so, without the express or implied consent of Marsh, for his own benefit and the benefit of Aon.

47.     Prior to Karasaki's resignation from Marsh, Marsh had been prospecting certain accounts of AON – including Outrigger, TDFood Group and ResortQuest. The identity of Marsh's prospective clients, and Marsh's strategies for obtaining such clients, constitute Marsh's confidential, proprietary and trade secret information. Upon information and belief, Karasaki disclosed such information to Aon, thereby impairing Marsh's ability to acquire these accounts.

20

### Non-Compliance with the Cooperation Clauses

48.     As set forth above, Karasaki was required by the terms of the Cooperation Clauses contained in the Non-Solicitation Agreement, the Restrictive Covenants Agreement and the Confidentiality and Ownership Rights Agreement, to provide Marsh, upon reasonable request, with information sufficient to allow Marsh to determine whether Karasaki was complying with those agreements.

49.     By letter dated March 25, 2008, Hawaii counsel for Marsh, Andrew L. Pepper, requested, among other things, that Karasaki provide "written assurance from [him], in the form of a sworn affidavit, that [he] did not solicit any existing customers or prospective customers on behalf of Aon while [he was] employed by Marsh and/or since [his] separation from employment as an employee of Marsh and [his] subsequent employment by Aon." In accordance with the terms of Karasaki's contractual agreements with Marsh, Pepper further requested that Karasaki "completely disclose and immediately return all Marsh trade secrets and proprietary information in [his] possession or control."

50.     Rather than comply with the clear and express terms of the Cooperation Clauses by providing Marsh with sufficient information to ensure that Karasaki was, in fact, complying with his contractual obligations, Karasaki's counsel, Jeffrey S. Portnoy, provided only a vague and conclusory response that Karasaki would comply with "all of [his] legal obligations, including any existing duties not to destroy documents belonging to Marsh." Aside from this representation, Karasaki did not provide any information that would enable Marsh to make a reasonable determination concerning Karasaki's compliance with his contracts, nor did he return any documents or other information to

21

Marsh pertaining to his former employment. Most notably, Karasaki never denied servicing or soliciting Marsh's current, former or prospective clients, or soliciting or seeking to induce Marsh's employees to leave their employment.

## COUNT I
### (Breach of Non-Solicitation Agreement)

51.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 50 above.

52.    Upon information and belief, Karasaki has breached the terms of the Non-Solicitation Agreement by, among other things, directly and/or indirectly, as an officer of Aon and for his benefit and/or the benefit of Aon:

- soliciting or accepting business of the type offered by Marsh during his term of his employment with Marsh from or for:

    (i)    clients or prospects of Marsh or its affiliates who were solicited or serviced directly by Karasaki or where he supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; and/or

    (ii)    former clients of Marsh or its affiliates who were former clients within two (2) years prior to Karasaki's termination of employment with Marsh and who were solicited or serviced directly by him or where he supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients;

- performing or supervising the performance of services related to the type of business offered by Marsh during the term of his employment with Marsh for:

    (i)    clients or prospects of Marsh or its affiliates who were solicited or serviced directly by Karasaki or where Karasaki supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; and/or

22

(ii)    former clients of Marsh or its affiliates who were former clients within two (2) years prior to Karasaki's termination of employment with Marsh and who were solicited or serviced directly by him or where he supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; and

- soliciting one or more employees of Marsh who worked directly with Karasaki or in the same business unit as him to terminate their employment with Marsh for the purpose of competing with Marsh.

53.    Karasaki has further breached the terms of the Non-Solicitation Agreement by refusing, despite Marsh's repeated written demands, to identify and return all of Marsh's contractual, proprietary and trade secret information in his possession or control or to provide Marsh with such information relating to his work for Marsh or Aon as reasonably requested by Marsh in order to determine Karasaki's compliance or non-compliance with the Non-Solicitation Agreement.

54.    Marsh fully performed its obligations under the Non-Solicitation Agreement.

55.    As a direct and proximate result of Karasaki's breach of the Non-Solicitation Agreement, Marsh already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer further harm unless and until Karasaki is restrained from his current conduct and is compelled to abide by the terms of the Non-Solicitation Agreement.

56.    As a direct and proximate result of Karasaki's breach of the Non-Solicitation Agreement, Marsh already has suffered and will continue to suffer additional

23

damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## COUNT II
### (Breach of Restrictive Covenants Agreement)

57.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 56 above.

