UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH USA INC. and MARSH &
MCLENNAN COMPANIES, INC.

        Plaintiffs,

    v.

CHAD W. KARASAKI

        Defendant.

Case No. 08 Civ. 4195 (JGK)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

CARLSMITH BALL LLP
American Savings Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
(808) 523-2533 (v)
(808) 523-0842 (f)

Attorneys for Plaintiffs
MARSH USA, INC. and MARSH &
MCLENNAN COMPANIES, INC.

NY1:\1554710\07\XBM#07!.DOC\61804.0003

## TABLE OF AUTHORITIES

**Cases**

*7's Enters., Inc. v. Del Rosario,*
  143 P.3d 23, (Hawaii 2006) ..................................................................................39

*Am. Broadcasting Cos. v. Wolf,*
  420 N.E.2d 363, (N.Y. 1981) ................................................................................26

*BDO Siedman v. Hirshberg,*
  712 N.E.2d 1220, (N.Y. 1999) ....................................................................26, 27, 31

*Business Intelligence Services, Inc. v. Hudson,*
  580 F. Supp. 1068, (S.D.N.Y. 1984) .......................................................................31

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273, (2d Cir. 1985) .................................................................................38

*Crown It Servs., Inc. v. Koyal-Olsen,*
  782 N.Y.S.2d 708, (1st Dep't 2004) .......................................................................31

*Estee Lauder Companies Inc. v. Batra,*
  430 F. Supp. 2d 158, (S.D.N.Y. 2006)....................25, 27, 29, 33, 38, 39, 40, 41, 42

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
  730 F.2d 61, (2d Cir. 1984) ..................................................................................40

*Global Switching v. Kasper,*
  2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006) .............................................39

*Green Party v. New York State Bd. of Election,*
  389 F.3d 411, (2d Cir. 2004)................................................................................25

*Gundermann & Gundermann Ins. v. Brassill,*
  46 A.D.3d 615 (2d Dep't 2007) .............................................................................39

*Hawaii ex rel. Anzai v. Gannett Pacific Corp.,*
  99 F. Supp. 2d 1241, (D. Hawaii 1999) .................................................................25

*JSG Trading Corp. v. TrayWrap, Inc.,*
  917 F.2d 75, (2d Cir. 1990)..................................................................................39

*Lumex, Inc. v. Highsmith,*
  919 F. Supp. 624, (E.D.N.Y. 1996) ...........................................................30, 38, 39, 40

*Malcolm Pirnie, Inc. v. Werthman,*
  280 A.D.2d 934, (4th Dep't 2001) .........................................................................31

## TABLE OF AUTHORITIES

*Mallory Factor, Inc. v. Werthman,*
   146 A.D.2d 465, (1st Dep't. 1989) .................................................................................31

*Merrill Lynch, Pierce, Fenner & Smith v. McClafferty,*
   287 F. Supp. 2d 1244, (D. Haw. 2003) ................................................................33, 39, 42

*North Atlantic Instruments, Inc. v. Haber,*
   188 F.3d 38, (2d Cir. 1999)...............................................................................29, 41

*PepsiCo, Inc. v. Redmond,*
   54 F.3d 1262, (7th Cir. 1995) .......................................................................35, 37, 38

*Silipos, Inc. v. Bickel,*
   2006 WL 2265055, *3 (S.D.N.Y. Aug. 8, 2006)....................................................26, 27, 31

*Ticor Title Ins. Co. v. Cohen,*
   173 F.3d 63, (2d Cir. 1999)...............................................................................27, 41

*UARCO Inc. v. LAM,*
   18 F. Supp. 2d 1116, (D. Hawaii 1998) ..............................................................25, 39

*Verizon Communications, Inc. v. Pizzirani,*
   462 F. Supp. 2d 648, (ED. Pa. 2006))..................................................................33, 42

*Willis of New York, Inc. v. DeFelice,*
   299 A.D.2d 240, (1st Dep't 2002) .....................................................................31

## OTHER AUTHORITIES

Haw. Rev. Stat. § 480-13 .................................................................................44

Haw. Rev. Stat. § 482B...................................................................................43

Haw. Rev. Stat. § 482B-2 .............................................................................36, 37

Haw. Rev. Stat. § 482B-3 ...............................................................................36

Restatement of Torts § 757, comment b (1939) .......................................................29

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS................................................................... 6

    A.    Karasaki's Employment with Marsh ........................................ 6

    B.    Karasaki's Access to Marsh's Confidential, Proprietary and Trade
        Secret Information ................................................................ 7

    C.    Karasaki's Non-Solicitation Agreement, Restrictive Covenants
        Agreement And Confidentiality And Ownership Rights Agreement ...... 10

    D.    Karasaki's Resignation From Marsh To Accept Employment At
        Aon And His Actual Or Threatened Use And/Or Disclosure Of
        Marsh's Confidential And Proprietary Information and Trade
        Secrets ................................................................................ 15

    E.    Karasaki's Direct And/Or Indirect Solicitation Of Marsh
        Employees In Breach Of The Non-Solicitation And Restrictive
        Covenants Agreements ........................................................ 18

    F.    Karasaki's Direct And/Or Indirect Solicitation And Acceptance Of,
        And His Servicing And/Or Supervision Of, Marsh Clients In
        Breach Of The Non-Solicitation And Restrictive Covenants
        Agreements ........................................................................ 20

    G.    Marsh's Efforts to Abate Karasaki's Breaches ........................ 22

    H.    Karasaki's Ongoing Violations............................................. 23

ARGUMENT................................................................................. 25

MARSH IS ENTITLED TO A PRELIMINARY INJUNCTION
RESTRAINING KARASAKI, AND ALL THOSE ACTING FOR OR IN
CONCERT WITH HIM, FROM VIOLATING HIS CONTRACTUAL AND
OTHER OBLIGATIONS TOWARD MARSH. ........................................ 25

    I.    The Standard for Obtaining a Preliminary Injunction ............... 25

    II.    Marsh Is Extremely Likely to Prevail On The Merits Of Its Claims
        For Breach Of The Non-Solicitation Agreement, the Restrictive
        Covenants Agreement, And The Confidentiality And Ownership
        Rights Agreement. ............................................................... 23

A.   The Agreements Are Valid And Enforceable .............................. 26

    1.   The Restrictive Covenants Are Necessary to Protect
        Marsh's Legitimate Interests ........................................... 27

        a.   The Agreements Are Necessary To Protect
            Marsh's Client Base ............................................. 27

        b.   The Agreements Are Necessary To Protect
            Marsh's Trade Secrets And Confidential
            Customer Information ......................................... 29

    2.   The Agreements Are Reasonable In Time And
        Geographic Scope ......................................................... 31

    3.   The Agreements Do Not Unduly Burden Karasaki ........ 32

    4.   The Agreements Do Not Harm the General Public ........ 33

B.   Karasaki Has Breached The Agreements ..................................... 33

    1.   Karasaki Has Solicited, Serviced And Supervised
        Marsh Clients, And Solicited Marsh Employees, In
        Violation Of The Non-Solicitation Agreement and
        The Restrictive Covenants Agreement ........................... 33

    2.   Karasaki Has Used And/Or Disclosed, And
        Threatens To Use And/Or Disclose, Marsh's
        Confidential, Proprietary And Trade Secret
        Information In Violation Of The Confidentiality
        And Ownership Rights Agreement .................................. 35

    3.   Karasaki Has Violated The Cooperation Clauses In
        Each Of The Agreements ............................................... 36

C.   Marsh Is Entitled To An Injunction Under The Hawaii
    Trade Secrets Act ...................................................................... 36

III.   Marsh Will Suffer Irreparable Injury If Interim Injunctive Relief is
      Not Granted .................................................................................... 38

IV.   A Balancing of the Hardship Weighs Heavily In Favor of
      Injunctive Relief ............................................................................. 41

CONCLUSION .......................................................................................... 42

Plaintiffs Marsh USA Inc. and Marsh & McLennan Companies, Inc. (collectively, "Marsh" or "Plaintiffs"), by and through their undersigned attorneys, respectfully submit this memorandum in support of their motion for a preliminary injunction restraining Defendant Chad W. Karasaki ("Karasaki"), and anyone acting in concert with him, under his supervision or on his behalf, from, among other things, violating the terms of certain non-solicitation, restrictive covenant and confidentiality agreements that Karasaki entered into with Marsh, and misappropriating Marsh's trade secrets in violation of applicable statutory law, as more fully described below.

## PRELIMINARY STATEMENT

Through this action, Marsh seeks to enjoin Karasaki, a former senior-level Marsh executive, from knowingly violating his express contractual commitments, and his fiduciary, statutory and common law obligations to Marsh, for the purpose of unfairly competing with Marsh, on behalf of Marsh's direct competitor, in the insurance brokerage business.

Marsh employed Karasaki for 22 years – most recently as Managing Director and Head of Marsh's Hawaii office. By virtue of his many years of employment with Marsh, his position and responsibilities as the Head of Marsh's Hawaii office, and his service as one of a select handful of individuals who participated in the creation, development, and implementation of the historical and current marketing and business development plans for Marsh's Hawaiian operations, Karasaki was entrusted with – and otherwise gained unique access to – a wealth of Marsh's confidential, proprietary and trade secret information. Indeed, in addition to intimate knowledge of Marsh's unique practices, methodologies and "back room" operations – including with respect to several highly-specialized areas of insurance in which Marsh has long distinguished itself from its competition – Karasaki had unusual access to, and peculiar

knowledge of, such highly confidential and competitively sensitive information as: (i) the
revenues, cost-structures and profitability of Marsh's Hawaiian operations; (ii) its current and
future marketing and business development plans (including the identity of Marsh's current and
potential "target" clients); and (iii) all details concerning Marsh's Hawaiian clients and their
accounts, including, for example, the nature, cost and structure of such clients' insurance
programs, the expiration and renewal dates thereof, client satisfaction with Marsh (as evidenced
by, among other things, the results of confidential, annual client surveys conducted by Marsh),
and those accounts that Marsh considered to be "at risk" and vulnerable to competition, as well
as the reasons therefor. In addition, Karasaki was one of a select few Marsh executives who had
access to the personnel files of each and every employee in Marsh's Hawaii office, and the
competitively sensitive information contained therein including, for example: (i) employee
compensation and benefit information; (ii) employee performance reviews; (iii) employees'
eligibility for, and receipt or non-receipt of, promotions and stock options; and (iv) employee
satisfaction or dissatisfaction with Marsh, and the reasons therefor.

