**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARSH USA INC. and MARSH &
MCLENNAN COMPANIES, INC.

        Plaintiffs,

    v.

CHAD W. KARASAKI

        Defendant.

Case No. _O8 Cis. 4/95 (JGK)_

**DECLARATION OF**
**KENNETH P. GAVSIE**

KENNETH P. GAVSIE pursuant to 28 U.S.C. § 1746, affirms the following:

    1.     I am a member of the Bar of the State of New York and of this Court. I am an associate of the law firm of Weil, Gotshal & Manges LLP, attorneys for Plaintiffs Marsh USA, Inc. and Marsh & McLennan Companies, Inc. (collectively, "Plaintiffs") in this action.

    2.     Attached hereto at Tabs 1 through 7 are true and correct copies of the following declarations that were filed in support of Plaintiffs' Motion for Temporary Restraining Order, filed on April 14, 2008, in the United States District Court for the District of Hawaii against Defendant Chad W. Karasaki, civil action No. 08-00149 SOM KSC, which are being re-filed with this Court in support of Plaintiffs' Motion for Preliminary Injunction:

- **Declaration of Erika L. Lewis**, annexed hereto at Tab 1
- **Declaration of Cynthia Ramirez Roland**, annexed hereto at Tab 2
- **Declaration of Andrew L. Pepper**, annexed hereto at Tab 3
- **Declaration of Gregory Wolter**, annexed hereto at Tab 4
- **Declaration of Michael Kelly**, annexed hereto at Tab 5
- **Declaration of Gregg Carpenter**, annexed hereto at Tab 6
- **Declaration of Mason Williams**, annexed hereto at Tab 7

This declaration is made upon personal knowledge and is filed pursuant to 28 U.S.C. § 1746(2). I declare under penalty of perjury that the foregoing is true and correct.

Executed on Thursday, May 1, 2008 at New York, New York.

_____
KENNETH GAVSIE

**Tab 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation, | CIVIL NO. 08-00149 SOM-KSC DECLARATION OF ERIKA L. LEWIS; EXHIBITS "G" - "H" |
| Plaintiffs, | |
| vs. | |
| CHAD W. KARASAKI, | |
| Defendant. | |

## DECLARATION OF ERIKA L. LEWIS

I, ERIKA L. LEWIS, declare:

1.     I am an attorney with Carlsmith Ball, LLP, attorneys for Marsh U.S.A., Inc. and Marsh & McLennan, Inc.  I make this declaration on my personal knowledge.

2.     Attached hereto as Exhibit G is a true and correct copy of a news item reported as *Chad Karasaki Joins AON Risk Services as Top Hawaii Executive*, PACIFIC BUSINESS NEWS, Mar. 21, 2008 at 5.

3.     Attached hereto as Exhibit H is a true and correct copy of a press release announcing Defendant Chad W. Karasaki's hiring acquired on April 11, 2008 at AON Corporation's website, http://aon.mediaroom.com/index. php?s=43&item=1087.

This declaration is made upon personal knowledge and is filed pursuant to 28 U.S.C. § 1746(2).  I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2008 at Honolulu, Hawaii.


_Erika Lewis_
ERIKA L. LEWIS

# PACIFIC BUSINESS NEWS

WE UNDERSTAND HOW HAWAII WORKS

## Chad Karasaki joins AON Risk Services as top Hawaii executive



**Karasaki**

AON Risk Services of Hawaii has a new CEO and chairman: Chad Karasaki.

Karasaki left Marsh Management Services Hawaii after 22 years, where he most recently was its managing director.

In addition to his new position at AON, Karasaki will serve on the national operating board of AON Construction Services, a division that employs 540 in 25 offices worldwide.

"My goal is to build this operation and focus on the construction activities that are going on in the Pacific Rim," Karasaki said. "We'll use Hawaii as the launching point for Guam, Asia and the Mariana Islands, where there have been a lot of federal construction and major relocations."

March 12 marked his first day on the job.

"I still don't have a computer and business cards," he joked.

**EXHIBIT G**

# Aon Construction Services Group Hires Veteran Industry Expert to Lead Hawaii Operations - Mar 20, 2008

**Aon Corporation**

## Aon Construction Services Group Hires Veteran Industry Expert to Lead Hawaii Operations
**Chad Karasaki joins Honolulu office as managing director**

PRNewswire-FirstCall
HONOLULU
(NYSE:AOC)

HONOLULU, March 20 /PRNewswire-FirstCall/ -- Aon Corporation (NYSE: AOC), the leading provider of global risk management services, today announced that Chad Karasaki has joined Aon Construction Services Group as managing director. Karasaki, who will also serve as chairman and CEO of the Aon Honolulu office, is the latest in a series of strategic hires by Aon Construction Services Group to strengthen its growing presence in Hawaii and deliver distinctive value to clients.

(Logo: http://www.newscom.com/cgi-bin/prnh/20041215/CGW049LOGO)

Karasaki joins Aon from Marsh, where he had worked for 22 years. He was most recently head of Marsh's Hawaii office and was responsible for managing many of the company's largest construction, development, hospitality and retail clients.

"The addition of a practitioner with Chad's outstanding level of knowledge and experience in the construction industry will immediately enhance our profile within Hawaii," said Peter Arkley, president and chief executive officer of Aon Construction Services Group. "His understanding of the challenges facing contractor, owner and developer clients in the state will strengthen our ability to provide our clients with the best coverage and advice available today."

Karasaki, 45, holds over 20 years of construction risk

**EXHIBIT H**

management experience and has worked in the Hawaii market for almost his entire career. As managing director, Karasaki will utilize his access to this market and his keen understanding of owner and contractor controlled programs, hurricane and typhoon-related claims and construction defect cases to the benefit of the Aon Honolulu construction practice.

Karasaki holds a bachelor's degree with a double major in marketing and management from the University of Portland and a master of arts in organizational management from the University of Phoenix. He is a member of the Chartered Property Casualty Underwriters Association, General Contractors Association, Business Roundtable and the Japan American Society.

About Aon Construction Services Group

Aon Construction Services Group employs over 540 employees dedicated to the construction industry in 25 offices across the country. Backed by broad resources, industry knowledge and technical expertise, Aon professionals understand every major sector of the construction industry and help a wide range of clients develop effective risk management and workforce productivity solutions.

About Aon Corporation

Aon Corporation (NYSE: AOC) is the leading global provider of risk management services, insurance and reinsurance brokerage, human capital and management consulting, and specialty insurance underwriting. Through its 43,000 professionals worldwide, Aon readily delivers distinctive client value via innovative and effective risk management and workforce productivity solutions. Our industry-leading global resources, technical expertise and industry knowledge are delivered locally through more than 500 offices in more than 120 countries. Aon was ranked by A.M. Best as the number one global insurance brokerage in 2007 based on brokerage revenues, and voted best insurance intermediary, best reinsurance intermediary, and best employee benefits consulting firm in 2007 by the readers of Business Insurance. For more information on Aon, log onto http://www.aon.com/.

```
Media Contact
Raphaele Schnoll
KemperLesnik
312.755.3592
Raphaele.Schnoll@kemperlesnik.com
```

Photo: NewsCom: http://www.newscom.com/cgi-
bin/prnh/20041215/CGW049LOGO
AP Archive: http://photoarchive.ap.org/
PRN Photo Desk, photodesk@prnewswire.com

SOURCE: Aon Corporation

CONTACT: Raphaele Schnoll of KemperLesnik, +1-
312-755-3592,
Raphaele.Schnoll@kemperlesnik.com, for Aon
Corporation

Web site: http://www.aon.com/


Aon Corporation

**Tab 2**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation, | CIVIL NO. 08-00149 SOM-KSC<br><br>DECLARATION OF ANDREW L. PEPPER; EXHIBITS "D" - "F" |
| Plaintiffs, | |
| vs. | |
| CHAD W. KARASAKI, | |
| Defendant. | |

## DECLARATION OF ANDREW L. PEPPER

I, Andrew L. Pepper, declare as follows:

1.      I am a partner with Carlsmith Ball LLP, attorneys for Plaintiffs MARSH USA, INC. and MARSH & MCLENNAN COMPANIES, INC. in this lawsuit. I am familiar with the documents and events described below.

2.      I make this declaration on my personal knowledge and would be competent to testify on the matters stated herein.

3.      Attached hereto as Exhibit "D" is a true and correct copy of a contractual compliance demand letter sent to Defendant Chad W. Karasaki, via U.S. regular mail and certified mail, return receipt requested, postage prepaid to Chad W. Karasaki at his residence and place of business on March 25, 2008.

4.    Attached hereto as Exhibit "E" is a true and correct copy of a non-spoliation letter sent to Defendant Chad W. Karasaki, via U.S. regular mail and certified mail, return receipt requested, postage prepaid to Chad W. Karasaki at his residence and place of business on March 25, 2008.