58.    Upon information and belief, Karasaki has breached the terms of the Restrictive Covenants Agreement by, among other things, directly and/or indirectly,

- soliciting clients of Marsh for the purpose of selling or providing products or services of the type sold or provided by Karasaki while employed by Marsh;

- inducing clients and/or prospective clients of Marsh to terminate, cancel, not renew, or not place business with Marsh;

- performing or supervising the performance of services or the provision of products, of the type sold or provided by Karasaki while he was employed by Marsh, on behalf of clients and/or prospective clients of Marsh with which Karasaki had contact or about which Karasaki obtained confidential information or trade secrets during the last two years of his employment with Marsh; and

- soliciting or otherwise endeavoring to cause employees of Marsh with whom Karasaki, during the last two years of his employment with Marsh, came into contact for the purpose of soliciting or servicing business or about whom Karasaki obtained confidential information, to leave employment with Marsh.

59.    Karasaki has further breached the terms of the Restrictive Covenants Agreement by refusing, despite Marsh's repeated written demands, to identify and return all of Marsh's contractual, proprietary and trade secret information in his possession or control or to provide Marsh with such information relating to his work for Marsh or Aon as reasonably requested by Marsh in order to determine Karasaki's compliance or non-compliance with the Restrictive Covenants Agreement.

24

60.    Marsh fully performed its obligations under the Restrictive Covenants Agreement.

61.    As a direct and proximate result of Karasaki's breach of the Restrictive Covenants Agreement, Marsh already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  Marsh will continue to suffer this harm unless and until Karasaki is restrained from his current conduct and is compelled to abide by the terms of the Restrictive Covenants Agreement.

62.    As a direct and proximate result of Karasaki's breach of the Restrictive Covenants Agreement, Marsh already has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

**COUNT III**
**(Breach of Confidentiality and Ownership Rights Agreement)**

63.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 62 above.

64.    Upon information and belief, Karasaki has breached the terms of the Confidentiality and Ownership Rights Agreement by using and/or disclosing during the period he was employed by Marsh "Confidential Information" (as defined in the Confidentiality and Ownership Rights Agreement) for a purpose other than carrying out his duties as a Marsh employee.

65.    Upon information and belief, Karasaki further breached the terms of the Confidentiality and Ownership Rights Agreement by using and/or disclosing,

"Confidential Information" (as defined in the Confidentiality and Ownership Rights Agreement) after the termination of his employment with Marsh.

66.     Karasaki has further breached the Confidentiality and Ownership Rights Agreement by refusing, despite Marsh's repeated written demands, identify and return all of Marsh's contractual, proprietary and trade secret information in his possession or control or to provide Marsh with such information relating to his work for Marsh or Aon as reasonably requested by Marsh in order to determine Karasaki's compliance or non-compliance with the Confidentiality and Ownership Rights Agreement.

67.     Marsh fully performed its obligations under the Confidentiality and Ownership Rights Agreement.

68.     As a direct and proximate result of Karasaki's breach of the Confidentiality and Ownership Rights Agreement, Marsh already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  Marsh will continue to suffer this harm unless and until Karasaki is restrained from his current conduct and is compelled to abide by the terms of the Confidentiality and Ownership Rights Agreement.

69.     As a direct and proximate result of Karasaki's breach of the Confidentiality and Ownership Rights Agreement, Marsh already has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## COUNT IV
### (Breach of Fiduciary Duty)

70.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 69 above.

71.    By virtue of Karasaki's position at Marsh, the special relationship of trust and confidence reposed by Marsh in him, and the access provided to him to Marsh's confidential, proprietary and trade secret information, Karasaki was required to act solely in Marsh's interest. Karasaki also had duties of loyalty and of utmost good faith to Marsh, and was obligated not to subvert or misappropriate Marsh's confidential and trade secret information or business opportunities.

72.    Upon information and belief, Karasaki breached his fiduciary duties owed to Marsh by, among other things, directly or indirectly soliciting and diverting Marsh's clients, opportunities and employees to Marsh's principal competitor, Aon, and by directly or indirectly disclosing and/or using Marsh's confidential, proprietary and trade secret information.

73.    As a direct and proximate result of Karasaki's breach of his fiduciary duties, Marsh already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer this harm unless and until Karasaki is restrained from taking further actions in breach of his fiduciary duties to Marsh.

74.    As a direct and proximate result of Karasaki's breach of fiduciary duties, Marsh already has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

27

75.    Karasaki committed his actions knowingly, willfully and in conscious disregard of Marsh's rights. Accordingly, Marsh is entitled to recover actual and exemplary damages in an amount to be determined at trial.