In acknowledgment that he had been granted uncommon access to Marsh's
confidential information and sensitive trade secrets, and in exchange for valuable stock options
and more than $410,000.00 in cash bonus payments which he received between February 2004
and February 2008, Karasaki entered into three separate agreements with Marsh – a non-
solicitation agreement, a restrictive covenants agreement, and a confidentiality and ownership
rights agreement – pursuant to which Karasaki promised not to use or disclose any of Marsh's
trade secrets or other confidential and proprietary information, and to refrain from soliciting,
interfering with, or servicing Marsh clients and employees, for a reasonable period of time
following any termination of his employment with Marsh. Nevertheless, and notwithstanding his

2

contractual commitments and legal obligations to Marsh, Karasaki abruptly resigned from Marsh in March 2008, and announced that he had accepted a position as Chairman and Chief Executive Officer of Aon Risk Services, Inc. of Hawaii ("Aon"), Marsh's direct competitor in Hawaii.

By virtue of its directly competitive nature and its attendant responsibilities, Karasaki's new position as head of Aon and its Hawaiian operations *in and of itself* threatens the unlawful use and/or disclosure of Marsh's trade secret and other confidential and proprietary information, *even if* Karasaki has not already used and disclosed such information in violation of his obligations to Marsh. But since his resignation, Karasaki *has in fact used and disclosed* such information – among other things, in furtherance of a brazen, orchestrated, and unlawful campaign to solicit Marsh clients and employees to terminate their relationships with Marsh in favor of Aon. Karasaki has thus breached not only his confidentiality agreement with Marsh, but his non-solicitation and restrictive covenants agreement with Marsh as well. Moreover, since resigning from Marsh, Karasaki has proceeded to supervise – and in many cases *personally service* – the former Marsh clients and employees that he has successfully solicited. This conduct constitutes an independent and yet another clear and blatant violation of both Karasaki's non-solicitation agreement and his restrictive covenants agreement.

To date, Karasaki's unlawful solicitations and other conduct have been successful in causing at least four (4) former Marsh executives, and at least nineteen (19) former Marsh clients, to leave Marsh and to defect to Aon. Marsh has thus already suffered extensive, irreparable injury, loss of goodwill and its customer base, and other injury and damages for which there is no adequate remedy at law. Undeterred by Marsh's repeated demands that he cease and desist from his unlawful behavior – including by the prior filing of this action in the federal court in Hawaii – Karasaki continues to misappropriate Marsh's confidential and trade

3

secret information, and to wrongfully solicit Marsh's employees and current and prospective clients, even as of the filing of this action. Accordingly, Marsh stands to suffer even further irreparable injury and harm to its business for which there is no adequate remedy at law, and an injunction restraining Karasaki from further breaching his contractual and legal obligations to Marsh is both necessary and appropriate.

Consequently, Marsh respectfully requests that the Court issue a preliminary injunction that:

(i)    enjoins Karasaki and any person or entity acting in concert with him or under his supervision (including, but not limited to, any Aon employees over whom Karasaki has supervisory or managerial authority), for a period of not less than one (1) year from entry of the Court's order, from soliciting or accepting business from, or from performing or supervising the performance of any insurance brokerage services for, any current, former or prospective clients of Marsh with whom Karasaki had contact, or about which he obtained confidential information or trade secrets, during the last two years of his employment at Marsh;

(ii)   enjoins Karasaki and any person or entity acting in concert with him (including, but not limited to, his current employer, Aon, and any of its officers, employees or agents) from disclosing or misappropriating for his, her or Aon's own use or benefit, any of Marsh's trade secrets or other confidential or proprietary information in violation of Karasaki's various contractual commitments and restrictions toward Plaintiff Marsh;

(iii)  requires Karasaki to return to Marsh, within 24 hours, all property, documents, files, reports, and/or other materials that Karasaki has in his possession, custody, or control that were obtained from Marsh;

(iv)   prohibits Karasaki from destroying or spoliating any documents of any

4

kind, whether in written or electronic form, concerning Marsh and Aon's employment of Karasaki and/or the transfer or solicitation of Marsh's clients or employees from Marsh to Aon;

(v)    enjoins Karasaki and any person or entity acting on behalf of or in concert with him (including but not limited to Aon and any of its officers, employees or agents), from soliciting, encouraging, or attempting to solicit or induce employees of Marsh to terminate their employment with Marsh and go to work for any other entity, including Aon; and

(vi)    enjoins Karasaki and any person or entity acting on behalf of or in concert with him (including but not limited to Aon and any of its officers, employees or agents), from all actions in violation of Karasaki's various contractual commitments and restrictions in favor of Plaintiff Marsh;

(vii)    enjoins Karasaki in all such other and further ways necessary to bring Karasaki into full and complete compliance and conformance with his contractual agreements with Marsh and to ensure no further violations of Haw. Rev. Stat. Chapter 482B;

(viii)    enjoins Karasaki pursuant to Haw. Rev. Stat. § 480-13 from further acts of unfair methods of competition, and for an award of reasonable attorneys' fees and costs related to obtaining such injunctive relief.

5

## STATEMENT OF FACTS

### A.    Karasaki's Employment with Marsh

Marsh is a leading insurance broker. (Carpenter Decl. ¶ 2).[1]  Karasaki is an
insurance broker whose work includes, among other things, placing insurance requested by
customers with insurers upon the best terms available, advising customers about structuring their
insurance coverage, managing customers' insurance programs, and assisting customers with
negotiating settlement of insurance claims. (*Id.* ¶ 7).  Karasaki originally commenced
employment with Marsh in its Portland, Oregon office in 1986. (*Id.* ¶ 6).  In 1990, however,
Karasaki transferred to Marsh's Hawaii office, where he worked as a Client Executive, servicing
and supervising client relationships on behalf of Marsh. (*Id.* ¶6).

In February 1999, Mason Williams was also transferred to Hawaii from San
Diego, California to became the Head of Marsh's Hawaii office. ("Williams Decl." ¶ 4).
Williams recognized that, in order to succeed in the long term, Marsh's Hawaii office needed to
be led by someone from Hawaii. (*Id.* ¶ 5).  Williams identified Karasaki as having the potential
to be the Head of the office. (*Id.* ¶ 6).  Accordingly, Williams included Karasaki in the
management team that assisted him in developing a marketing plan to expand Marsh's business
in Hawaii. (*Id.* ¶¶ 6, 7).

Marsh had a strong reputation in Hawaii as being a leader in the area of
construction insurance, (*id.* ¶ 8, Sansone Decl. ¶ 8), and during his employment with Marsh,
Karasaki focused primarily, although not exclusively, on construction and hospitality insurance.

---

[1] References to "_____ Decl." refer to the accompanying Declarations of Ronald K. Beers, Kathy Dang, Christopher
Davis, Janet Mei Chi Ng, Marissa Mandado, Deborah L. Park, Rocco Sansone, Evelyn Shannon, Stephanie
Tsumoto, and Lea S. Uehara, submitted by Marsh herewith. Moreover, the following declarations are attached to
the Declaration of Kenneth P. Gavsie at the indicated tabs: Erika L. Lewis (Tab 1); Cynthia Ramirez Roland (Tab
2); Andrew L. Pepper (Tab 3); Gregory Wolter (Tab 4); Michael Kelly (Tab 5); Gregg Carpenter (Tab 6); and
Mason Williams (Tab 6).

6

(Williams Decl. ¶ 9; Carpenter Decl. ¶ 12; Kelly Decl. ¶ 8).  Over the years of his employment

with Marsh, and as a result of his exposure to its industry-leading construction insurance

practice, methodologies and relationships, Karasaki, on behalf of Marsh and with its financial

and other support, developed extensive knowledge and in these areas, including in the areas of

structuring and servicing highly-specialized construction insurance products known as Owner

Controlled Insurance Programs ("OCIPs"), insurance programs wherein the developer of a real

estate project purchases the insurance for the entire project, covering all contractors and

subcontractors.  (Williams Decl. ¶ 9).

     Ultimately, in an effort to capitalize on Marsh's recognized strengths and

competitive edge in Hawaii in the area of construction insurance, construction insurance was

made one of the key focuses of the business plan for Marsh's Hawaii office.  (Williams Decl. ¶

8).  This business plan was successful, and as a result of Marsh's focused efforts in the area of

construction insurance, Marsh acquired a number of clients, including Maryl Group, Inc. (whose

relationship was serviced and supervised by Karasaki) and a number of OCIPs.  (*Id.* ¶ 10).

     In November 2004, upon Williams' recommendation, Karasaki was promoted to

Managing Director within Marsh's Hawaii office.  (*Id.* ¶ 11).  And ultimately, when Williams

retired from Marsh in April 2005, Karasaki was, upon Williams' recommendation, appointed as

Head of Marsh's Hawaii office.  (*Id.* ¶ 12).

   **B.**   **Karasaki's Access to Marsh's Confidential,**
             **Proprietary and Trade Secret Information**

     In his capacity as Head of Marsh's Hawaii office, Karasaki enjoyed unique and

unfettered access to an abundance of Marsh's highly confidential, proprietary and trade secret

information.  For example, as Head of the Office, Karasaki was privy to corporate information

about Marsh and its Hawaii operations that was available only to a select few, senior-executive

level Marsh employees, including, without limitation, information about: Marsh's current and
historical revenues; its cost structure; its profitability; and its historical, current, and future
marketing and business development plans and strategies, including, for example, information
about areas of concentration and prospective and/or "target" clients, and the strategies Marsh
would implement in an effort to develop particular business and/or clients. (Sansone Decl. ¶ 6;
Carpenter Decl. ¶ 10). Indeed, as noted above, Karasaki was one of only a handful of individuals
who were part of the management team that personally developed, and implemented highly
successful marketing and business development plans of Marsh's Hawaii office. (Sansone Decl.
¶ 6; Carpenter Decl. ¶ 11).[2]

      Similarly, as Head of Marsh's Hawaii office, Karasaki enjoyed unique access to a
wealth of confidential, proprietary and competitively sensitive information regarding Marsh's
employees. Among other things, as Head of the Office, Karasaki had oversight over, and
managerial and supervisory responsibility for, all of the employees in the Hawaii office, each of
whom reported, directly or indirectly, to him. (Sansone Decl. ¶ 7). In addition, Karasaki was
responsible for conducting employee performance reviews for, and played a key role in
determining the compensation of, all personnel in the Hawaii office. (Id). Accordingly, as Head
of the Office, he was one of a select few individuals at Marsh who was given access to the
personnel files of each and every employee in the Hawaii office. (Id). By virtue of such access,
and by virtue of the duties described above, he had access to such confidential, proprietary and
competitively sensitive information as: employee compensation (e.g., salary and bonus

---

[2] Notably, Marsh supported Karasaki's marketing efforts by, among other things, sponsoring community, charity, industry, and entertainment events that were designed to, and did, promote Marsh and Karasaki. (Carpenter Decl. ¶ 11). For example, Marsh provided Karasaki with a charity budget of over $122,000.00 in 2006 and over $91,000.00 in 2007, and sponsored such high-profile events as the Sony Open and the PGA Grand Slam of Golf, which Karasaki personally attended. (Uehara Decl. ¶ 3). Marsh also provided Karasaki with a generous travel and entertainment expense account, which totaled over $34,000.00 last year. (Id. ¶ 4).

information); employee benefit information, including the impact to individual employees of any planned changes to Marsh's benefits policies; eligibility for stock options and other restricted grants; eligibility for, and historical and likely future receipt or deferral of, intra-office promotions; employee performance reviews and score cards; the expertise, talents, strengths and weaknesses of individual employees; and information concerning each employee's level of satisfaction or dissatisfaction with his or her employment at Marsh, and the particular reasons therefor. (*Id*).