5.    Attached hereto as Exhibit "F" is a true and correct copy of a letter from Jeffrey S. Portnoy of Cades Schutte, dated April 2, 2008 received April 2, 2008.

This Declaration is filed pursuant to 28 U.S.C. § 1742(2). I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2008 at Honolulu, Hawaii.



ANDREW L. PEPPER

2.

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

ASB TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE 808.523.2500    FAX 808.523.0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
808.523.2572

APEPPER@CARLSMITH.COM

OUR REFERENCE NO.:
000ALP-1

March 25, 2008

**VIA REGULAR U.S. MAIL AND CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**

Mr. Chad W. Karasaki
307 Hamakua Drive
Kailua, HI 96734
    and
Mr. Chad W. Karasaki
c/o AON Risk Services Inc. of Hawaii
201 Merchant Street, Suite 2400
Honolulu, HI 96813

Re:    Marsh USA Inc., Marsh & McLennan Companies, Inc.,
        AON Risk Services, Inc., AON Construction Services Group

Dear Mr. Karasaki:

    This law firm has been retained to protect the interests of your former employer, Marsh USA Inc., a subsidiary of Marsh & McLennan Companies, Inc. (collectively "Marsh"), with respect to issues arising out your resignation from employment with Marsh, your subsequent employment with a company in direct competition with Marsh, your compliance (or lack thereof) with the terms and conditions of various contractual agreements you entered into with Marsh (and that survive your resignation from employment), and the preservation and return of trade secrets and proprietary information belonging to Marsh, which may be in your possession or under your control.

    Pursuant to the *Non-Solicitation Agreement for Participants in the Discretionary Bonus Plan* ("Non-Solicitation Agreement") that you executed on November 25, 2003, you were (and are) strictly prohibited from soliciting or accepting the transfer of certain business relationships enjoyed by Marsh and/or from performing or supervising the performance of any services for certain Marsh customers who might transfer their business to your new employer. In addition, you were (and are) strictly prohibited from soliciting any Marsh employee to terminate his or her employment with Marsh for the purposes of moving to a competing company. Specifically, your Non-Solicitation Agreement provides:

HONOLULU  ·  KAPOLEI  ·  HILO  ·  KONA  ·  MAUI  ·  GUAM  ·  SAIPAN  ·  LOS ANGELES

**EXHIBIT D**

Mr. Chad W. Karasaki
March 25, 2008
Page 2

I agree that if my employment with the Company
terminates for any reason, I will not, for a period of one (1)
year from date of termination, <u>directly or indirectly,</u> as a
sole proprietor, member of a partnership, or stockholder,
investor, officer or director of a corporation, or as an
employee, agent, associate or consultant of any person,
firm or corporation except for the benefit of the Company:
(emphasis added)

(a)      solicit or accept business of the type offered by the
Company during my term of employment with the
Company, or perform or supervise the performance of any
services related to such type of business, from or for

(i)      clients or prospects of the Company or its
affiliates who were solicited or serviced directly by
me or where I supervised, directly or indirectly, in
whole or in part, the solicitation or servicing
activities related to such clients or prospects; or

(ii)     any former client of the Company or its
affiliates who was such within two (2) years prior to
my termination of employment and who was
solicited or serviced directly by me or where I
supervised, directly or indirectly, in whole or in
part, the solicitation or servicing activities related to
such former clients; or

(b)      solicit any employee of the Company who worked
in the same business unit or who worked with me directly
to terminate his or her employment with the Company for
the purpose of competing with the Company.

Similar prohibitions on your post-employment conduct are found in the *Restrictive
Covenants Agreement* you executed on June 27, 2007:

Employee covenants and agrees that in the event of
separation from employment with the Company, whether
such separation is voluntary or involuntary, the Employee
will not, for a period of twelve (12) months following such
separation, <u>directly or indirectly:</u> (i) solicit clients of the
Company for the purpose of selling or providing products
or services of the type sold or provided by the Employee
while employed by the Company; or (ii) induce clients or
prospective clients of the Company to terminate, cancel,

Mr. Chad W. Karasaki
March 25, 2008
Page 3

not renew, or not place business with the Company; or (iii)
perform or supervise the performance of services or
provision of products of the type sold or provided by the
Employee while he or she was employed by the Company
on behalf of any clients or prospective clients of the
Company. (emphasis added)
. . .
Accordingly, both during employment with the Company
and for a period of twelve (12) months thereafter, the
Employee shall not, either on the Employee's own account
or on behalf of any person, company, corporation, or other
entity, directly or indirectly, solicit, or endeavor to cause
any employee of the Company with whom the Employee,
during the last two (2) years of his or her employment with
the Company, came into contact for the purpose of
soliciting or servicing business or about whom the
Employee obtained confidential information, to leave
employment with the Company.

In addition to the above-described contractual prohibitions and restrictions on your
post-employment conduct, Hawaii's general laws regarding employee honesty and faithfulness
recognize that "unless otherwise agreed, an agent is subject to a duty to his principal to act solely
for the benefit of the principal in all matters connected with his agency." Restatement (Second)
of Agency §387 (1958). See also Stout v. Laws, 37 Haw. 382 at *6 (1946):

An employee unquestionably owes a duty of loyalty to his
employer. Likewise an agent in respect to the subject matter of his
agency must exercise the utmost good faith in the furtherance and
advancement of the interests of his principal. Agents, as to matters
within the scope of their duty, cannot assume positions
antagonistic to their employer's interest. And failing to observe
this duty the agent is guilty of constructive fraud.

"Although an employee 'is entitled to make arrangements to compete' with his employer
prior to terminating the employment relationship, the employee is not 'entitled to solicit
customers for such rival business before the end of his employment.'" Eckard Brandes, Inc. v.
Riley, 338 F.3d 1082, 1085 (9th Cir. 2003) (quoting Restatement (Second) of Agency §393
cmt. e).

Further, in addition to the various contracts to which you are bound, and the Hawaii
common law above-cited, Hawaii statutory law, specifically the Hawaii Uniform Trade Secrets
Act, Haw. Rev. Stat. Ch. 482B, broadly defines "trade secrets" as "information, including a
formula, pattern, compilation, program device, method, technique, or process that: . . . (1)
Derives independent economic value, actual or potential, from not being generally known to, and
not being readily ascertainable by proper means by, other persons who can obtain economic

Mr. Chad W. Karasaki
March 25, 2008
Page 4

value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Haw. Rev. Stat. § 482B-2. Marsh's confidential, proprietary, and competitive information, to which you had access, clearly falls within that definition. The statute makes it unlawful for an employing company (such as AON) to acquire a trade secret when it has reason to know that the trade secret was acquired by improper means. It further prohibits persons (such as yourself) from disclosing trade secrets to a subsequent employer (such as AON) without the consent of the owner (*i.e.*, Marsh). Haw. Rev. Stat. § 482B-2. Liability includes actual damages and "exemplary" damages for "wilful and malicious" violations. Haw Rev. Stat. § 482B-4.

Trade secrets take a variety of forms and include, without limitation, the following:

- Advertising strategies, plans and techniques;

- Business strategies and methods;

- Use of terms of contracts with third-party vendors, or customers;

- Cost information;

- Customer lists and customer information;

- Key contact personnel with customers or prospective customers;

- Marketing research, strategies, plans, and marketing concessions;

- Pricing information, including pricing concessions;

- Product plans and designs;

- Personnel information such as compensation;

- Profit margins;

- Technical know-how; and

- Technical specifications.

Thus, under Hawaii statutory law, you must not disclose or use Marsh's confidential, proprietary, or competitive information to solicit Marsh's customers or employees or disclose or use such confidential, proprietary, or competitive information in any other fashion that would benefit yourself or your new company (*i.e.*, AON). If you have possession or control of Marsh trade secrets, you must fully identify those trade secrets in a sworn affidavit and return this property immediately to Marsh through this law firm. You must further *cease and desist* from utilizing Marsh trade secrets to advance the interests of yourself, AON or others.

Mr. Chad W. Karasaki
March 25, 2008
Page 5

Returning to your contractual agreements, you have made the following contractual promise in your *Non-Solicitation Agreement*:

> Both during my employment with [Marsh] and after termination thereof for any reason, I agree to provide [Marsh] with such information relating to my work for [Marsh] or others, as [Marsh] may from time to time reasonably request in order to determine my compliance with this Agreement.