### COUNT V
### (Haw. Rev. Stat. § 482B -- Misappropriation of Trade Secrets)

76.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 75 above.

77.    As a result of his responsibilities and positions with Marsh, Karasaki developed, used, received and gained knowledge of Marsh's confidential, proprietary and trade secret information.

78.    Such confidential and proprietary information and trade secrets have independent economic value and were not generally known to or readily ascertainable by persons not employed by Marsh.

79.    Marsh has made and continues to make reasonable efforts to maintain the secrecy of this confidential and proprietary information and trade secrets.

80.    Because the position that Karasaki holds at Aon – Marsh's direct competitor – is a senior executive position with responsibilities that are substantially similar to those responsibilities held by Karasaki during his employment with Marsh, Karasaki threatens to disclose and/or use Marsh's trade secrets, or has already done so, without the express or implied consent of Marsh, for his own benefit and the benefit of Aon. Such a use constitutes a violation of Haw. Rev. Stat. § 482B, *et. seq.*

81.    As a direct and proximate result of the threatened and/or actual misappropriation of trade secrets and confidential and proprietary information by Karasaki, Marsh already has suffered and will continue to suffer extensive, irreparable

28

injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will suffer this harm unless and until Karasaki is restrained from his current and intended conduct.

82.    As a direct and proximate result of Karasaki's threatened and/or actual misappropriation of trade secrets and confidential and proprietary information, Marsh already has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial. Moreover, Karasaki's wrongful conduct entitles Marsh to punitive damages in amounts to be proven at trial.

## COUNT VI
### (Tortious Interference with Contractual Relationships with Employees)

83.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 82 above.

84.    Based on his prior employment at Marsh, Karasaki was aware of the existing employment relationships between Marsh and its employees in the Hawaii office, including but not limited to, Marcus Kim, Jeffrey Case, Francis Wirt, Janet Ng, Kathy Dang, Stephanie Tsumoto, Mei Chi Ng, R.K. Beers, Evelyn Shannon and Marissa Mandado.

85.    Upon information and belief, Karasaki, improperly and without privilege, has engaged and is continuing to engage in the enticement and solicitation of employees at Marsh, and has unlawfully interfered and intends to continue to interfere with Marsh's employment relationships with its employees by, among other things, soliciting employees in violation of the Non-Solicitation Agreement and Restrictive Covenants

29

Agreement, and by improperly using Marsh's confidential, proprietary and trade secret information in aid of such solicitations.

86.    The foregoing conduct was willful and intentional, and has already caused and will continue to cause serious damage to Marsh with respect to its employment relationships with its employees.

87.    As a direct and proximate result of the loss of numerous Marsh employees to Aon in such a concentrated period of time, Marsh already has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will suffer this harm unless and until Karasaki is restrained from his current and intended conduct.

88.    As a direct and proximate result of the loss of numerous Marsh employees to Aon in such a concentrated period of time, Marsh has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial. Moreover, Karasaki's wrongful conduct entitles Marsh to punitive damages in amounts to be proven at trial.

## COUNT VII
**(Tortious Interference with Existing and Prospective Business Relationships)**

89.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 88 above.

90.    As a result of his employment with Marsh, Karasaki was intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between Marsh and virtually all of its clients in the Hawaii office.

91.    Upon information and belief, Karasaki, directly or indirectly, intentionally and with malice, and without privilege or justification, interfered with Marsh's business relationships – causing such relationships to defect to Aon – using unfair or improper means, and/or with the intent to interfere with such relationships.

92.    As a direct and proximate result of the loss of business relationships to Aon, Marsh has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  Marsh will suffer this harm unless and until Karasaki is restrained from his current and intended conduct.

93.    As a direct and proximate result of the loss of business relationships to Aon, Marsh has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.  Moreover, Karasaki's wrongful conduct entitles Marsh to punitive damages in amounts to be proven at trial.

### COUNT VIII
### (Unfair Methods of Competition/Haw. Rev. Stat. § 480-2)

94.    Marsh realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 93 above.

95.    Under Haw. Rev. Stat. § 480-2(a), unfair methods of competition in the conduct of any trade, including but not limited to, the trade of insurance brokerage services, are unlawful.