Furthermore, as Head of the Hawaii office, Karasaki supervised, directly or indirectly, virtually all client relationships with Marsh's Hawaii office, and had – and was entrusted with – access to all information about each of Marsh's accounts in Hawaii, as well as Marsh's Hawaii clients who are, or were, serviced in Marsh's other offices on the mainland and globally. (*Id*. ¶ 5; Carpenter Decl. ¶ 9). This information included, by way of example but without limitation: all details of such clients' insurance programs and submissions, including (but not limited to) the expiration and renewal dates of their current insurance programs and policies; details concerning available markets, market contacts, and the cost of each such clients' insurance programs; each such clients' current and historical revenues, loss exposure data, and insurance premiums; details concerning prior bargaining and claims settlement negotiations and experiences that each such client had with historical insurers, and each client's level of satisfaction or displeasure with particular individual or groups of carriers; the fee structure (*i.e.*, fee or commission) utilized by Marsh with each such client and the amount of income that Marsh derived therefrom; contact details and personal information concerning the key representatives from each of the clients; each client's level of satisfaction with Marsh, including as described in clients' responses to confidential annual client surveys conducted by Marsh; and what accounts

9

are considered "at risk" by Marsh (*i.e.*, what accounts may be vulnerable to competition) and the reasons therefor. (Sansone Decl. ¶ 5).

And finally, as Head of Marsh's Hawaii office and a leader of Marsh's construction insurance practice group, Karasaki had intimate knowledge of, and unique insights into, Marsh's highly-developed practices, methodologies, and "back-room" operations relating to the structuring, placement, and servicing of OCIPs, areas in which Marsh has long been viewed as the industry leader and held a carefully cultivated competitive edge over its competitors in Hawaii, including Aon. (Sansone Decl. ¶ 12).

All of the above information was maintained and treated by Marsh as strictly confidential and proprietary and, as such, constitutes Marsh's trade secrets. Indeed, such information is available only to a limited number of senior-level Marsh employees, and certainly not to any of Marsh's competitors. As former Head of the Hawaii office, however, Karasaki had unfettered access to and routinely relied upon such information, including at the time of his resignation from Marsh in March of 2008. (*Id.* ¶¶ 5-8).

C.   **Karasaki's Non-Solicitation Agreement, Restrictive Covenants Agreement And Confidentiality And Ownership Rights Agreement**

On or about November 25, 2003, in exchange for the right to receive substantial monetary benefits under Marsh's Discretionary Bonus Plan – benefits which he did in fact receive[3] – Karasaki entered into two agreements with Marsh: the Marsh USA Inc. Non-Solicitation Agreement for Participants in the Discretionary Bonus Plan (the "Non-Solicitation Agreement") and the Marsh USA Inc. Confidentiality and Ownership Rights Agreement (the

---

[3] Between February 2004 and February 2008, in addition to his annual salary (the most recent of which was equal to $245,000.00), and in addition to various stock units that were granted to him (including as recently as February 28, 2008), Karasaki received cash bonuses from Marsh, exclusive of other non-cash and deferred bonuses, totaling $410,375.00. (Roland Decl. ¶¶ 4-6).

"Confidentiality and Ownership Rights Agreement").

The Non-Solicitation Agreement expressly prohibits Karasaki, for a period of one (1) year following termination of his employment with Marsh, from, among other things, soliciting, servicing or otherwise interfering with current, former, or prospective clients of Marsh, and from soliciting or otherwise seeking to induce Marsh employees to leave their employment with Marsh for the purpose of competing with Marsh. Specifically, the Non-Solicitation Agreement provides, in relevant part:

> I understand and acknowledge that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I agree that if my employment with the Company terminates for any reason, I will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:
>
> (a)     solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for
>
> (i)     clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or
>
> (ii)     any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or
>
> (b)     solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

(Roland Decl., Ex. B, ¶ 1).

11

The Confidentiality And Ownership Rights Agreement, in turn, prohibited Karasaki, both during and following the termination of his employment with Marsh, from using or disclosing, to any person and for any reason other than for purposes of carrying out his duties for and on behalf of Marsh, any of Marsh's confidential, proprietary or trade secret information. Specifically, the Confidentiality and Ownership Rights Agreement expressly provides, in relevant part:

> I understand and acknowledge that:
>
> (i)    the nature of the Company's work is highly confidential;
>
> (ii)    as an employee of the Company I learn or have access to highly confidential and sensitive information about the Company and its clients;
>
> (iii)    providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations; and
>
> (iv)    I may learn or assist in developing highly sensitive data or other information relating to the Company and its operations.
>
> During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company. After termination of my employment by the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information.

(Roland Decl. ¶ 7 & Ex. C, ¶¶ 1, 3).[4]

---

[4] The Confidentiality and Ownership Rights Agreement defines "Confidential Information" as:

> (i) any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, assets, liabilities, identity, risk characteristics, insurance policy terms, conditions and rates, finances, products, discoveries, databases, computer programs, frameworks, models, marketing, selling and operating practices and information concerning the markets with which its risks are placed;
>
> (ii) any and all information in whatever form relating to the Company, including but not limited

Subsequently, on or about June 27, 2007, Karasaki entered into another agreement with Marsh pursuant to which he agreed to be bound by non-solicitation restrictions similar to those contained in his 2003 Non-Solicitation Agreement. Specifically, in order to become eligible for grants of stock options from Marsh – which grants he did in fact receive[5] – Karasaki executed a Restrictive Covenants Agreement with Marsh (the "Restrictive Covenants Agreement"), which provides, in relevant part:

> Non-Solicitation Of Clients. (a) The Employee acknowledges and agrees that solely by reason of employment by the Company, the Employee has and will come into contact with a significant number of the Company's clients and prospective clients, as well as confidential information and trade secrets relating thereto. (b) Consequently, the Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, the Employee will not, for a period of twelve (12) months following such separation, directly or indirectly: (i) solicit clients of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company. This restriction shall apply only to those clients or prospective clients of the Company with which the Employee had contact or about which

---

to, information relating to the Company's business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, policy expiration dates and other financial or risk information about clients, arrangements with insurers and other financial institutions, products, discoveries, databases, computer programs, frameworks, models, methods, and marketing, selling, operating, recruiting, and compensation practices, and information in whatever form relating to the manner in which the Company conducts its business; and

(iii) any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public or which is disclosed to me or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party.

[5] *See* n. 3, *supra.*

the Employee obtained confidential information or trade secrets during the last two (2) years of his or her employment with the Company.

Non-Solicitation of Employees. The Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, the Employee has and will come into contact with and acquire confidential information and trade secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained confidential information, to leave employment with the Company.

(Wolter Decl., Ex. A at ¶¶ 2-3).

Notably, in addition to containing the above-excerpted provisions, each of the

Non-Solicitation Agreement, the Confidentiality and Ownership Rights Agreement and the

Restrictive Covenants Agreement contains express cooperation clauses that require Karasaki to

provide Marsh with such information as it may, from time to time, reasonably request in order to

permit Marsh to determine Karasaki's compliance with his contractual obligations. Indeed, each

of the agreements executed by Karasaki specifically provide, in relevant part, that:

Both during my [the Employee's] employment with the Company and after termination thereof for any reason, I [the Employee] agree[s] to provide the Company with such information relating to my [his or her] work for the Company or others, as the Company may from time to time reasonably request in order to determine my [his or her] compliance with this Agreement. (bracketed language found in Restrictive Covenants Agreement)

(Wolter Decl., Ex. A ¶ 16; Roland Decl., Ex. B ¶ 2(a), Ex. C ¶ 6(a)) (collectively, the

"Cooperation Clauses").

In addition, each of Karasaki's agreements with Marsh contain express provisions in which Karasaki recognized and acknowledged the irreparable harm that his non-compliance with those agreements would cause Marsh, and in which Karasaki accordingly agreed that, in the event of his breach, Marsh should be entitled to temporary and permanent injunctive relief (without the need for posting a bond), as well as specific performance, in addition to any other available legal remedies and damages:

> In recognition of the fact that irreparable injury will result to the Company in the event of a breach [ ] of [my] obligations under [...] this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, [I] acknowledge[ ], consent[ ] and agree[ ] that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by [me] and persons acting for or in connection with [me] and (b) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement.

(Wolter Decl., Ex. A ¶ 7; Roland Decl., Ex. B ¶ 2(c) & Ex. C ¶ 6(c)).

**D.    Karasaki's Resignation From Marsh To Accept Employment At Aon And His Actual Or Threatened Use And/Or Disclosure Of Marsh's Confidential And Proprietary Information And Trade Secrets**

On March 6, 2008, Karasaki notified Gregg K. Carpenter, the head of Marsh's Western U.S. operations (which includes Hawaii), and Michael Kelly, the Leader of Marsh's Bay Partnership (which is comprised of Marsh's San Francisco, San Jose, Denver, Salt Lake City and Hawaii office), that he would be resigning from his position at Marsh. (Carpenter Decl. ¶ 13; Kelly Decl. ¶ 4). Karasaki informed Carpenter that he had accepted an offer to become the Chairman, Chief Executive Officer of Aon's Hawaii office, Marsh's direct competitor, and that he would be working for Aon immediately upon his departure from Marsh in March 2008.

15

(Carpenter Decl., ¶ 13; Kelly Decl. ¶¶ 5-7). Karasaki further advised that, in addition to serving as office leader of Aon's Hawaii office, he would also be serving as the leader of Aon's Global Construction Group in Hawaii. (Kelly Decl. ¶¶ 6, 7).