This letter constitutes a contractual demand that you provide such information. Accordingly, Marsh demands a written assurance from you, in the form of a sworn affidavit, that you did not solicit any existing customers or prospective customers on behalf of AON while you were employed by Marsh and/or since your separation from employment as an employee of Marsh and your subsequent employment by AON. If you, if fact, did solicit Marsh customers or prospective customers, we will require a list of the customers and prospective customers solicited and a disclosure of whether the listed individuals or entities are now doing business with AON. We require this in order to "determine [your] compliance" with your contracts with Marsh, including but not limited to your *"Non-Solicitation Agreement."*

Because you are now on notice of potential legal claims, you must take steps to preserve all documents and information in your possession or control (including those in your possession and control at AON), whether preserved through hard copy or electronically, that relate to the issues posed in this correspondence. This demand includes a demand for the preservation of electronic meta-data. This demand for preservation should be considered to be very broad, sweeping, and all-encompassing so as to include the preservation of any documents and information that relate to, pertain to, refer to, or in any other way touch upon your entire career at Marsh, your relationship(s) with Marsh's customers, your employment by AON, and all other activities connected with AON. Any deletion, modification or other spoliation of evidence could result in severe court sanctions. Given the serious nature of these matters, and the severe consequences and ramifications associated with spoliation of evidence once you are on notice of potential claims, you should consult with an attorney prior to responding to this correspondence.

We urge you to consult with independent *personal* legal counsel, and to take immediate steps to (1) completely disclose whether and to what extent you may have engaged in activities inconsistent with your common law and/or contractual duties to Marsh (both while employed by Marsh and since employed by AON; (2) completely disclose and immediately return all Marsh trade secrets and proprietary information in your possession or control;[1] and (3) immediately cease and desist from utilizing Marsh's trade secrets to advance your interests and/or the interests of AON or third-parties. Your disclosures and representations must be via sworn affidavit and sufficiently detailed and complete so as to allow Marsh to analyze your compliance with the

---

[1] For your obligations with regard to the return of such information and materials, please see, *e.g.*, paragraph 4 of the *Confidentiality and Ownership Rights Agreement*, executed by you on November 25, 2003, entitled "Return of Materials Upon Termination of Employment."

Mr. Chad W. Karasaki
March 25, 2008
Page 6

various legal obligations discussed in this letter (and such other obligations that exist in your various contracts). If we do not hear from you by 5:00 p.m., HST, on Monday, March 31, 2008, we will assume that you do not intend to respond and will take appropriate (and immediate) legal action.[2] We urge your full cooperation in resolving these matters. As I am sure you can appreciate, the alternative will result in litigation.

Very truly yours,

Andrew L. Pepper

ALP/rkh

4820-6364-2370.1

---

[2] Marsh reserves the right to take legal action against you even prior to 5:00 p.m., HST, on Monday, March 31, 2008, and the setting of this deadline is not a waiver of legal action or a promise of forbearance of litigation prior to that date and time.

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

ASB TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE 808.523.2500    FAX 808.523.0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
808.523.2572

APEPPER@CARLSMITH.COM

OUR REFERENCE NO.:
000ALP-1

March 25, 2008

**VIA REGULAR U.S. MAIL AND CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**

Mr. Chad W. Karasaki
307 Hamakua Drive
Kailua, HI 96734
            and
Mr. Chad W. Karasaki
c/o AON Risk Services Inc. of Hawaii
201 Merchant Street, Suite 2400
Honolulu, HI 96813

Re:    Marsh USA Inc., Marsh & McLennan Companies, Inc.,
       AON Risk Services, Inc., AON Construction Services Group

Dear Mr. Karasaki:

As noted in my prior letter to you of earlier this morning, this law firm has been retained to represent, protect, and pursue the interests of your former employer, Marsh USA Inc., a subsidiary of Marsh & McLennan Companies, Inc. (collectively "Marsh") with regard to issues relating to your resignation, improper conversion, detention, use, and exploitation of Marsh's confidential, proprietary, and competitive information, your employment with and by AON, and breaches of your fiduciary duties, duties of loyalty, and contractual duties owed to Marsh (for example, we note that as Chairman and CEO of AON Construction Services Group you are in open and flagrant violation of your contractual promises to not "supervise the performance" of insurance brokerage services for Marsh's ex-customers, including but not limited to Maryl Group, Stanford Carr Development, LLC (and SCD ML II), Niking Corporation & King Construction, Commercial Plumbing, Ala Moana Services, LLC, James K. Schuler & Associates, Kiahuna Kanahiku, LLC, Nordic Construction, Ltd., TDM Kua, LLC, VP & PK ML, Arisumi Bros., etc.).

Marsh is conducting a variety of investigations into your conduct leading up to your resignation from Marsh and your subsequent employment by AON and is preparing to take appropriate legal action against you to protect its interests and enforce its rights.

HONOLULU    ·    KAPOLEI    ·    HILO    ·    KONA    ·    MAUI    ·    GUAM    ·    SAIPAN    ·    LOS ANGELES

**EXHIBIT E**

Mr. Chad W. Karasaki
March 25, 2008
Page 2

Accordingly, because you, AON, and the Relevant Persons (as defined below) are now on notice that there exists a reasonable likelihood of litigation being filed against you, AON, and one or more of the Relevant Persons (as defined below), it is imperative that you take immediate and effective steps to preserve, protect, sequester, and prevent the spoliation of any and all documents and electronic forms of data that may become evidence in the litigation (or may be reasonably calculated to lead to the discovery of admissible evidence) and that relate to, pertain to, or refer to your employment with Marsh, your resignation from Marsh, your association and subsequent employment with AON, Marsh's customers, clients, employees, marketing strategies, products, services, fees, methods of business and competition, and strategic goals, and AON's customers, clients, employees, marketing strategies, products, services, fees, methods of business and competition, and strategic goals. To that end, and without defining or limiting the boundaries of the actions that you must take to satisfy this document/data preservation and non-spoliation demand, your actions must include the following:

1.  *Immediately* collect and return to Marsh (through me and via hand-delivery) any and all physical "hard copy" documents (originals, copies, and derivatives) that originated from Marsh, including but not limited to, the documents described in this letter and other documents prepared utilizing, and thereby derivative of, Marsh's materials and that are in the control, custody, or possession (actual or constructive) of you, AON, or such other employees or agents of AON who have been involved in AON's solicitation of Marsh's customers (collectively hereinafter and above, the "Relevant Persons"). For purposes of this letter, the term "Relevant Persons" shall also mean and include Janet L. Ng, Francis "Frank" Wirt, and Jeffrey H. Case.

2.  *Immediately* audit and inventory any and all computer and other electronic communications and processing systems used by you, AON, or the Relevant Persons to determine what documents and other communications that relate to, pertain to, or refer to, Marsh exist on such systems or on associated electronic or magnetic storage media and provide said inventory to me within five (5) calendar days. In connection with this audit, provide written assurances that all of the various electronic devices (and all associated electronic and magnetic storage media), including but not limited to computers, laptop computers, Blackberry-type devices, cellular telephones, to which you, AON, or the Relevant Persons had access or used, and all "electronic media and data" (as defined below) have been surrendered by you and seized from the Relevant Persons, that they have been deenergized, and that they have been placed in secure storage, controlled by a third party not employed or associated with you, AON, or the Relevant Persons, and beyond your reach and the reach of the Relevant Persons or any other AON employee/agent, and that such equipment will be

Mr. Chad W. Karasaki
March 25, 2008
Page 3

made available for forensic review by any expert retained or
employed by Marsh. Provide in connection with this assurance,
the name, address, telephone number, facsimile number, and email
address of the person(s) in whom such custody the equipment has
been placed. Custody may be placed with an attorney representing
you, AON, or the Relevant Persons provided that attorney's
primary office is in Honolulu, Hawaii (who must *immediately* be
identified to me) and that the equipment remains in that attorney's
Honolulu office.

3.      Provide a complete and comprehensive description of each
and every document or record of you, AON, and the Relevant
Persons that contains, or was derived from, any of Marsh's
confidential, proprietary, or competitive information. This will
require that you provide the date of the document or record, the
author of the document or record, the recipients of the document or
record, and the name and address of the current custodian of each
such document or record.

4.      Provide a complete and comprehensive description of each
and every document or record of you, AON, or any of the Relevant
Persons in which any of Marsh's confidential, proprietary, or
competitive information has been transmitted or communicated to
or from any third party (regardless of whether that third party is a
natural person or a business entity).

5.      Provide true and accurate printouts of each and every email
communication between you and any other director, shareholder,
partner, agent or employee of AON, including but not limited to
the Relevant Persons, for the time period of 12:01 a.m. on
January 1, 2008 through and including 5:30 p.m. on the date of this
letter. This will require that you provide accurate information as to
the original transmission date and time of each such email, as well
as the identification of each and every person who was the sender,
recipient, open copy recipient, or blind copy recipient of each such
email. In providing such email printouts, all necessary steps must
be taken to preserve the metadata that accompanies each email.
Failure to so protect metadata shall be considered an act of
evidentiary spoliation and will form the basis for additional claims
against you, AON, and the Relevant Persons.