96.    By breaching his contractual obligations and fiduciary duties to Marsh and by threatening to misappropriate Marsh's confidential and proprietary information,

Karasaki has acted in bad faith and has engaged, and is continuing to engage, in unfair competition against Marsh.

97.    Such actions constitute unfair and deceptive trade practices and unfair competition.

98.    Under Haw. Rev. Stat. § 480-13, Marsh is entitled to (1) treble its actual damages for Karasaki's unfair methods of competition; and (2) enjoin Karasaki's unfair methods of competition. Marsh is further entitled to collect reasonable attorney's fees and costs for seeking and obtaining an injunction against unfair methods of competition prohibited by Haw. Rev. Stat. § 480-2(a).

WHEREFORE, Marsh respectfully requests that the Court:

A.    Enter a preliminary injunction and permanent injunction that:

(i)    enjoins Karasaki and any person or entity acting in concert with him or under his supervision (including, but not limited to, any Aon employees over whom Karasaki has supervisory or managerial authority), for a period of not less than one (1) year from entry of the Court's order, from soliciting or accepting business from, or from performing or supervising the performance of any insurance brokerage services for, any current, former or prospective clients of Marsh with whom Karasaki had contact, or about which he obtained confidential information or trade secrets, during the last two years of his employment at Marsh;

(ii)    enjoins Karasaki and any person or entity acting in concert with him (including, but not limited to, his current employer, Aon, and any of its officers, employees or agents) from disclosing or misappropriating for his, her or Aon's own use or benefit, any of Marsh's trade secrets or other confidential or proprietary information in

32

violation of Karasaki's various contractual commitments and restrictions toward Plaintiff Marsh;

        (iii)    requires Karasaki to return to Marsh, within 24 hours, all property, documents, files, reports, and/or other materials that Karasaki has in his possession, custody, or control that were obtained from Marsh;

        (iv)    prohibits Karasaki from destroying or spoliating any documents of any kind, whether in written or electronic form, concerning Marsh and Aon's employment of Karasaki and/or the transfer or solicitation of Marsh's clients or employees from Marsh to Aon;

        (v)    enjoins Karasaki and any person or entity acting on behalf of or in concert with him (including but not limited to Aon and any of its officers, employees or agents), from soliciting, encouraging, or attempting to solicit or induce employees of Marsh to terminate their employment with Marsh and go to work for any other entity, including Aon; and

        (vi)    enjoins Karasaki and any person or entity acting on behalf of or in concert with him (including but not limited to Aon and any of its officers, employees or agents), from all actions in violation of Karasaki's various contractual commitments and restrictions in favor of Plaintiff Marsh;

        (vii)    enjoins Karasaki in all such other and further ways necessary to bring Karasaki into full and complete compliance and conformance with his contractual agreements with Marsh and to ensure no further violations of Haw. Rev. Stat. Chapter 482B;

(viii)    enjoins Karasaki pursuant to Haw. Rev. Stat. § 480-13 from further acts of unfair methods of competition, and for an award of reasonable attorneys' fees and costs related to obtaining such injunctive relief.

B.    Enter judgment awarding Marsh direct and consequential damages in an amount to be determined at trial, to compensate Marsh for the losses it suffered by reason of Karasaki's breaches of the Non-Solicitation Agreement, Restrictive Covenants Agreement and the Confidentiality and Ownership Rights Agreement, his actual or threatened misappropriation or disclosure of confidential, proprietary or trade secret information, and his breaches of his fiduciary duties and his wrongful interference with Marsh's employment and existing prospective client relationships.

C.    Enter judgment awarding Marsh general and special compensatory damages in an amount to be determined at trial and an award of treble damages, in an amount to be determined at trial, for Karasaki's unfair methods of competition, in violation of Haw. Rev. Stat. § 480-2(a) and pursuant to Haw. Rev. Stat. § 480-13;

D.    Enter judgment awarding Marsh its reasonable costs and attorney's fees incurred by Marsh in connection with this litigation;

E.    Grant to Marsh such other and further relief as the Court deems just and appropriate.

34

DATED this 2nd day of May, 2008.

Gary D. Friedman, Esq. (GF 6175)
David R. Fertig, Esq. (DF 5068)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
gary.friedman@weil.com
david.fertis@weil.com

Nenad Krek, Esq. (NK6300)
CARLSMITH BALL LLP
American Savings Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
(808) 523-2533 (v)
(808) 523-0842 (f)
nk@carlsmith.com

Attorneys for Plaintiffs
MARSH USA INC. and MARSH &
MCLENNAN COMPANIES, INC.