On March 11, 2008, Carpenter and Kelly met with Karasaki in Honolulu to discuss his resignation. (Carpenter Decl. ¶ 14; Kelly Decl. ¶ 9). During that meeting, Carpenter reminded Karasaki of his continuing contractual obligations owed to Marsh, including his obligation not to solicit Marsh's customers and employees as per the terms of his Non-Solicitation Agreement and Restrictive Covenants Agreement. (Carpenter Decl. ¶ 15; Kelly Decl. ¶ 10). Karasaki responded that he was aware of those obligations, understood them, and that he would not do anything to violate his agreements with Marsh. (Carpenter Decl. ¶ 16; Kelly Decl. ¶ 11). Carpenter further reminded Karasaki that, until March 20, 2008, the effective date of his resignation per the terms of Karasaki's notice of resignation, Karasaki remained an employee of Marsh and under a duty of loyalty that went beyond Karasaki's duties under his Non-Solicitation Agreement, Restrictive Covenants Agreement and Confidentiality and Ownership Rights Agreement. (Carpenter Decl. ¶ 18; Kelly Decl. ¶ 13). Karasaki again responded that he recognized his obligations and would not do anything that would impede Marsh. (Carpenter Decl. ¶ 19; Kelly Decl. ¶ 14).

On March 12, 2008, Karasaki submitted a revised notice of resignation, making his resignation effective retroactively as of March 11, 2008. (Carpenter Decl. ¶ 20; Kelly Decl. ¶ 15). According to a media report, Karasaki actually commenced his employment with Aon on March 12, 2008. (Lewis Decl. ¶ 2, Ex. G). Moreover, according to that same media report and a subsequent Aon press release announcing his hiring, Karasaki's role and responsibilities at Aon are substantially similar to those that he held at Marsh. (Lewis Decl. Ex. A & Ex. B).

16

Indeed, Aon's press release indicated that Karasaki's hiring was a "strategic hire" designed to give Aon's construction insurance business a presence in Hawaii. (*Id.*, Ex. B). And Aon's press release further explained that Karasaki would "utilize his access to [the Hawaiian] market and his keen understanding of owner and contractor controlled programs, hurricane and typhoon-related claims and construction defect cases to the benefit of Aon Honolulu construction['s] practice." (*Id*). Aon thus effectively admitted that Karasaki would be using Marsh's confidential, proprietary and trade secret information on behalf of Aon in his new position as head of Aon's Hawaii office and as managing director of Aon's Global Construction Services Group.

Furthermore, upon information and belief, Karasaki actually *did* use and disclose Marsh's confidential and trade secret information concerning prospective Marsh clients and Marsh's strategic plans to secure their business. Specifically, Karasaki used and/or disclosed to Aon's client service teams various issues that Marsh had identified concerning deficiencies in Aon's placement and servicing of certain insurance programs that Aon had placed with Outrigger, TD Food Group, and ResortQuest – three Aon clients that Karasaki had been prospecting on behalf of Marsh just prior to his resignation and departure – thereby allowing Aon to react and reach out to those clients, and address those issues, so as to impair Marsh's efforts to obtain those accounts. (Sansone Decl. ¶ 11).

In addition, in February 2008 – approximately two weeks before his resignation – Karasaki requested and received a copy of Marsh's marketing report relative to Kawailoa, a Marsh client that had been handled by Karasaki. (*Id.* at ¶ 13). There are no records of inquiries from underwriters or Kawailoa that would have necessitated Karasaki's requesting a copy of the report. (*Id*). But that report would be useful in preparing a renewal proposal for Kawailoa,

17

whose current insurance program is set to expire this year. (*Id*). Kawailoa's current insurance

program, however, is not set to expire until December of 2008, and so, upon information and

belief, Karasaki requested and misappropriated Marsh's marketing report for the purpose of

preparing a renewal proposal for Kawailoa on behalf of Aon, in direct competition with Marsh.

(*Id*).

### E.   Karasaki's Direct And/Or Indirect Solicitation Of Marsh Employees In Breach Of The Non-Solicitation And Restrictive Covenants Agreements

Almost immediately after Karasaki commenced his employment with Aon, a

substantial number of key Marsh employees began receiving solicitations from Aon, and several

of them in fact terminated their employment with Marsh in order to commence employment with

Aon. Indeed, upon Karasaki's resignation from Marsh, Marsh's Hawaii office had 36

employees, only 11 of whom were broking professionals – a category that includes such key

employees as Office Heads, Department Heads, Client Executives, Client Advisors, Placement

Specialists, Bond Managers and Senior Consultants. (Uehara Decl. ¶ 9). Of those 11 broking

professionals, seven (7) of them – including Francis "Frank" Wirt ("Wirt"), Janet Ng ("Ng"),

Marcus Kim ("Kim"), Jeffrey Case ("Case"), Kathy Dang ("Dang"), Ronald Beers ("Beers") and

Stephanie Tsumoto ("Tsumoto") – were immediately solicited by Aon, and four (4) of them –

Wirt, Ng, Kim and Case – left Marsh and joined Aon within just days of Karasaki's departure.

(Dang Decl. ¶ 15; Tsumoto Decl. ¶¶ 11-12; Beers Decl. ¶ 4; Carpenter Decl. ¶ 21; Ng Decl. ¶¶ 7-

8).

In addition, at least three (3) other employees from Marsh's Hawaii office –

Client Representatives Evelyn Shannon ("Shannon") and Janet Mei Chei Ng ("Mei Chi Ng"),

and Transaction Specialist Marissa Mandado ("Mandado") – were also solicited by Aon between

April 2, 2008 and April 18, 2008, bringing the total number of Marsh employees solicited by

Aon to ten (10) within less than five weeks from Karasaki's departure. (Shannon Decl. ¶¶ 8-13; Mei Ch Ng Decl. ¶¶ 9-16; Mandado Decl. ¶¶ 8-14).

Notably, all of the solicited employees worked directly with Karasaki, or in his business unit and under his direct or indirect supervision, during the time he was employed by Marsh. For example, up until the time of their resignations, Karasaki supervised the client accounts serviced by Ng, Wirt and Case (Uehara Decl. ¶ 6), and Ng worked closely with Karasaki in the area of construction and contractors' insurance, while Wirt provided key support for Karasaki's OCIP placements through the placement of construction bonds – an integral and complementary part of OCIP programs. (Tsumoto Decl. ¶ 8; Carpenter Decl. ¶¶ 22, 23). Similarly, Tsumoto, Shannon, Mei Chi Ng, Mandado, and Beers all worked in the same Marsh insurance broking unit that was led by Karasaki, and Karasaki supervised or worked directly with them in furtherance of each their respective efforts to solicit and service business on behalf Marsh. (Tsumoto Decl. ¶¶ 2-5; Shannon Decl. ¶¶ 3-6; Mei Chi Ng Decl. ¶¶ 3-6; Mandado Decl. ¶¶ 4-7).

Furthermore, there is compelling circumstantial evidence – in addition to the facts set forth above – suggesting that Karasaki was involved, either directly or indirectly, in each of these solicitations. For example, none of the solicited Marsh executives, with the lone exception of Mandado, had ever been solicited by Aon prior to the commencement of Karasaki's employment with Aon – and even Mandado, who had previously worked at Aon until 2002, hadn't been solicited to rejoin Aon at any point in time during the last five years. (Tsumoto Decl. ¶ 24; Shannon Decl. ¶ 13; Mei Chi Ng Decl. ¶ 16; Mandado Decl. ¶ 14). In addition, several of the Marsh executives who were solicited, including Tsumoto and Beers, were advised that they were on a "list" of Marsh executives that were be recruited by Aon following

19

Karasaki's defection to Aon – a list that included various individuals with whom Karasaki had worked closely while at Marsh. (Tsumoto Decl. ¶ 10; Beers Decl. ¶¶ 4, 7). And finally, Aon recruiters repeatedly invoked Karasaki's name in connection with their solicitation efforts, expressing surprise at Marsh executives' refusal to accept their offers of employment, remarking "but Chad is here" and promising that Karasaki would follow up with them directly. (Tsumoto Decl. ¶ 14; Mandado Decl. ¶ 11).

F.    **Karasaki's Direct And/Or Indirect Solicitation And Acceptance Of, And His Servicing And/Or Supervision Of, Marsh Clients In Breach Of The Non-Solicitation And Restrictive Covenants Agreements**

In addition to soliciting Marsh employees following his resignation and departure from Marsh, Karasaki also solicited and/or serviced and/or supervised the provision of services to, various existing Marsh clients that he had serviced or supervised, either directly or indirectly, during his employment with (and through his resignation from) Marsh. Indeed, in the short time that has passed since Karasaki's resignation from Marsh, at least *19* long-standing Marsh clients have transferred their business from Marsh to Aon. (Uehara Decl. ¶ 6). And right until his resignation from Marsh in March of 2008, all *19* of those clients had either been serviced directly by Karasaki, as the responsible Marsh Client Executive, or supervised and/or indirectly serviced by Karasaki, with Ng, Wirt or Case serving as the responsible Marsh Client Executive. *(Id)*.

As just one example, Commercial Plumbing was a Marsh client since 1997. (Uehara Decl. ¶ 6) As a Marsh client, Commercial Plumbing was serviced by Tsumoto and Ng, with Karasaki acting in an overall supervisory capacity. (Tsumoto Decl. ¶¶ 5, 7). On March 18, 2008, about one week after Karasaki's resignation from Marsh – and on the same day that Ng announced her resignation and her intention to join Karasaki at Aon – Commercial Plumbing notified Marsh that it was transferring its business from Marsh to Aon. (Carpenter Decl. ¶ 21; Tsumoto Decl. ¶ 9).

Moreover, there exists compelling evidence that a number of the *19* clients that transferred their accounts from Marsh to Aon did so as a result of direct or indirect solicitations *by Karasaki*, and that Karasaki has "accepted," and continued to service or supervise, their businesses. For example, on or about March 21, 2008, two long-term clients of Marsh – Maryl Group, Inc. and Stanford Carr Development – suddenly moved their business from Marsh to Aon. (Davis Decl. ¶2). On that day, Helen Otani of Aon drafted an e-mail to Zurich Residential Risk, the insurance carrier for Maryl Group and Stanford Carr, alerting Zurich that Maryl Group and Stanford Carr had, in fact, moved their businesses from Marsh to Aon. (*Id.* ¶ 3 & Ex. A). Notably, Otani of Aon copied Karasaki, who had serviced Maryl Group as its Client Executive while employed at Marsh (Carpenter Decl. ¶ 10), on the e-mail. (Davis Decl. ¶ 6 & Ex. A).