6.      Provide true and accurate copies of each and every
document or record (including but not limited to email records) of
you, AON, or any of the Relevant Persons that was transmitted or
communicated in any fashion to any client or customer, or former

Mr. Chad W. Karasaki
March 25, 2008
Page 4

or prospective client or customer, of Marsh during the period 12:01
a.m. on January 1, 2008 through and including 5:30 p.m. on the
date of this letter.

7.      Provide true and accurate copies of each and every
document or record (including but not limited to email records) of
you that was transmitted or communicated in any fashion to any of
the Relevant Persons during the period 12:01 a.m. on January 1,
2008 through and including 5:30 p.m. on the date of this letter.

8.      Provide true and accurate copies of your, AON's and of the
Relevant Persons' detailed cellular and traditional landline
telephone bills, from and including 12:01 a.m. on January 1, 2008
through and including 5:30 p.m. on the date of this letter.

9.      Provide true and accurate copies of any and all documents
that relate to, pertain to, or refer to the potential or actual retention
by you as a shareholder, partner, agent, director, officer, or
employee of AON. These documents should include, but not be
limited to, all drafts of any proposed shareholder, partnership,
agency, or employment agreement between you and AON (or any
intermediary between AON and you), and any document that
discusses the amount of remuneration that you were to receive, or
are receiving as a shareholder, partner, agent, director, officer, or
employee of AON. Provide identical information for each of
Janet L. Ng, Francis "Frank" Wirt, and Jeffrey H. Case.

10.     Provide, *immediately*, the names, addresses, telephone
numbers, facsimile numbers, and email address of each and every
director, shareholder, partner, agent, officer, or employee of AON.

11.     Provide true and accurate copies of any and all documents
that relate to, refer to, or pertain to, AON's plans to conduct
business in the State of Hawaii and/or to compete with Marsh.
Such documents shall include but not be limited to any and all
documents that relate to, refer to, or pertain to the "series of
strategic hires by AON Construction Services Group to strengthen
its growing presence in Hawaii" as described in a press release or
other media announcement issued by AON or AON's agents
during the month of March 2008.

12.     Provide true and accurate copies of any and all documents
that relate to, refer to, or pertain to, the conceptualization,
formation, registration, and operation of AON in the State of
Hawaii.

Mr. Chad W. Karasaki
March 25, 2008
Page 5

> 13.    Undertake meaningful and *effective* efforts to ensure that
> the above-referenced materials are preserved and not spoliated (if
> in electronic form), altered, mutilated, or destroyed, in any manner
> by any person (including but not limited to you, the Relevant
> Persons, or any officer, director, agent, or employee of AON).

I want to make clear that no document and/or electronic media and data that relates to, pertains to, refers to, or touches in any way upon Marsh's dispute with you, AON, or the Relevant Persons should be destroyed, disposed of, defaced, deduplicated, or stored in a manner in which they may degrade, become altered, or become spoliated (including but not limited to spoliation through any modification or change in system or document metadata). Specifically, a **NON-SPOLIATION DEMAND IS HEREBY MADE** that until further notice by Marsh, you and AON, and your and AON's respective directors, officers, employees, and agents, (including, but not limited to, the members and employees of AON), and all persons in active concert or participation with you and AON (including, but not limited to, the Relevant Persons) shall not interline, destroy, permit the destruction of, discard, delete, dispose of, alter, deface or in any other fashion change any "document" or "electronic media and data," (as each word or phrase is defined below) in the actual or constructive care, custody, or control of any such person, wherever such document is physically *or electronically/magnetically* located. Demand is also made that no such persons change the location of any such documents or electronic media or data to a location outside of the jurisdiction of the Circuit Court of the First Circuit, State of Hawaii.

As used in this letter, "document" shall mean and include any and all of Marsh's and AON's business records, your personal and business records, and the personal and business records of the Relevant Persons, including, but not limited to, writings, drawings, films, videotapes, charts, photographs, phonographs, records, tape records, email, mechanical or electronic sound recordings or transcripts thereof, retrievable data (whether carded, taped, coded, electrostatically or electromagnetically recorded, or otherwise), or other data compilations from which information can be obtained, including but not limited to, notices, memoranda, diaries, minutes, purchase records, purchase invoices, market data, correspondence, computer storage tapes, computer storage cards or discs, optical platters, books, journals, ledgers, statements, Rolodexes® (or similar methods or devices to store and record contact information), reports, invoices, bills, vouchers, worksheets, financial writings and other financial records, jottings, notes, letters, abstracts, audits, charts, checks, diagrams, drafts, recordings, instructions, lists, logs, orders, recitals, telegram messages, telephone bills and logs, resumes, summaries, compilations, computations, and other formal and informal writings or tangible preservations of information.

As used in this letter, "electronic media and data," shall mean and include the following:

> (1)    Any and all mainframe and networked computers, personal
> computers, laptop, portable, notebook and palm computers,
> personal digital assistants ("PDAs"), central processing units, data
> drives, flash drives, thumb drives, USB drives, I-Pod® hard drives
> (or such other similar MP3 capable devices whose essential storage

Mr. Chad W. Karasaki
March 25, 2008
Page 6

and playback function and capability is similar to that provided by
I-Pod® hard drives), hard drives, floppy drives, optical drives, tape
drives, digital audio tape drives, and/or any other internal or
external storage devices such as magnetic tapes and/or disks; any
terminals and/or video display units and/or receiving units and/or
peripheral equipment such as, but not limited to, printers, digital
scanning equipment, automatic dialers, modems, acoustic couplers
and/or direct line couplers, peripheral interface boards, and
connecting cable and/or ribbons; any computer software, program
and source documentation, computer logs, diaries, magnetic audio
tape and recorders, digital audio discs and/or recorders, any
memory devices such as, but not limited to, memory modules,
memory chips, bubble memory, and any other form of memory
device utilized by the computer or its peripheral devices; and all
computer related accessories not specifically mentioned.

(2)     Any and all electronic data, including but not limited to computer
programs, programming notes or instructions, activity listings of
electronic mail receipts and/or transmittals, output resulting from
the use of any software program, including word processing
documents, spreadsheets, database files, charts, graphs and
outlines, electronic mail, operating systems, source code of all
types, peripheral drivers, PIF files, batch files, ASCII files, and any
and all miscellaneous files and/or file fragments, regardless of the
media on which they reside and regardless of whether said
electronic data consists in an active file, deleted file or file
fragment.  Electronic data includes any and all items stored on
computer memories, hard disks, floppy disks, CD-ROMs,
removable media such as Zip disks, Jaz cartridges, Bernoulli
Boxes and their equivalent, magnetic tapes of all types, microfiche,
punched cards, punched tape, computer chips, including, but not
limited to EPROM, PROM, RAM and ROM, on or in any other
vehicle for digital data storage and/or transmittal.  The term
electronic data also includes the file, folder tabs and/or containers
and labels appended to, or associated with, any physical storage
device associated with each original and/or copy.

(3)     Any and all documentation and/or notations referring to a
computer, the contents of a computer, the use of a computer or any
computer software and/or communications including but not
limited to, machine readable data, all previously erased data
(regardless of the status of the File Allocation Table or similar
table function), and any personal communications including, but
not limited to, email, chat capture, capture file, correspondence

Mr. Chad W. Karasaki
March 25, 2008
Page 7

stored in electronic form, and/or correspondence exchanged in
electronic form.

(4)    Any and all "electronic mail and/or email," the meaning of which
would include the exchange of computer-generated and/or
computer-stored messages by means of communications that use
electronic utilities and protocols, including but not limited to,
Transport Control Protocol/Internet Protocol ("TCP/IP"), IMAP,
SMTP and/or POP3.

This letter is not intended to suggest or establish that the documents whose retention and
non-spoliation is demanded are discoverable; nor is this letter intended to provide a complete
listing of documents and/or data that must be maintained as relevant to Marsh's investigation of
your conduct and/or that may be evidentiary material in any lawsuit that Marsh may file against
you, AON, and/or the Relevant Persons. This letter is intended merely to achieve the retention
and non-spoliation of documents and electronic forms of data so that their discovery may be
sought and the discoverability of the documents and/or data may be adjudicated (if necessary)
once Marsh files a lawsuit against you, AON, and/or any of the other Relevant Persons.

As soon as you have retained *personal* legal counsel in this matter, please put that person
in contact with me so that I may avoid any inadvertent *ex parte* communications with a
represented party. Until you have retained counsel in this matter and made that person's identity
known to me, I will continue to deal with you directly.

Very truly yours,



Andrew L. Pepper

ALP/rkh

4826-1748-7106.2.000ALP-00001

# c a d e s ▪ s c h u t t e

a limited liability law partnership

## Facsimile Cover Sheet

DATE        : April 2, 2008

TO          : Name                          Fax No.            Phone No.