Similarly, MNS, Inc. d/b/a ABC Stores ("MNS") was a long-standing client of Marsh dating back to approximately 1982. (Park Decl. ¶ 2). At the time of his departure from Marsh, Karasaki was the broker in charge of the MNS account. (*Id.* ¶ 3). On or about March 25, 2008, less than two weeks after Karasaki resigned from Marsh, MNS notified Marsh that it was transferring its business to Aon. (*Id.* ¶ 8). On that date, Riki Morimoto of MNS left the following voice mail message for Deborah Park at Marsh, which indicated that MNS was switching their business – not just to Aon – but to "Chad" (*i.e.*, Karasaki):

> "Yea, hi Debbie this is Riki Morimoto, ABC Stores. I just wanted to, to let you know that we're going to switch, to Aon, *with Chad,* so we're sending out the letters today. I wanted to give you the heads up first, I'm not sure how this transition thing is going to work …. OK, thank you very much Debbie, bye, bye."

(*Id.* ¶¶ 8-9) (emphasis added).

Furthermore, since MNS transferred its business to Aon, Karasaki has directly and personally been involved in servicing MNS' account. On or about April 4, 2008, shortly after MNS moved its business, a claims review meeting was held by MNS concerning its

21

workers' compensation insurance policy. (Park Decl. ¶¶ 11-12). A claims review is an important aspect of servicing a client. It involves, among other things, a meeting among representatives of the client, the broker (*e.g.*, Marsh), and the client's insurance carrier, during which the parties jointly review claims to date under the client's particular policies or programs. (*Id.* ¶ 6). Karasaki personally attended the April 4, 2008 MNS claims review meeting on behalf of Aon. (*Id.* ¶ 12). Just three months earlier, however, as the Marsh broker in charge of the MNS account, Karasaki had attended similar meetings with MNS on Marsh's behalf. (*Id.* ¶ 3).

### G.   Marsh's Efforts to Abate Karasaki's Breaches

Marsh has made numerous efforts to halt Karasaki's repeated and continuing breaches of his contractual commitments and legal obligations to Marsh. For instance, in written correspondence dated March 25, 2008, Marsh, through its Hawaii counsel, Andrew L. Pepper, demanded that Karasaki "cease and desist" from violating his obligations to Marsh, and invoking Marsh's contractual rights under the Cooperation Clauses, and requested that Karasaki provide Marsh with "written assurance . . . in the form of a sworn affidavit, that [he] did not solicit any existing customers or prospective customers on behalf of Aon while [he was] employed by Marsh and/or since [his] separation from employment as an employee of Marsh and [his] subsequent employment by Aon." (Pepper Decl., Exh. D at 5). In addition, consistent with the terms of the Confidentiality and Ownership Rights Agreement, Pepper also requested that Karasaki "completely disclose and immediately return all Marsh trade secrets and proprietary information in [his] possession or control." (Pepper Decl., Ex. D at 5).

No formal response to Pepper's March 25, 2008 letter was received as of March 31, 2008. Thus, on March 31, 2008, in a further effort to abate Karasaki's continuing breaches, Marsh commenced an action against Karasaki in the United States District Court for the District

22

of Hawaii, Civil Action No. 08-00149 SOM KSC (the "Hawaii Action"). Just two days later, Karasaki's counsel, Jeffrey S. Portnoy, responded to Pepper's letter of March 25, 2008. Rather than complying with Marsh's reasonable request and Karasaki's contractual obligations, however, Portnoy simply stated, in vague and conclusory fashion, that "[Karasaki] . . . will comply with all of [his] legal obligations, including any existing duties not to destroy documents belonging to Marsh." (Pepper Decl., Ex. F at 1). Apart from this representation, however, Karasaki did not provide Marsh with any other documents or information sufficient to assure Marsh of Karasaki's compliance with his contractual and other obligations. (Id).

Accordingly, on April 14, 2008, Marsh was forced to file an emergency motion for relief in Hawaii district court seeking to, among other things, enjoin Karasaki from further breaching his contractual and statutory obligations. On April 15, 2008, Karasaki moved to dismiss the entire Hawaii Action solely on grounds of improper venue, and by Order dated April 22, 2008, the District of Hawaii, without addressing the merits of Marsh's claims or application for interim injunctive relief, granted Karasaki's motion to dismiss, holding that a forum selection clause contained in the Restrictive Covenants Agreement requires disputes related to that agreement as well as the Non-Solicitation and Confidentiality and Ownership Rights Agreements, to be brought exclusively in the courts of the State of New York. *Marsh USA, Inc. v. Karasaki*, 2008 WL 1805662 (D. Hawaii April 22, 2008). Significantly, the court dismissed rather than transferred the action, without prejudice, only because it wished to "leav[e] it to [Marsh] to select the precise court in New York in which to revive this dispute." *Id.* In an effort to do just that, Marsh filed the instant action on May 2, 2008.

**H.    Karasaki's Ongoing Violations**

Remarkably, notwithstanding Marsh's efforts to halt Karasaki's repeated and continuing breaches – through written demands and litigation – Karasaki has continued, openly

23

and brazenly, to breach his obligations toward Marsh. Indeed, as noted above, Karasaki attempted to solicit, directly or indirectly, the employment of several Marsh employees subsequent to the filing of the Hawaii Action. (*See* Tsumoto Decl. ¶¶ 21-23; Shannon Decl. ¶¶8-11; Mandado Decl. ¶¶8-13). And, as evidenced by his personal participation in the MNS claims review meeting on April 4, 2000, Karasaki has also continued to solicit, directly or indirectly, various Marsh clients, and to service the accounts of those Marsh clients that he has successfully lured away from Marsh. (*See* Uehara Decl. ¶ 7; Park Decl. ¶ 12).

In fact, as late as April 8, 2008, Marsh's Mei Che Ng was notified by current Marsh client, Ken Kanehori of Arcadia Retirement Residence ("Arcadia") that former Marsh employee, Marcus Kim, a current subordinate of Karasaki at Aon, was soliciting him to sign a "Broker of Record" form, transferring the Arcadia account from Marsh to Aon, so that Aon, and Kim in particular, "would do the servicing." (Mei Che Ng Decl. ¶ 17).

In addition, as recently as April 10, 2008, David Kahaulelio, risk manager for The Queens Health Systems ("QHS"), a current Marsh client, received an invitation from Kim to attend and to meet with both Kim *and* Karasaki at an Aon-sponsored hospitality event at the Risk and Insurance Management Society conference in San Diego, California on April 29, 2008, the purpose of which was to market Aon's products and services. (Dang Decl. ¶ 17). Neither Kahaulelio nor QHS had ever before been invited to attend Aon's hospitality event, at which Aon would be marketing its products and services to potential clients. (*Id.* ¶¶ 16-17). Nevertheless, on April 29, 2008, and in flagrant disregard of his obligations to Marsh, Karasaki, with Kim, met with Kahaulelio, in San Diego, notwithstanding Kahaulelio's expressed reservations about meeting with them all due to their just recently terminated affiliation with Marsh. (*Id.* ¶¶ 19-23).

24

## ARGUMENT

## MARSH IS ENTITLED TO A PRELIMINARY INJUNCTION RESTRAINING KARASAKI, AND ALL THOSE ACTING FOR OR IN CONCERT WITH HIM, FROM VIOLATING HIS CONTRACTUAL AND OTHER OBLIGATIONS TOWARD MARSH

### I.    The Standard for Obtaining a Preliminary Injunction

To obtain a preliminary injunction, the movant must show (1) irreparable injury absent injunctive relief, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *Green Party v. New York State Bd. of Election,* 389 F.3d 411, 418 (2d Cir. 2004); *Estee Lauder Companies Inc. v. Batra,* 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006); *see also Hawaii ex rel. Anzai v. Gannett Pacific Corp.,* 99 F. Supp. 2d 1241, 1247 (D. Hawaii 1999); *UARCO Inc. v. LAM,* 18 F. Supp. 2d 1116, 1120 (D. Hawaii 1998). As demonstrated below, Marsh's application for a preliminary injunction unquestionably satisfies this standard.

### II.    Marsh Is Extremely Likely to Prevail On The Merits Of Its Claims For Breach Of The Non-Solicitation Agreement, The Restrictive Covenants Agreement, And The Confidentiality And Ownership Rights Agreement

In Counts I through III of its Complaint, Marsh has asserted claims for breach of Karasaki's Non-Solicitation Agreement, Restrictive Covenants Agreement, and Confidentiality and Ownership Rights Agreement (collectively, the "Agreements"). Those Agreements are valid and enforceable, and contain clear covenants by Karasaki to, among other things:

(i) refrain, following termination of his employment with Marsh, from directly or indirectly soliciting or servicing the business of current, former, and prospective Marsh clients that he serviced or supervised while at Marsh, or about whom he obtained confidential information while at Marsh;

(ii) refrain, following termination of his employment with Marsh, from directly or indirectly soliciting or otherwise causing Marsh employees that worked in the same business unit as him, about whom he learned confidential information, or with whom he worked directly, from terminating their employment with Marsh;

25

(iii) refrain, both during and following his employment with Marsh, from using or disclosing to any person, for any purpose whatsoever other than for the purpose of carrying out his duties as an employee of Marsh, any of Marsh's confidential, proprietary or trade secret information, and to return such information to Marsh upon termination of his employment with Marsh; and

(iv) to provide Marsh, from time to time, such information as Marsh may reasonably request in order to permit Marsh to determine his compliance with the Agreements.

(Wolter Decl., Ex. A, ¶¶ 2, 3, 15; Roland Decl., Ex. A at ¶¶ 1, 2; Ex. B at ¶¶ 3, 4, 6). Karasaki's conduct, as described above and recounted below, places him in clear breach of these restrictive covenants. Accordingly, Marsh has an overwhelming likelihood of success on the merits of its breach of contract claims.

### A.    The Agreements Are Valid And Enforceable

Restrictive covenants, like the ones embodied in the Agreements, are valid and enforceable under New York law[6] when they satisfy "an overriding requirement of reasonableness." *Silipos, Inc. v. Bickel,* 2006 WL 2265055, *3 (S.D.N.Y. Aug. 8, 2006). In determining whether a restrictive covenant is reasonable, courts examine the following factors: (1) whether the covenant is necessary to protect the employer's legitimate interests; (2) whether the restriction is reasonable in time and geographic scope; (3) whether the restriction is not unreasonably burdensome to the employee; and (4) whether the covenant is harmful to the general public. *Id.; BDO Siedman v. Hirshberg,* 712 N.E.2d 1220, 1223 (N.Y. 1999); *Am. Broadcasting Cos. v. Wolf,* 420 N.E.2d 363, 367 (N.Y. 1981). The restrictive covenants embodied in the Agreements satisfy each of these factors.