Andrew L. Pepper, Esq,.       523-0842           523-2500
Carlsmith Ball LLP

FROM        : Name:            Jeffrey S. Portnoy
Fax Number:      (808) 540-5040
Phone Number:    (808) 521-9221
E-mail Address:  jportnoy@cades.com

RE          : Subject:         AON/Marsh
File No.:
Pages:           3

Transmitting:    Letter of today's date

Remarks:

If all pages are not received, please call _____ at _____

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND IS EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal service. Thank you.

C S

Cades Schutte Building          Kona Office
1000 Bishop Street, Suite 1200   75-170 Hualalai Road, Suite B-205
Honolulu, Hawaii 96813          Kailua Kona, Hawaii 96740
Tel: 808.521-9200               Tel: 808.329-5011
Fax: 808.521-9210               Fax: 808.326-1175
www.cades.com

**EXHIBIT F**



Jeffrey S. Portnoy
Direct Line: (808) 521-9221
Direct Fax: (808) 540-5040
E-mail: jportnoy@cades.com

April 2, 2008

VIA FACSIMILE

Andrew L. Pepper, Esq.
Carlsmith Ball LLP
ASB Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813

     Re:    Marsh USA Inc., Marsh & McLennan Companies, Inc.
           AON Risk Services, Inc., AON Construction Services Group

Dear Andrew:

Thank you for your March 25, 2008 correspondence to Chad Karasaki, Jeffrey Case, Janet Ng and Francis Wirt. Please be advised that I represent Mr. Karasaki, Mr. Case, Ms. Ng and Mr. Wirt, and accordingly ask that any additional communications to them from you or anyone else representing Marsh USA Inc. or Marsh & McLennan Companies, Inc. (collectively, "Marsh") be directed exclusively through me.

In response to the numerous demands in your letters, please understand that Mr. Karasaki, Mr. Case, Ms. Ng and Mr. Wirt will comply with all of their legal obligations, including any existing duties not to destroy documents belonging to Marsh. However, I disagree that they are legally or otherwise obligated to take many of the actions you demand, particularly those enumerated in paragraphs 2 and 5-12 of your letters. To the extent that you are aware of law that would compel them to comply with these and the other demands in your letters, I invite you to provide any applicable cites or references.

Please also understand that, with minor exceptions, Mr. Karasaki, Mr. Case, Ms. Ng and Mr. Wirt are not in possession of any documents that originated from Marsh, contain Marsh's confidential information, or are otherwise responsive to paragraphs 1, 3 or 4 of your letters. The exceptions include:

Cades Schutte Building
1000 Bishop Street, Suite 1200
Honolulu, Hawaii 96813
Tel 808.521.9200
Fax 808 521.9210
www.cades.com

Kona Office
75-170 Hualalai Road, Suite 303
Kailua-Kona, Hawaii 96740
Tel: 808.329.5811
Fax: 808.326-1175

Apr-02-08  12:05    From-CADES SCHUTTE LLP                    +8086219210          T-594   P.03/03   F-954

Andrew L. Pepper, Esq.
April 2, 2008
Page 2

    ●    Mr. Case's business card files, many of which he accumulated before working for
Marsh.

    ●    Mr. Wirt's business card files.

    ●    Additional contact names, telephone numbers and email addresses retained by
Mr. Wirt.

Without representing that an obligation exists to provide any of these documents, and
without waiving the right to object to further productions, I will shortly provide you with the
above-listed documents and items (including business cards from Mr. Case that he did not obtain
while with Marsh). Our investigation continues as to whether Mr. Karasaki, Mr. Case, Ms. Ng
or Mr. Wirt possess any additional documents that would be appropriately disclosed pursuant to
paragraphs 1, 3 or 4 of your letters.

Very truly yours,

Jeffrey S. Portnoy
    for
CADES SCHUTTE
A Limited Liability Law Partnership

ImanageDB:861370.1

**Tab 3**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>   vs.<br><br>CHAD W. KARASAKI,<br><br>        Defendant. | CIVIL NO. 08-00149 SOM-KSC<br><br>DECLARATION OF CYNTHIA RAMIREZ ROLAND, EXHIBITS "B" AND "C" |

<u>DECLARATION OF CYNTHIA RAMIREZ ROLAND</u>

I, CYNTHIA RAMIREZ ROLAND, declare:

    1.    I am a Human Resources Assistant employed with Marsh Risk & Insurance Services ("MRIS").

    2.    MRIS maintains certain employment-related records for Plaintiff Marsh & McLennan Companies, Inc. and Plaintiff Marsh USA Inc.

    3.    I have reviewed the employment records of Defendant Chad W. Karasaki ("Karasaki") which are maintained by MRIS in its files the regular course of its business.

    4.    These records reflect that, from February 28, 2004, to February 28, 2008, Karasaki received a total of $410,375.00 in cash bonus payments from Plaintiffs (not including deferred bonuses and non-cash bonuses).

4825-0562-0994.1.050293-00013

5.    Karasaki also received various stock unit grants from Plaintiffs, most recently on February 28, 2008.

6.    Karasaki most recent annual salary, exclusive of any discretionary bonuses, was $245,000.00.

7.    Exhibits "B" and "C" attached hereto are true copies of agreements between Karasaki and Plaintiffs which are maintained by MRIS in its files in the regular course of its business.

This declaration is made upon personal knowledge and is filed pursuant to 28 U.S.C. § 1746(2). I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2008 at Newport Beach, California.

_____
CYNTHIA RAMIREZ ROLAND

### Marsh USA Inc. Non-Solicitation Agreement
### for Participants in the Discretionary Bonus Plan

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.    Non-Solicitation of Company Business and Employees

I understand and acknowledge that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I agree that if my employment with the Company terminates for any reason, I will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(a)    solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for

(i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or

(ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b)    solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

2.    Miscellaneous

a.    Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my work for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement. I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.    I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

## EXHIBIT B

c.    In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.    I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.    I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to my business activities during and/or subsequent to my employment by the Company.

f.    I understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.    I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

This Agreement shall be construed in accordance with the laws of the State of New York.

Name (Print):     Chad W. Karasaki          SS#: _____

Signature:     Chad W. Karasaki          Date: 11 25 03

# MARSH USA INC.

## Confidentiality and Ownership Rights Agreement

In order to receive the benefits afforded by the Marsh USA Inc. Discretionary Bonus Plan ("the Bonus Plan"), during my employment with Marsh USA Inc., a Delaware corporation, or and for any subsequent period I am employed by any company directly or indirectly affiliated with, controlled by, controlling or under common control with Marsh USA Inc. (collectively referred to herein as the "Company"), I hereby agree as follows:

1.    Acknowledgment of Confidential Nature of Work

I understand and acknowledge that:

(i)    the nature of the Company's work is highly confidential;

(ii)    as an employee of the Company I learn or have access to highly confidential and sensitive information about the Company and its clients;

(iii)    providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations; and

(iv)    I may learn or assist in developing highly sensitive data or other information relating to the Company and its operations.

2.    Definition of "Confidential Information," "Inventions" and "Copyrightable Work"

a.    For the purposes of this Agreement, "Confidential Information" shall consist of and include:

(i)    any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, assets, liabilities, identity, risk characteristics, insurance policy terms, conditions and rates, finances, products, discoveries, databases, computer programs, frameworks, models, marketing, selling and operating practices and information concerning the markets with which its risks are placed;

(ii)    any and all information in whatever form relating to the Company, including but not limited to, information relating to the Company's business, employees, operations, systems, assets, liabilities, finances, resources, clients or prospects, risk management procedures, client insurance programs and the cost thereof, policy expiration dates and other financial or risk information about clients, arrangements with insurers and other financial

**EXHIBIT C**

institutions, products, discoveries, databases, computer programs, frameworks, models, methods, and marketing, selling, operating, recruiting, and compensation practices, and information in whatever form relating to the manner in which the Company conducts its business;

(iii)    any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public or which is disclosed to me or the Company pursuant to a Confidentiality or Non-Disclosure Agreement between the Company and a third party;

(iv)    Inventions (as defined below); and

(v)    Copyrightable Works (as defined below).

Information which otherwise falls within the definition of "Confidential Information" above shall not be considered Confidential Information to the extent that:

(A)    the information has been published or made generally available, or is otherwise in the public domain, without breach of this Agreement; or

(B)    the information was given to me by a party (other than a client or prospective client of the Company or another employee of the Company) who was not obligated to the Company or any of its clients or prospective clients to maintain its confidentiality.

b.    For the purposes of this Agreement, "Inventions" shall include, but not be limited to, all inventions, designs, specifications, insurance policy forms and provisions, instructions, formulations, products, discoveries, articles, reports, specimens, models (computer or otherwise), methods of analysis, prototypes, sketches, processes, methods, frameworks, formulas, systems, techniques, trademarks, names, commercial or business methods of any kind, concepts, and ideas, the expressions of all concepts and ideas, computer programs, codes, documentation, software, improvements, and all modifications and developments with respect to the foregoing and know-how related thereto, whether or not any such Invention is eligible for patent, trademark, copyright, trade secret or other legal protection.

c.    For the purposes of this Agreement, "Copyrightable Work" means any work subject to copyright protection as defined by the U.S. Copyright Act, 17 U.S.C. § 102 including, but not limited to, catalogs, directories, factual, reference or instructional works, literary and dramatic works, pictorial, musical and graphic works, motion pictures and other audiovisual works, sound recordings, architectural works and compilations of data, computer data bases and computer programs.