---

[6] Each of the Agreements contains a governing law provision, indicating that they "shall be governed by, and construed with, the laws of the State of New York." (Wolter Decl., Ex. A at ¶ 12; Roland Decl., Ex. B at 2, Ex. C at ¶ 6(h)).

1.    The Restrictive Covenants Are Necessary to
Protect Marsh's Legitimate Interests

It is well established that courts will enforce restrictive covenants that are

reasonable in time and scope: "(1) to prevent an employee's solicitation or disclosure of trade

secrets, (2) to prevent an employee's release of confidential information regarding the

employer's customers, or (3) in those cases where the employee's services to the employer are

deemed special or unique." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999); *see*

*also Estee Lauder Cos.*, 430 F. Supp. 2d at 180; *BDO Siedman*, 712 N.E.2d at 1224-25.

Moreover, courts have recognized that restrictive covenants are enforceable to protect an

employer's legitimate interest in protecting its client base. *See Silipos*, 2006 WL 2265055, at * 5

(citing *BDO Seidman*, 712 N.E.2d at 1224-25); *see also Ticor*, 173 F.3d at 70-71 (likening client

relationships to special or unique services). Here, the Agreements at issue are necessary to

protect, *inter alia*, Marsh's client relationships *and* its trade secrets and confidential information,

all of which Marsh carefully cultivated and took great lengths to safeguard, at great expense to

Marsh.

a.    The Agreements Are Necessary
To Protect Marsh's Client Base

As explained by the New York Court of Appeals, "[t]he employer has a legitimate

interest in preventing former employees from exploiting or appropriating the goodwill of a client

or customer, which had been created and maintained at the employer's expense, to the

employer's competitive detriment." *BDO Seidman*, 712 N.E.2d at 1224-25; *see also Silipos*,

2006 WL 2265055, * 3. As reflected in the accompanying affidavits submitted herewith, Marsh

has expended considerable resources developing and maintaining its goodwill and its client

relationships, but Karasaki threatens to misappropriate that goodwill and those relationships for

Aon's competitive benefit, to the detriment of Marsh.

27

For example, Marsh devoted years and considerable resources – including substantial investments in Karasaki and the development of his knowledge and practice – carefully cultivating its construction insurance and OCIP practice that gave Marsh a competitive edge in the industry and a significant portion of its client base. (Sansone Decl. ¶ 12; Williams Decl. ¶¶ 8-10). In addition, Marsh developed a long-term business plan that sought to leverage its considerable strength and recognized leadership position in those areas (Williams Decl. ¶¶ 8-10), and engaged in substantial and costly marketing efforts to successfully promote its related products and services, and to develop valuable goodwill and many of its long-time client relations (including, for example, Maryl Group, Inc) (Carpenter Decl. ¶ 11; Williams Decl. ¶¶ 7-10; Uehara Decl. ¶¶ 3-4). Indeed, between 2006 and 2007 alone, Marsh provided Karasaki with a charity budget of more than $213,000.00 that was used to sponsor various community, charity, industry and entertainment events designed to promote Marsh and Karasaki, including, for example, such high-profile events as the Sony Open and the PGA Grand Slam of Golf, which Karasaki personally attended. (Uehara Decl. ¶3; Carpenter Decl. ¶ 11). And Marsh further provided Karasaki with a generous travel and entertainment expense account to ensure that Karasaki could properly entertain clients, thereby further generating client relationships and goodwill on behalf of Marsh. (Uehara Decl. ¶ 4).

Despite the enormous time and expense that Marsh incurred cultivating its goodwill and client relationships, it now stands to unfairly lose those valuable assets to Karasaki, and to Aon, Marsh's direct competitor, if Karasaki is not enjoined. Indeed, Karasaki and Aon each expressly stated that they intended to compete with Marsh -- including in the areas of construction insurance and OCIPs that Karasaki helped to develop on Marsh's dime and for Marsh's benefit. (Carpenter Decl. ¶ 12; Lewis Decl., Ex. B). And through their unfair

28

"competition," Karasaki and Aon have already succeeded in misappropriating at least *19* of Marsh's long-standing clients. (Uehara Decl. ¶ 6). Moreover, Karasaki and Aon continue to solicit Marsh's clients, even to this day. *See pp. 23-24, supra.* Accordingly, an injunction is appropriate to protect Marsh's client base and goodwill.

> b.  The Agreements Are Necessary To Protect Marsh's
>     Trade Secrets And Confidential Customer Information

Marsh also has a legitimate interest in protecting the disclosure of its trade secrets and confidential client information. New York subscribes to the definition of trade secrets found in § 757, comment b, of the Restatement of Torts (1939). Section 757 broadly defines "trade secret" to include "any formula, pattern, device or compilation of information which is used in one's own business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999); *Estee Lauder*, 430 F. Supp.2d at 175 (quoting Restatement of Torts § 757, comment b (1939)).

In determining whether information constitutes a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside the business; (2) the extent to which the information is known to employees and others involved in the business; (3) the extent that measures are taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*North Atlantic Instruments*, 188 F.3d at 44; *Estee Lauder*, 430 F. Supp.2d at 175. Here, under the Restatement definition and this six-factor test, there is no question that Karasaki is in possession of, and threatens to disclose and/or misappropriate, confidential and trade secret information owned by Marsh.

As described in the Statement of Facts, as Head of Marsh's Hawaii office, Karasaki had unfettered access to a considerable amount of confidential and proprietary information. Unlike other employees, Karasaki had access to a wealth of information concerning Marsh's business operations, including, without limitation, current and historical revenues, Marsh's cost structure, the historical, current and future marketing and development plans for the Hawaii office, including, without limitation, information about Marsh's "target clients" and the strategies it would implement to develop a particular business and/or client base. In addition, Karasaki had access to a wide array of confidential information concerning Marsh's clients and employees, including details of clients' insurance programs, including their expiration and renewal dates, historical revenues, loss exposure data, the names of client contacts, the results of annual client surveys on the quality of Marsh's services, and a list of client accounts "at risk" of being lost by Marsh to another competitor. (*See* Sassone Decl. ¶¶ 5-8; Carpenter Decl. ¶¶ 9-12). New York courts have afforded "trade secret" protection to this type of information in the past. *See, e.g., Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 629-30 (E.D.N.Y. 1996) (holding that marketing information, customer feedback, market needs, pricing structure, sales training, and projected release dates were protectable as trade secrets).

All of this confidential information is kept confidential by Marsh and is not readily available to competitors or most executives in the Hawaii office. However, as Head of the Hawaii office, Karasaki enjoyed unfettered access to and routinely relied on such information. (*See* Sassone Decl. ¶¶ 5-8; Carpenter Decl. ¶¶ 9-12). Moreover, to further ensure that none of this information would be disclosed by Karasaki to Marsh's competitors or any other third-party, Marsh required Karasaki to sign the Confidentiality and Ownership Rights Agreement, pursuant to which Karasaki promised not to use or disclose Marsh's confidential and

trade secret information. Karasaki's possession of Marsh's trade secrets and confidential

customer information makes Marsh particularly vulnerable to unfair competition from Karasaki

now that he has resigned from Marsh to accept employment with Aon. In order to ensure that

Karasaki does not unfairly use or disclose any of this trade secret or confidential customer

information, Karasaki must be made to honor the reasonable restrictions set forth in his

Agreements.

2.    <u>**The Agreements Are Reasonable In Time And Geographic Scope**</u>

The temporal restraints in the Agreements are eminently reasonable. Both the

Non-Solicitation Agreement and the Restrictive Covenants Agreements preclude Karasaki from

soliciting Marsh's clients and employees only for one year following his resignation from Marsh

(Roland Decl., Ex. B ¶ 1; Wolter Decl. Ex. A at ¶¶ 2-3), and "New York Courts routinely find

one-year restrictions to be reasonable." *Silipos*, 2006 WL 2265055, at *6 (citing *Crown It Servs.,*

*Inc. v. Koyal-Olsen*, 782 N.Y.S.2d 708, 710 (1st Dep't 2004) (finding "no serious dispute" that a

one-year limitation is reasonable"); *see also BDO Siedman*, 712 N.E.2d at 1226-27 (18 months);

*Business Intelligence Services, Inc. v. Hudson*, 580 F. Supp. 1068, 1072-73 (S.D.N.Y. 1984) (one

year); *Willis of New York, Inc. v. DeFelice*, 299 A.D.2d 240, 241 (1st Dep't 2002) (two years).

Moreover, although the Restrictive Covenants Agreement and the Non-

Solicitation Agreements do not, on their face, contain any express geographic limitation, New

York courts routinely permit a client restriction to substitute for a geographic restriction where a

restrictive covenant is customer-based. *See, e.g., Malcolm Pirnie, Inc. v. Werthman*, 280 A.D.2d

934, 935 (4th Dep't 2001) (client-based restrictions are not unreasonable despite no geographical

limitation); *Mallory Factor, Inc. v. Werthman*, 146 A.D.2d 465, 467-68 (1st Dep't. 1989)

(upholding 18-month restrictive covenant restricting employee from working on any account that

he or his employer had been involved with during the course of the employee's employment).

31

Here, Karasaki's Non-Solicitation Agreement and his Restrictive Covenants Agreement both, on their face, contain express client-based and employee-based restrictions that narrow the potential universe of clients and employees that Karasaki is prohibited from soliciting and/or servicing. Indeed, by their terms, those Agreements prohibit Karasaki from soliciting and/or servicing only those clients, prospects or former clients of Marsh: (i) with whom Karasaki, during the last two (2) years of his employment at Marsh, had "contact" or obtained confidential information; or (ii) whom Karasaki, during the last two (2) years of his employment at Marsh, solicited, serviced or supervised, whether directly or indirectly. (Roland Decl. Ex B ¶ 1; Wolter Decl. Ex. A at ¶¶ 2, 3 ). Similarly, the Agreements prohibit Karasaki from soliciting only those employees of Marsh: (i) with whom Karasaki, during the last two (2) years of his employment at Marsh, had "contact" or obtained confidential information; or (ii) who worked with Karasaki in the same Marsh business unit as Karasaki or who worked with him directly. (*Id*). The Agreements are thus narrowly tailored to protect Marsh's legitimate interests, particularly given that Marsh and Aon are direct, intense competitors.