- 2 -

3.    Nondisclosure of Confidential Information

During the period I am employed by the Company, I agree that, unless authorized in writing to do so by the Company's Human Resource Director, North American Operations, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out my duties as an employee of the Company. After termination of my employment by the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information.

4.    Return of Materials Upon Termination of Employment

Upon the termination of my employment with the Company for any reason, I will leave at the Company or return to the Company within seven (7) days:

a.    any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports and other media or property in my possession or control which contain or pertain to Confidential Information; and

b.    all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.

I agree that, upon my completion of the obligations set forth in Section 4, paragraphs a. & b. above and my receipt of a request from the Company, I will execute a statement declaring that I have retained no property of the Company or materials containing Confidential Information nor have I supplied the same to any person, except as required to carry out my duties as an employee of the Company. I understand that a receipt signed by a Managing Director of the Company (or his/her delegate) itemizing the returned property and materials shall be necessary to demonstrate that the property or materials itemized were so returned and the Company agrees not to unreasonably withhold production of such a receipt.

5.    Assignment of Rights to Inventions; Ownership of Copyrightable Works

a.    I hereby assign, and agree to assign, to the Company all my present and future right, title and interest in and to any Inventions conceived, discovered, reduced to practice and/or made by me during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement), such assignment to occur within 30 days of such conception, discovery, reduction to practice, or making, whichever is earlier (or, if prior to the date of this Agreement, within 30 days after the date hereof), whether such Inventions were conceived, discovered and/or reduced to practice and/or made by me solely or jointly with others, on or off the premises of the Company's business, or during or after working hours, if such Invention(s): (i) were conceived, discovered, reduced to practice and/or made with the Company's facilities, equipment, supplies and/or trade secrets; or (ii) relate to the Company's current, potential or anticipated business activities, work or research; or (iii) result from work done or to be

- 3 -

done by me or under my direction, alone or jointly, for the Company. I further acknowledge and agree that such Inventions as referred to herein belong to the Company and that the Company may keep such Inventions and/or processes pertaining thereto, whether patented or copyrighted or not, as trade secrets and make all decisions regarding whether and how to use such Inventions and/or processes. I further agree not to use or seek any commercial exploitation of or otherwise use any Invention required to be assigned under this Agreement for personal use.

b.    I acknowledge, agree, and intend that all Copyrightable Work I create during the period of time that I am employed by the Company (whether before, on or after the date of this Agreement) and within the scope of my employment shall be considered to be "works made for hire" as defined under the U.S. Copyright Act, 17 U.S.C. §§ 101 et seq. I also acknowledge, agree, and intend that the Company will be deemed the author of all such works made for hire and the owner of all of the rights comprised in the copyright of such works.

c.    I agree to execute all documents and do all things deemed necessary by the Company at the Company's sole discretion to assist the Company in obtaining: (i) patent and/or trade secret protection in all countries for all Inventions referred to in Section 5, paragraph a; and (ii) copyright protection in all Copyrightable Work created by me during the period of time that I am employed by the Company. All acts required by this Section 5, paragraph c., will be at the Company's expense.

d.    I understand and agree that: (i) no license or conveyance of any rights or warranty to me is granted or implied by the Company furnishing or disclosing any Inventions or Copyrightable Works to me; and (ii) the Company shall retain whatever ownership and other proprietary rights it otherwise has in all Inventions and Copyrightable Works.

6.    Miscellaneous

a.    Both during my employment with the Company and after the termination thereof for any reason, I agree to provide the Company with such information relating to my treatment of Confidential Information or my work assignments for the Company or others, as the Company may from time to time reasonably request in order to determine my compliance with this Agreement.    I hereby specifically authorize the Company to contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b.    I hereby specifically authorize the Company to, in its sole discretion, and without further permission from me, furnish copies of this Agreement to any client or prospective client of the Company and indicate that I have entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon my compliance with this Agreement.

- 4 -

c.    In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me.

d.    I agree that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended and reformed to the extent necessary to make it valid and enforceable, such amendment and reformation to apply, however, only with respect to the operation of this Agreement in the particular jurisdiction to which such adjudication shall apply.

e.    I understand that my obligations under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding me which relate to confidentiality or my business activities during and/or subsequent to my employment by the Company.

f.    I understand that without executing this Agreement, I would not be eligible to participate in the Bonus Plan. I also understand that this Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time.

g.    I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without my consent, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

h.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed therein.

*Signed and agreed to by:*

_____
EMPLOYEE (signature)

_____
EMPLOYEE (print name)

11/5/03
_____
TODAY'S DATE

- 5 -

**Tab 4**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation, | CIVIL NO. 08-00149 SOM-KSC |
| Plaintiffs, | DECLARATION OF GREGORY WOLTER, EXHIBIT "A" |
| vs. | |
| CHAD W. KARASAKI, | |
| Defendant. | |

<u>**DECLARATION OF GREGORY WOLTER**</u>

I, GREGORY WOLTER, declare:

1.    I am a Compensation Analyst employed by Marsh & McLennan Companies' Global Compensation Department ("MMC Compensation").

2.    For Plaintiff Marsh & McLennan Companies, Inc. and Plaintiff Marsh USA Inc., MMC Compensation maintains certain records, including those agreements with employees that are associated with the granting of MMC stock options and other forms of equity.

3.    Exhibit "A" attached hereto, the Restrictive Covenants Agreement, is a true copy of records on file with MMC Compensation and is maintained in the ordinary course of its business.

This declaration is made upon personal knowledge and is filed pursuant to 28 U.S.C. § 1746(2). I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2008 at New York, New York.

GREGORY WOLTER

MARSH USA, INC., etc., et al. v. CHAD W. KARASAKI, CIVIL NO. 08-00149 SOM-KSC, DECLARATION OF GREGORY WOLTER

 

*General – February 2007*

### RESTRICTIVE COVENANTS AGREEMENT

THIS RESTRICTIVE COVENANTS AGREEMENT (THE "AGREEMENT") IS A LEGAL AGREEMENT BETWEEN YOU (THE "EMPLOYEE") AND MARSH & MCLENNAN COMPANIES, INC., A DELAWARE CORPORATION ("MMC"), AND ITS AFFILIATES AND SUBSIDIARIES (COLLECTIVELY, THE "COMPANY"). PLEASE READ IT CAREFULLY. BY SIGNING THIS DOCUMENT, YOU WILL BE AFFIRMING THAT YOU ACKNOWLEDGE, ACCEPT AND UNDERSTAND THE AWARD (AS DEFINED BELOW) AND AGREE TO BE BOUND BY THIS AGREEMENT.

### R E C I T A L S:

A.  The Employee is employed by MMC or one of its affiliates or subsidiaries (the "Employer").

B. The execution of this Agreement is required of any grantee of a stock option, other equity-based award or other unvested award granted on or after February 12, 2007 under any plan of the Company (each, an "Award"), and is a condition precedent to the exercise of any stock option or other Award and to any continuation or acceleration of the vesting of any Award following the Employee's separation from employment.

C. The Employee desires to enter into this Agreement in order to satisfy such conditions.

D. The consideration for the Employee's entering into this Agreement consists of each occurrence of a Consideration Event (as hereinafter defined), and the parties intend that this Agreement shall become effective upon the first such occurrence.

NOW, THEREFORE, the parties hereby agree as follows:

1.    **Effectiveness Of Agreement**

(a) This Agreement shall become effective upon the first occurrence of a Consideration Event (as defined in Section 1(b)). The Employee acknowledges and agrees that the execution of this Agreement is a condition precedent to any Consideration Event.

(b) For purposes of this Agreement, a "Consideration Event" means an occurrence of any of the following events: (i) the granting to the Employee of an Award, (ii) the Employee's exercise of a stock option or other Award, or (iii) any continuation or acceleration of the vesting of an Award following the Employee's separation from employment as provided in the applicable Terms & Conditions of such Award.

General – February 2007

## 2.    Non-Solicitation Of Clients

(a) The Employee acknowledges and agrees that solely by reason of employment by the Company, the Employee has and will come into contact with a significant number of the Company's clients and prospective clients, as well as confidential information and trade secrets relating thereto.