3.    The Agreements Do Not Unduly Burden Karasaki

Enforcement of the restrictions contained in the Agreements will not cause Karasaki undue hardship. Notably, the Agreements do not in any way prevent Karasaki from earning a livelihood. Moreover, Marsh is not requesting that Karasaki step down from his position at Aon – only that Karasaki honor the reasonable non-solicitation and confidentiality restrictions contained in the Agreements. As noted above, the Agreements prevent Karasaki from engaging in only certain client and employee solicitations – and only for a period of one year from the termination of his employment with Marsh. Between now and March 2009, Karasaki may still use his talent and skills to solicit myriad clients and employees on behalf of Aon, so long as he does not pilfer Marsh's clients. Accordingly, enforcement of the Agreements

32

would not unduly burden Karasaki.

      4.     The Agreements Do Not Harm the General Public.

      Enforcement of the Agreements would also not impair the public interest. Indeed, public policy supports the enforcement of reasonable restrictive covenants, including non-competition agreements that are more restrictive than the covenants at issue here. As the *Verizon* court opined, "non-competition covenants . . . serve an important public-policy function by encouraging employers to make significant investments in training key employees and permitting employers to share confidential information with employees, which encourages the free exchange of ideas among top personnel." *Verizon Communications, Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 662 (ED. Pa. 2006) (applying New York law); *see also Estee Lauder,* 430 F. Supp. at 179 (rejecting defendant's argument "that the purpose of the Non-compete Agreement is pernicious to New York's policy regarding covenants not to compete); *Merrill Lynch, Pierce, Fenner & Smith v. McClafferty*, 287 F. Supp. 2d 1244, 1249 (D. Haw. 2003) (the overriding public interest is the honoring and enforcing reasonable non-compete agreements).

**B.    Karasaki Has Breached the Agreements.**

      1.    Karasaki Has Solicited, Serviced And Supervised Marsh Clients, And Solicited Marsh Employees, In Violation Of The Non-Solicitation Agreement and The Restrictive Covenants Agreement

      As set forth in the Statement of Facts above, almost immediately after Karasaki began his employment with Aon, several key Marsh employees received solicitations from Aon, and, in fact, terminated their employment with Marsh in order to commence employment at Aon. Indeed, within less than five (5) weeks since Karasaki's departure, ten (10) out of 36 employees were solicited by Aon. (Uehara Decl. ¶ 9). Notably, all of the solicited employees worked directly with Karasaki, or under his direct supervision. (Uehara Decl. ¶ 6; Tsumoto Decl. ¶¶ 2-5, 8; Carpenter Decl. ¶¶ 22-23; Shannon Decl. ¶¶ 3-6; Mandado Decl. ¶¶ 4-7). Furthermore, the

following, among many other facts, is compelling circumstantial evidence that Karaski was directly or indirectly involved with the employee solicitations: (1) none of the solicited employees, other than Mandado who had previously worked for Aon, had ever been solicited by Aon until Karasaki's resignation (Tsumoto Decl. ¶ 24; Shannon Decl. ¶ 13; Mei Chi Ng Decl. ¶ 16; Mandado Decl. ¶ 14); (2) many of those solicited were on a "list" of Marsh executives to be solicited by Aon, which included individuals who had worked closely with Karasaki (Tsumoto Decl. ¶10; Beers Decl. ¶¶ 4-7); and (3) Aon recruiters repeatedly invoked Karasaki's name in their solicitation efforts (Mandado ¶ 11).

Within that same timeframe, at least *19* longstanding clients of Marsh suddenly moved their accounts to Aon. All of these clients had been serviced directly by Karasaki as the Client Executive or indirectly supervised with Ng, Wirt or Case serving as the responsible Client Executive. (Uehara Decl. ¶¶5-6). Moreover, as fully described in the Statement of Facts, there is compelling evidence that a number of these clients were solicited, directly or indirectly, by Karasaki and that Karasaki accepted, and continued to service or supervise their businesses: (1) Karasaki was cc'd on an email from Aon to a former Marsh client, who had transferred its business to Aon (Davis Decl. ¶ 6 and Ex. A); (2) Morimoto of MNS informed Park of Marsh, by voicemail, that "we're going to switch to Aon with Chad" (Park Decl. ¶¶ 8-9); and (3) Karasaki attended a claims review meeting with MNS on behalf of Aon, just weeks after resigning from Marsh, and just three months after attending an important meeting with MNS on behalf of Marsh. (Park Decl. ¶¶ 3, 6, 11-12).

Accordingly, Karasaki clearly breached the Non-Solicitation Agreement by "perform[ing] or supervis[ing] the performance of any services ... for any former client of [Marsh] who was such within two (2) years prior to [his] termination of employment and who

34

was ... serviced directly by [Karasaki]. (Roland Decl., Ex. B ¶1(a)(ii)). Similarly, by attending

the April 4 claims review meeting, Karasaki breached the Restrictive Covenants Agreement by

"perform[ing ... services ... of the type ... provided by [Karasaki] while he ... was employed" at

Marsh, to a client that Karasaki had contact with and obtained confidential information about

during the last two years of his employment with Marsh. (Wolter Decl., Ex. A ¶2(b)).

   2.   Karasaki Has Used And/Or Disclosed, And Threatens To Use And/Or
      Disclose, Marsh's Confidential, Proprietary And Trade Secret Information
      <u>In Violation Of The Confidentiality and Ownership Rights Agreement</u>

     The Confidentiality and Ownership Rights Agreement, provides, *inter alia*, that

Karasaki "will not for any purpose whatsoever use or disclose to any person, Confidential

Information, except to the extent required to carry out [his] duties [at Marsh]." (Ex. C ¶ 3). As

discussed, *supra*, it defines "Confidential Information" as any information related to Marsh's

clients and business which is sensitive and proprietary and which is not readily available to the

public. (Id. ¶ 2). As the new Head of Aon's Hawaii office, it is inevitable that Karasaki will use

and/or disclose Marsh's confidential information in order to grow Aon's business. At Marsh,

Karasaki played a pivotal role in developing Marsh's strategic operational plans for Hawaii.

Given the similarities between his role for both companies, Karasaki will necessarily make

decisions for Aon, in part, relying on his knowledge of Marsh's confidential strategic

information. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). Indeed,

approximately two weeks before his resignation, Karasaki requested and received a copy of

Marsh's marketing report relative to Kawailoa, a Marsh client that had been handled by

Karasaki. (Sansone Decl. at ¶ 13). As demonstrated in the Statement of Facts, there does not

appear to be any valid business reason for reviewing the Kawailoa marketing report several

months before the account's renewal in December 2008, and yet, two weeks before Karasaki's

resignation from Marsh. Thus, it appears Karasaki may have requested the marketing report for

the purpose of preparing a renewal proposal for Kawailoa on behalf of Aon, in direct competition

with Marsh. (*Id*). Immediate relief is necessary to prevent the use and disclosure of such

confidential information.

        3.     **Karasaki Has Violated The Cooperation Clauses In Each Of The Agreements**

Additionally, Karasaki has breached the Non-Solicitation Agreement, the

Restrictive Covenants Agreement *and* the Confidentiality and Ownership Rights Agreement in

another material respect. All of these agreements require that Karasaki provide Marsh, upon

reasonable request, with information relating to Karasaki's work for Aon or his treatment of

"Confidential Information" (as that term is defined in the Confidentiality and Ownership Rights

Agreement). Despite Marsh's requests, Karasaki has refused to provide Marsh with information

that would enable Marsh to determine whether Karasaki has complied with the Agreements.

Indeed, evidence to date clearly shows that Karasaki has not complied with the Restrictive

Covenants.

    **C.**    **Marsh is Entitled to an Injunction under the Hawaii Trade Secrets Act.**

Hawaii's Trade Secret Act ("HTSA") provides that "[a]ctual or *threatened*

misappropriation may be enjoined." Haw. Rev. Stat. § 482B-3 (emphasis added). The HTSA

defines "misappropriation," in part, as:

> [The d]isclosure or use of a trade secret of another without express
> or implied consent by a person who . . . [a]t the time of disclosure
> or use, knew or had reason to know that the person's knowledge of
> the trade secret was . . . [a]cquired under circumstances giving rise
> to a duty to maintain its secrecy or limit its use; or {d]erived from
> or through a person who owed a duty to maintain its secrecy or
> limit its use[.]

Haw. Rev. Stat. § 482B-2. Thus, to obtain an injunction under the HTSA, a movant must show:

(1) threatened or actual (2) disclosure or use (3) of a trade secret of another (4) without consent

36

(5) where there was a duty to maintain its secrecy or limit its use. The HTSA defines "trade

secret" as:

> Information, including a formula, pattern, compilation, program
> device, method, technique, or process that: (1) derives independent
> economic value, actual or potential, from not being generally
> known to, and not being readily ascertainably by proper means by,
> other persons who can obtain economic value from its disclosure
> or use; and (2) is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

Haw. Rev. Stat. § 482B-2. As discussed in detail *supra*, Karasaki possesses detailed knowledge

of Marsh's strategic business plans for Hawaii, its OCIP strategies, client accounts, and corporate

information. These trade secrets were learned by Karasaki during the course of his employment

with Marsh. Not only does Karasaki have a contractual obligation to maintain the information as

confidential *(see generally* Roland Decl., Exh. C), but he also has a statutory obligation.

As demonstrated above, absent injunctive relief, Karasaki's disclosure and use of

Marsh's trade secrets is inevitable. The Seventh Circuit's ruling in *PepsiCo, Inc. v. Redmond*, 54

F.3d 1262 (7th Cir. 1995), is instructive. In *PepsiCo*, the Court of Appeals applied the

"inevitable disclosure doctrine" to find a violation of the Illinois Trade Secrets Act, which, like

the HTSA, permits courts to enjoin the actual or ***threatened*** misappropriation of a trade secret.

*PepsiCo*, 54 F.3d at 1267-68. PepsiCo sought to enjoin a former employee, Redmond, from

accepting employment with PepsiCo's competitor, Gatorade, on the theory that he would

inevitably disclose PepsiCo's trade secrets in the course of his new employment. *Id.* at 1271.

Redmond was the General Manager of PepsiCo's California business unit, a position that gave

him "access to inside information and trade secrets," when he accepted the new position with

Gatorade. *Id.* at 1264. Despite Redmond's insistence that he did not intend to use any of

PepsiCo's confidential information, the Court held that Redmond's employment work for

Gatorade posed a threat because Redmond could not help but rely on PepsiCo's trade secrets as

37

he plotted Gatorade's course. *Id.* at 1270. The Court also found that Redmond's "lack of forthrightness" with PepsiCo demonstrated that he "could not be trusted to act with the necessary sensitivity and good faith under the circumstances." *Id.* As noted by the Court, PepsiCo found itself "in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *Id.*

Similarly, Karasaki left Marsh with its playbook tucked under his arm. Even assuming that Karasaki does not *intend* to misappropriate Marsh's trade secrets, it is inevitable, and at minimum, highly likely, that he will do so. *See Lumex,* 919 F. Supp. at 631 (holding an employee "involved in top level meetings and decisions on all matters within the company," who "had a wide range of duties, including marketing and product management" would inevitably disclose his former employer's trade secrets to his new employer in the same industry).