(b) Consequently, the Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, the Employee will not, for a period of twelve (12) months following such separation, directly or indirectly: (i) solicit clients of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company. This restriction shall apply only to those clients or prospective clients of the Company with which the Employee had contact or about which the Employee obtained confidential information or trade secrets during the last two (2) years of his or her employment with the Company. For the purposes of this Section, the term "contact" means interaction between the Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the making of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of this Section 2, the term "contact" with respect to a "prospective" client means interaction between the Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company.

## 3.    Non-Solicitation Of Employees

The Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, the Employee has and will come into contact with and acquire confidential information and trade secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained confidential information, to leave employment with the Company.

## 4.    Non-Disparagement

The Employee agrees that except as required by law the Employee will take no action that is intended, or would reasonably be expected, to harm or disparage the Company or to impair its reputation to any third party.

5.    **Non-Competition**

The provisions of this Section 5 apply in the event of the Employee's separation from employment and only if the vesting of an Award or any portion thereof held by the Employee is continued or accelerated in connection with the Employee's separation from employment ("Vesting Continuation or Acceleration") as provided in the applicable Terms & Conditions of such Award. The Company may waive the applicability of this Section 5 by written notice to the Employee.

If the Employee engages in Competition (as hereinafter defined) during the period (the "Rescission Period") beginning on the date of the Employee's separation from employment and ending on the last scheduled vesting date (as described in the applicable Terms & Conditions of such Award) of the portion of the Award affected by the Vesting Continuation or Acceleration (the "Affected Portion"), then (i) the Affected Portion (to the extent still outstanding) shall be canceled and (ii) any previous delivery of MMC common stock or cash with respect to the Affected Portion shall be rescinded promptly following written notice to the Employee of the Company's discovery of such Competition but no later than two years after the last day of the Rescission Period. In the event of a rescission of the delivery of MMC common stock, the Employee shall promptly (i) return to the Company all shares of MMC common stock that the Employee has not disposed of and that were delivered to the Employee with respect to the Affected Portion, and (ii) pay to MMC a cash amount equal to the fair market value on the vesting date (as determined after giving effect to the Vesting Continuation or Acceleration) of the shares of MMC common stock that the Employee has disposed of and that were delivered to the Employee upon the vesting of such Affected Portion.

For purposes of this Section 5 "Competition" means the rendering of services, of a type similar to the services the Employee provided to the Company or in a capacity similar to the capacity the Employee was in with the Company, for any person or organization, or otherwise engaging directly or indirectly in any business, if either (i) such person, organization, or business is or becomes competitive with the Company, or (ii) the rendering of services to such organization or business is or becomes prejudicial to or in conflict with the interests of the Company.

The Employee agrees that the cancellation and rescission provisions of this Section 5 are reasonable and agrees not to challenge the reasonableness of such provisions, even where forfeiture is the penalty for engaging in Competition.

6.    **Conflict Of Interest**

The Employee may not use his or her position, influence, knowledge of confidential information or trade secrets or the Company's assets for personal gain, except as specifically provided in this Agreement. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, customer or prospective customer without disclosure and the express written approval of the highest executive officer of the Employer is strictly prohibited and constitutes cause for dismissal.

**7.    Equitable Relief**

        In recognition of the fact that irreparable injury will result to the Company in the event of a breach by the Employee of his or her obligations under Section 2, 3, 4 or 6 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, the Employee acknowledges, consents, and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by the Employee and persons acting for or in connection with the Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement.

**8.    Severability**

        The parties agree they have attempted to limit the scope of the post-employment restrictions contained herein to the extent necessary to protect confidential information and trade secrets, client relationships and goodwill. It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom such invalid portion, and reformed to the extent valid and enforceable. Such deletion and reformation shall apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

**9.    Other Agreements and Obligations Survive**

        Neither the Employee nor the Company intends to waive or release the applicability of any other more extensive legal or contractual obligations the Employee may owe the Company at any particular time hereafter with regard to the subject matters of Sections 2 through 6.

        The obligations of the Employee under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding the Employee which apply to the Employee's business activities during and/or subsequent to the Employee's employment by the Company. The obligations under this Agreement also shall survive any changes made in the future to the employment terms of the Employee, including but not limited to changes in salary, benefits, bonus plans, job title and job responsibilities.

**10.    Employment At Will**

        The Employee understands that this Agreement does not constitute a contract of employment and does not promise or imply that his or her employment will continue for any period of time. Employment with the Company is "at will," and may be terminated either by the Employee or the Company at any time, with or without cause, and with or without notice.

General – February 2007

## 11.    Binding Effect; Assignment

The Employee expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any of its subsidiaries or affiliates to whose employ he or she may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. Further, the rights of the Company hereunder may be assigned, without consent of the Employee, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

## 12.    Governing Law and Choice of Forum

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws provisions. The parties, being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement and the Employee's employment shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof. The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum. The Employee recognizes that, should any dispute or controversy arising from or relating to this agreement be submitted for adjudication to any court, arbitration panel or other third party, the preservation of the secrecy of confidential information or trade secrets may be jeopardized. Consequently, the Employee agrees that all issues of fact shall be severed for trial without a jury.

## 13.    Non-Waiver

The failure of either the Company or the Employee, whether purposeful or otherwise, to exercise in any instance any right, power, or privilege under this Agreement or under law shall not constitute a waiver of any other right, power, or privilege, nor of the same right, power, or privilege in any other instance. Any waiver by the Company or by the Employee must be in a written or electronic instrument signed by either the Employee, if the Employee is seeking to waive any of his or her rights under this Agreement, or by the President or highest executive officer of the Employer, if the Company is seeking to waive any of its rights under this Agreement.

## 14.    Modification

No modification of this Agreement shall be valid unless made in a written or electronic instrument signed by both parties hereto, wherein specific reference is made to this Agreement.

**15.    Cooperation**

Both during the Employee's employment with the Company and after the termination thereof for any reason, the Employee agrees to provide the Company with such information relating to his or her work for the Company or others, as the Company may from time to time reasonably request in order to determine his or her compliance with this Agreement.

**16.    Disclosure**

The Employee hereby specifically authorizes the Company to contact his or her future employers to determine his or her compliance with the Agreement or to communicate the contents of this Agreement to such employers. The Employee further specifically authorizes the Company to, in its sole discretion and without further permission from the Employee, furnish copies of the Agreement to any client or prospective client of the Company and indicate that the Employee has entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon his or her compliance with this Agreement.

**17.    Headings**

Section headings are used herein for convenience or reference only and shall not affect the meaning of any provision of this Agreement.


Chad W. Karasak.

Name (Print)


Chad W. Karasak

Signature


667568

ID#


6/27/07

Date

7/5/07
CS

**Tab 5**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>  vs.<br><br>CHAD W. KARASAKI,<br><br>        Defendant. | CIVIL NO. 08-00149 SOM-KSC<br><br>DECLARATION OF MICHAEL KELLY |

## DECLARATION OF MICHAEL KELLY

I, MICHAEL KELLY, declare:

1.    I am an officer of Marsh USA Inc. ("Marsh") with corporate title of Managing Director.  Marsh is a leading insurance broker.

2.    I am the Leader of Bay Partnership which is comprised of Marsh's San Francisco, San Jose, Denver, Salt Lake City and Hawaii offices.

3.    I make this declaration on my personal knowledge and would be competent to testify on the matters stated herein.

4.    On March 6, 2008 I learned that Chad W. Karasaki ("Karasaki"), the Head of Marsh's Hawaii office, who reported to me, tendered his resignation.

5.    I spoke with Karasaki repeatedly over the telephone between March 6 and March 11, 2008.

6.    Karasaki advised me that he was moving to AON, our principal competitor nationwide, to be the office leader for AON in Hawaii.

7.    Karasaki said he was also going to be the leader of AON's Global Construction Group in Hawaii, reporting to Peter Arkley, who I understand is based on the U.S. mainland and is the national leader of AON's construction insurance practice.

8.    Construction insurance was the main focus of Karasaki's insurance work while he was employed by Marsh.

9.    On March 11, 2008, Gregg Carpenter ("Carpenter"), the Leader of Zone West, to who I report, and I met with Karasaki in Honolulu and discussed the terms upon which Karasaki would be willing to remain with Marsh. In spite of our efforts, Karasaki confirmed his intention to move to AON.

10.    Carpenter reminded Karasaki of his obligations under the Non-Solicitation Agreements and other agreements he had signed, and advised him that Marsh would actively monitor and enforce those obligations.

11.    Karasaki responded that he was aware of those obligations, that he understood them, and that he would not do anything to violate the agreements he had signed.

12.    Carpenter told Karasaki that we were aware of ongoing solicitations on behalf of AON by other previously departed Marsh's employees, including Phillip Luecht. Karasaki responded that he would not violate his agreements but that he could not control what other people do.

13.    Carpenter further reminded Karasaki that until March 20, 2008, the effective date of his resignation, he remained an employee of Marsh and had a duty of loyalty which went way beyond his duties under the Non-Solicitation Agreement and related agreements.