Moreover, Karasaki, like Raymond, has been less than forthright with Marsh: he assured Marsh that he would comply with all of his legal obligations, and yet, violated the Agreements by actively soliciting Marsh's clients and employees, and even personally handled a claims review for MNS, just days after his and his counsel's assurances. (*See* Park Decl. ¶¶ 2-11). Karasaki's lack of candor demonstrates his willingness to use and/or disclose Marsh's proprietary and confidential information. Thus, Marsh is entitled to injunctive relief to stop Karasaki's threatened or actual misappropriation of Marsh's trade secrets.

### III.    Marsh Will Suffer Irreparable Injury If Interim Injunctive Relief is Not Granted

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Estee Lauder,* 430 F. Supp. at 174 (quoting *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir. 1985)); *see also Lumex,* 919 F.

38

Supp. at 627. A violation of contractual or statutory obligations results in "irreparable harm" where the injury is "so serious that a monetary award cannot be adequate compensation." *Estee Lauder*, 430 F. Supp. at 174. Furthermore, while the applicant must show "more than a 'mere possibility' of irreparable harm," it need only "show that the irreparable harm is 'likely' to occur." *Lumex*, 919 F. Supp. at 627 (quoting *JSG Trading Corp. v. TrayWrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

    Here, there is no question that, absent injunctive relief, Marsh will continue to suffer irreparable harm if Karasaki is not enjoined from violating his Agreements, and Marsh continues to lose valuable client relationships and customer goodwill that Marsh has spent many years – and countless thousands of dollars – to develop. *See Global Switching v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006) ("resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm"); *Gundermann & Gundermann Ins. v. Brassill*, 46 A.D.3d 615 (2d Dep't 2007); *7's Enters., Inc. v. Del Rosario*, 143 P.3d 23, 35 (Hawaii 2006); *UARCO*, 18 F. Supp. 2d at 1125-26. Indeed, despite the filing of the Hawaii Action, Karasaki, either directly or indirectly, continued soliciting Marsh employees, as well as prospective and current clients.

    Additionally, there is a significant risk that Karasaki already has, or will disclose, certain of the trade secrets or confidential customer information that he acquired during his employment with Marsh. It is well established that irreparable harm is presumed if the misappropriation or disclosure of trade secrets is likely to occur. *Estee Lauder*, 430 F. Supp. at 174; *Lumex*, 919 F. Supp. at 628; *Global Switching Inc.*, 2006 WL 1800001, at * 12; *see also McClafferty*, 287 F. Supp. 2d at 1249 (finding irreparable harm if proprietary information is disclosed). "'A trade secret once lost is, of course, lost forever' and as a result, such a loss

39

'cannot be measured in monetary damages." *Lumex,* 919 F. Supp. at 628 (quoting *FMC Corp. v.*

*Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984)). Indeed, "even where a trade

secret has not yet been disclosed, irreparable harm may be found" in circumstances, such as here,

where it is inevitable that they will be disclosed because "the movant competes directly with the

prospective employer and the transient employee possesses highly confidential or technical

knowledge concerning marketing strategies, or the like." *See Estee Lauder,* 430 F. Supp. at 174.

Here, given that Karasaki is now working for Aon – Marsh's direct competitor in

Hawaii – in such a senior-level position, Karasaki's misappropriation or disclosure of trade

secrets and/or confidential customer information is likely to occur, and therefore, irreparable

harm may be presumed. Indeed, Karasaki's knowledge of Marsh's trade secrets and confidential

and proprietary information gives Karasaki and Aon, Marsh's direct competitor, an undue and

unfair advantage in competing with Marsh. With all of Marsh's proprietary information at hand,

Karasaki and Aon can effectively solicit key employees to defect to Aon. Moreover, Karasaki's

knowledge of Marsh's strategic business and marketing plans, including its confidential list of

"target" clients, can be used by Karasaki and Aon to improve Aon's competitiveness in ways that

Aon could not otherwise accomplish by, for instance: (a) providing Aon with the identity of

accounts and prospective client contacts that Marsh was approaching as new business

opportunities; and (b) identifying for Aon, and providing Aon with an opportunity to cure or

otherwise seize upon, identified weaknesses in its or Marsh's other competitors' products and

service offerings (which weaknesses, if not disclosed to Aon, would offer Marsh greater

opportunities to effectively obtain additional business).

Finally, Karasaki has already conceded that breach of the Agreements constitutes

irreparable harm. In each of the three Agreements, Karasaki expressly acknowledges:

> In recognition of the fact that irreparable injury will result to the
> Company in the event of a breach . . . , that monetary damages for
> such breach would not be readily calculable, and that the Company
> would not have an adequate remedy at law therefor . . . [I]
> acknowledge[], consent[], and agree[] that in the event of such
> breach, or the threat thereof, the Company shall be entitled, in
> addition to any other legal remedies and damages available, to . . .
> temporary and permanent injunctive relief (without the necessity of
> posting a bond) to restrain the violation or threatened violation of
> such obligations[.]

(Roland Decl. Ex. B ¶ 7; Roland Decl. Ex. C ¶ 6(c); Wolter Decl. Ex. C ¶ 2(c)). New York

courts routinely have found such concessions to constitute admissions of irreparable injury. *See*

*Ticor,* 173 F.3d at 69; *North Atlantic Instruments, Inc.,* 188 F.3d at 49; *Estee Lauder,* 430 F.

Supp. 2d at 174. Unless and until this Court restrains Karasaki from breaching his obligations,

Marsh will continue to suffer such injury.

## IV.    A Balancing of the Hardship Weighs Heavily in Favor of Injunctive Relief

As detailed above, the issuance of an injunction would not be unduly burdensome

to Karasaki. Indeed, it would secure the *status quo,* and ensure that Karasaki honor his

contractual obligations to Marsh. Thus, a preliminary injunction would serve to honor the

parties' bargained for agreement and protect the public interest, while at the same time, not be

unduly burdensome.

· It is undisputed that Marsh required Karasaki to execute the Agreements to

safeguard its own legitimate interests – its customer base and its trade secrets. Marsh's client

base coupled with its confidential information form the back bone of Marsh's business. Those

Agreements protect Marsh by precluding Karasaki from soliciting certain of Marsh's clients and

employees and from divulging or using Marsh's confidential information. Without such

protections, Marsh's own business interests would be seriously jeopardized.

Enforcing the restrictive covenants contained in the Agreements between Marsh

41

and Karasaki also is consistent with public policy. As demonstrated in above, *supra p. 3*, society has an interest in allowing employers and employees to enter into restrictive covenants so that there is a free flow of information between key employees and their employers. This promotes economic growth and stability. Here, the restrictive covenants at issue fall squarely within the parameters of those restrictive covenants that courts have found protect that public interest. See *Verizon*, 462 F. Supp. 2d at 662 (applying New York law); *see also Estee Lauder*, 430 F. Supp. at 179; *McClafferty*, 287 F. Supp. 2d at 1249. Allowing Karasaki to utilize the information and access that he gained to clients and employees during his employment would be in direct conflict with the public interest.

Furthermore, imposing reasonable restrictive covenants on Karasaki would not unduly burden his ability to use his own talent and skill set to accumulate a new customer and employee base on behalf of whomever he chooses, including Aon. He would merely be in the position he was in before he was employed by Marsh – having to build a book of business and staff based on his own abilities. After the one year period expires in March 2009, Karasaki, as agreed to, could solicit business from whomever he chooses.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction that:

(i)        enjoins Karasaki and any person or entity acting in concert with him or under his supervision (including, but not limited to, any Aon employees over whom Karasaki has supervisory or managerial authority), for a period of not less than one (1) year from entry of the Court's order, from soliciting or accepting business from, or from performing or supervising the performance of any insurance brokerage services for, any current, former or prospective clients of Marsh with whom Karasaki had contact, or about which he obtained confidential information

42

or trade secrets, during the last two years of his employment at Marsh;

     (ii)    enjoins Karasaki and any person or entity acting in concert with him (including, but not limited to, his current employer, Aon, and any of its officers, employees or agents) from disclosing or misappropriating for his, her or Aon's own use or benefit, any of Marsh's trade secrets or other confidential or proprietary information in violation of Karasaki's various contractual commitments and restrictions toward Plaintiff Marsh;

     (iii)    requires Karasaki to return to Marsh, within 24 hours, all property, documents, files, reports, and/or other materials that Karasaki has in his possession, custody, or control that were obtained from Marsh;

     (iv)    prohibits Karasaki from destroying or spoliating any documents of any kind, whether in written or electronic form, concerning Marsh and Aon's employment of Karasaki and/or the transfer or solicitation of Marsh's clients or employees from Marsh to Aon;

     (v)    enjoins Karasaki and any person or entity acting on behalf of or in concert with him (including but not limited to Aon and any of its officers, employees or agents), from soliciting, encouraging, or attempting to solicit or induce employees of Marsh to terminate their employment with Marsh and go to work for any other entity, including Aon; and

     (vi)    enjoins Karasaki and any person or entity acting on behalf of or in concert with him (including but not limited to Aon and any of its officers, employees or agents), from all actions in violation of Karasaki's various contractual commitments and restrictions in favor of Plaintiff Marsh;

     (vii)    enjoins Karasaki in all such other and further ways necessary to bring Karasaki into full and complete compliance and conformance with his contractual agreements with Marsh and to ensure no further violations of Haw. Rev. Stat. Chapter 482B;

(viii)    enjoins Karasaki pursuant to Haw. Rev. Stat. § 480-13 from further acts of

unfair methods of competition, and for an award of reasonable attorneys' fees and costs related

to obtaining such injunctive relief.

Respectfully Submitted,

Gary D. Friedman, Esq. (GF 6175)
David R. Fertig, Esq. (DF 5068)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
gary.friedman@weil.com
david.fertig@weil.com

Nenad Krek, Esq. (NK6300)
CARLSMITH BALL LLP
American Savings Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
(808) 523-2533 (v)
(808) 523-0842 (f)
nk@carlsmith.com

Attorneys for Plaintiffs
MARSH USA, INC. and MARSH &
MCLENNAN COMPANIES, INC.