14.    Karasaki responded that he recognized his obligations and would not do anything that would impede Marsh.

15.    On March 12, 2008 Karasaki submitted a new letter of resignation and made his resignation effective retroactively as of March 11, 2008.

This declaration is made pursuant to 28 U.S.C. § 1746(2). I declare under penalty of perjury that the foregoing is true and correct.

Executed on Thursday, April 10, 2008 at San Francisco, California.

_____
MICHAEL KELLY

MARSH USA, INC., etc., et al. v. CHAD W. KARASAKI, CIVIL NO. 08-00149 SOM-KSC, DECLARATION OF MICHAEL KELLY

**Tab 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation, | CIVIL NO. 08-00149 SOM-KSC<br><br>DECLARATION OF GREGG CARPENTER |
| Plaintiffs, | |
| vs. | |
| CHAD W. KARASAKI, | |
| Defendant. | |

Case 1:08-cv-00149-SOM-KSC   Document 6-4   Filed 04/14/2008   Page 1 of

## DECLARATION OF GREGG CARPENTER

I, GREGG CARPENTER, declare:

1.    I am an officer of Marsh USA Inc. ("Marsh") with corporate title of Managing Director and functional title of Zone Leader - West.

2.    I have been employed by Marsh since 1981. Marsh is a leading insurance broker.

3.    I make this declaration on my personal knowledge and would be competent to testify on the matters stated herein.

4.    Since 2003 I have had direct or indirect oversight of Marsh's Hawaii office.

5.    From 2005 until his abrupt resignation in March 2008, the Head of Marsh's Hawaii Office was Chad W. Karasaki ("Karasaki").

6.    Karasaki was a long-time Marsh employee. He was originally hired in 1986 by Marsh's Portland, OR office, and he transferred to the Hawaii office in 1990. Karasaki worked as a Client Executive before his appointment as the Head of Hawaii Office.

7.    Karasaki was engaged in the business of insurance brokerage, which includes, among other things, placing insurance requested by customers with insurers upon the best terms available, advising customers about structuring their insurance coverage, managing customers' insurance programs, and assisting customers with negotiating settlement of insurance claims. Karasaki was focused on the areas of construction and hospitality insurance, among others.

8.    As the Head of the Hawaii Office, Karasaki initially reported directly to me as the Leader of Marsh's Western zone, subsequently through Phillip Luecht and later through Michael Kelly.

9.    In his capacity of the Office Head, Karasaki enjoyed access to all information about all Marsh's accounts in Hawaii, as well as Marsh's Hawaii clients who were serviced in Marsh's other offices on the U.S. Mainland. This information including all details of their insurance programs and submissions. This information is kept confidential by Marsh and is not readily available to competitors.

10.    In his capacity of the Office Head, Karasaki enjoyed access to Marsh's corporate information, such as revenues, cost structure, employee compensation, and profitability of Marsh's Hawaii office.  This information is strictly confidential and not available to the lower echelon employees at Marsh, let alone the competitors.

11.    In his capacity of the Office Head, Karasaki prepared business plans and marketing plans for Hawaii Office.  He had wide latitude and discretion in this regard.    Marsh supported Karasaki's marketing efforts by sponsoring community, charity, industry and entertainment events, which promoted both Marsh and Karasaki personally.

12.    At the time when Karasaki resigned from Marsh in March 2008, he possessed a wealth of Marsh's confidential and proprietary information and trade secrets, including (a) the know-how of structuring, placing and servicing construction insurance and owner controlled insurance programs ("OCIP") that he developed during his many years of employment with Marsh, (b) current marketing plans and strategies for Marsh's Hawaii office, including those that he developed; (c) internal operational, revenue, cost, profit and organizational information for Marsh's Hawaii Office; and (d)  knowledge of the strengths, skills and compensation of the employees of Marsh's Hawaii office, and the degree of their attachment to Marsh.

13. . On March 6, 2008, Karasaki advised me that he was resigning from Marsh effective March 20, 2008 and would be joining AON. AON Corporation, which operates through numerous subsidiaries, is another major insurance broker and Marsh's direct competitor nationwide and in Hawaii.

14. On March 10, 2008, Michael Kelly, Leader of the Bay Partnership, which includes Marsh's San Francisco, San Jose, Denver, Salt Lake City and Honolulu offices, and I met with Karasaki in Honolulu and discussed the terms upon which Karasaki would be willing to remain with Marsh. In spite of our efforts, Karasaki confirmed his intention to move to AON.

15. I reminded Karasaki of his obligations under the Non-Solicitation Agreements and other agreements he had signed, and advised him that we would actively monitor and enforce those obligations.

16. Karasaki responded that he was aware of those obligations, that he understood them, and that he would not do anything to violate the agreements he had signed.

17. I told Karasaki that I was aware of ongoing solicitations on behalf of AON by other previously departed Marsh's employees, including Phillip Luecht. Karasaki responded that he would not violate his agreements but that he could not control what other people do.

18.    I further reminded Karasaki that until March 20, 2008, the effective date of his resignation, he remained an employee of Marsh and had a duty of loyalty which went way beyond his duties under the Non-Solicitation Agreement and related agreements.

19.    Karasaki responded that he recognized his obligations and would not do anything that would impede Marsh.

20.    On March 12, 2008 Karasaki submitted a new letter of resignation and made his resignation effective retroactively as of March 11, 2008.

21.    On March 18, 2008, Janet Ng ("Ng") and Francis Wirt ("Wirt"), two Client Executives in Marsh's Hawaii office submitted their resignations and advised they were also moving to AON.

22.    Ng was involved mostly in construction and contractors' insurance.

23.    Wirt was involved mostly in construction bonds. Bonds are a complementary part of OCIP placements, and during his employment at Marsh, Wirt supported Karasaki's OCIP placements.

24.    Karasaki's knowledge of Marsh's trade secrets and confidential and proprietary information gives Karasaki a major, and in my opinion, undue and unfair advantage, in immediately competing with Marsh in his new capacity as the head of AON's Hawaii operations.

This declaration is made pursuant to 28 U.S.C. § 1746(2).  I declare under penalty of perjury that the foregoing is true and correct.

Executed on Thursday, April 10, 2008 at Los Angeles, California.

GREGG CARPENTER

MARSH USA, INC., etc., et al. v. CHAD W. KARASAKI, CIVIL NO. 08-00149
SOM-KSC, DECLARATION OF GREGG CARPENTER

**Tab 7**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation, | CIVIL NO. 08-00149 SOM-KSC |
| | DECLARATION OF MASON WILLIAMS |
| Plaintiffs, | |
| vs. | |
| CHAD W. KARASAKI, | |
| Defendant. | |

## DECLARATION OF MASON WILLIAMS

I, MASON WILLIAMS, declare:

1.     I am presently a consultant with Marsh USA Inc. ("Marsh").

2.     I make this declaration on my personal knowledge and would be competent to testify on the matters stated herein.

3.     I was employed with Marsh as an insurance broker for some thirty years, eventually reaching the corporate title of Managing Director.

4.     In February 1999, I was transferred from my then position of the Head of Marsh's San Jose, CA office to Hawaii and assumed the position of the Head of Marsh's Honolulu, Hawaii office.

5.     I quickly recognized that in order to succeed in the long term, Marsh's Hawaii office needed to be led by someone from Hawaii.

4821-7951-3090.1.050293-00013

6.    One of the Client Executives in Hawaii at that time was Chad W. Karasaki ("Karasaki"), who had worked there since 1990, and focused mostly, but not exclusively, on construction and hospitality insurance. I considered Karasaki to have the potential to lead the office.

7.    Karasaki was a part of the management team which assisted me in developing a marketing plan to expand our business in Hawaii.

8.    Marsh was always seen in Hawaii as being strong in the area of construction insurance, and because of this we made construction insurance one of the key focuses of our business plan.

9.    Construction insurance was also the area of Karasaki's primary focus. Over the years of his employment with Marsh, Karasaki had developed knowledge of structuring and servicing Owner Controlled Insurance programs ("OCIP"), where the developer of a real estate project purchases the insurance for the entire project, covering all contractors and subcontractors.

10.    Our business plan was successful and resulted in acquisition of a number of clients, including among others, Maryl Group, Inc., which became Karasaki's client, and a number of OCIPs.

11.    Upon my recommendation, in November 2003 Karasaki was promoted to a corporate title of Managing Director.

12.     In April 2005 I had to retire from full-time work for health reasons.  Upon my recommendation, Karasaki succeeded me as the Office Head for the Hawaii Office.  I remained and still remain a consultant.

This declaration is made upon personal knowledge and is filed pursuant to 28 U.S.C. § 1746(2).  I declare under penalty of perjury that the foregoing is true and correct.

Executed on Tuesday, April 8, 2008 at Philadelphia, Pennsylvania.

MASON WILLIAMS