UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH USA, INC., a Delaware corporation; and MARSH & MCLENNAN COMPANIES, INC., a Delaware corporation,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>CHAD W. KARASAKI,<br><br>　　　　Defendant. | CIVIL NO. 08 Civ. 4195 (JGK)<br><br>DECLARATION OF ROCCO SANSONE |

### DECLARATION OF ROCCO SANSONE

I, ROCCO SANSONE, declare:

1.　I am a Senior Vice President with Marsh USA Inc. ("Marsh"), a leading insurance broker, and the current co-Head of Marsh's Hawaii office.

2.　I have served as the co-Head of Marsh's Hawaii office since April 25, 2008, after Chad W. Karasaki ("Karasaki"), the individual who formerly served as the Head of Marsh's Hawaii office, resigned from Marsh to join Aon ("Aon Hawaii"), a principal competitor in Hawaii. Prior to becoming co-Head of Marsh's Hawaii office, I worked in Marsh's Hawaii office for nearly 32 years in many other capacities, including sales, brokerage and client advisory. In each of these roles, I worked closely and extensively with the former Heads of Marsh's Hawaii office including, without limitation, Karasaki.

3. I make this declaration upon my personal knowledge and would be competent to testify on the matters stated herein.

4. Karasaki was a long-time Marsh employee. He transferred to the Hawaii office in 1990, and worked as a Client Executive from 1990 to November 2003, when he was promoted to the corporate title of Managing Director. Karasaki then served as a Managing Director from 2003 to April 2008, and served as the Head of the Hawaii Office from 2005 until his abrupt resignation in March 2008.

5. In my current capacity as co-Head of Marsh's Hawaii Office, I supervise, directly or indirectly, client relationships within Marsh's Hawaii office, and have access to all information about each of Marsh's accounts in Hawaii, as well as Marsh's Hawaii clients who are, or were, serviced in Marsh's other offices on the mainland and globally. This information includes, by way of example and without limitation: all details of such clients' insurance programs and submissions, including (but not limited to) the expiration and renewal dates of their current insurance programs and policies; details concerning available markets, underwriter responses, market contacts, and the cost of each such clients' bound insurance programs; each such clients' current and historical revenues, loss exposure data, and insurance premiums; details concerning prior bargaining and claims settlement negotiations and experiences that each such client had with historical insurers, and

each client's level of satisfaction or displeasure with particular individual or groups of carriers; the fee structure (*i.e.*, fee or commission) utilized by Marsh with each such client and the amount of income that Marsh derived therefrom; contact details and personal information concerning the key representatives from each of the clients; each client's level of satisfaction with Marsh, including as described in clients' responses to confidential annual client surveys conducted by Marsh; and what accounts are considered "at risk" by Marsh (*i.e.*, what accounts may be vulnerable to competition) and the reasons therefor. This information is kept confidential by Marsh and is not readily available to competitors and/or other client executives within the Hawaii office. As former Head of the Hawaii Office, however, Karasaki enjoyed unfettered access to and routinely relied upon this information, including at the time of his resignation from Marsh in March of 2008.

6.  In my capacity as co-Head of Marsh's Hawaii Office, I also have access to highly confidential, corporate and trade secret information about Marsh and its Hawaii operations, including, without limitation, information about: Marsh's current and historical revenues; its cost structure; its profitability; and its historical, current, and future marketing and business development plans and strategies, including, for example, information about areas of concentration and prospective and/or "target" clients, and the strategies Marsh would implement in an effort to develop particular business and/or clients. This information is strictly

confidential and is available only to a limited number of senior level Marsh employees, and certainly not to any of Marsh's competitors. As former Head of the Hawaii Office, however, Karasaki had unfettered access to and routinely relied upon this information, including at the time of his resignation from Marsh. In fact, during his employment at Marsh and particularly in his capacity as Head of the Hawaii office, Karasaki was personally involved in developing and implementing marketing and business development plans that Marsh's Hawaii office has successfully implemented and continues to implement.

7. In my capacity as co-Head of Marsh's Hawaii office, I also have access to a wealth of confidential, proprietary and competitively sensitive information regarding Marsh's employees. Indeed, as co-Head of the Office, I have oversight over, and managerial and supervisory responsibility for, all of the employees in the Hawaii office, each of whom report, directly or indirectly, to me. In addition, as co-Head of the Office, I am responsible for conducting employee performance reviews for, and I play a key role in determining the compensation of, all personnel in the Hawaii office. Accordingly, as co-Head of the Office, I am one of a select few individuals at Marsh who is given access to the personnel files of each and every employee in the Hawaii office. By virtue of such access, and by virtue of the duties described above and my direct, day-to-day dealings with the employees in the Hawaii office, I have access to such confidential, proprietary and

competitively sensitive information as: employee compensation (e.g., salary and bonus information); employee benefit information, including the impact to individual employees of planned changes to Marsh's benefits policies; eligibility for stock options and other restricted grants; eligibility for, and historical and likely future receipt or deferral of, intra-office promotions; employee performance reviews and score cards; the expertise, talents, strengths and weaknesses of individual employees; and information concerning each employee's level of satisfaction or dissatisfaction with his or employment at Marsh, and the particular reasons therefor. This information is strictly confidential and is only available to a very limited number of Marsh employees, and certainly not to Marsh's competitors. As former Head of the Hawaii Office, however, and as someone who had the personnel-related privileges and responsibilities that I now have, Karasaki had unfettered access to and routinely relied upon this information, including at the time of his resignation from Marsh.

8. At the time Karasaki resigned from Marsh in March 2008, he possessed all of the confidential and proprietary information and trade secrets identified in the foregoing paragraphs. In addition, as Head of Marsh's Hawaii office, Karasaki had intimate knowledge of Marsh's highly-developed practices, methodologies, and "back-room" operations relating to the structuring, placement, and servicing of construction insurance and owner controlled insurance programs

("OCIPs"), commercial brokerage and risk management clients in which Marsh has long been viewed as the industry leader and held a competitive advantage over its competitors in Hawaii.

9. Karasaki's knowledge of Marsh's trade secrets and confidential and proprietary information gives Karasaki and Marsh's principal competitor in Hawaii, Aon, a major, and in my opinion, undue and unfair advantage, in immediately competing with Marsh. For example, Karasaki's intimate knowledge of Marsh employees and their personnel files – including information contained therein regarding their talent, their performance, their experiences, their compensation, their benefit levels, and the level of their satisfaction and/or attachment to Marsh – will enable (and in fact already has enabled) Karasaki and Aon to effectively solicit key Marsh employee specialists in the areas of surety, construction insurance (including OCIPs), healthcare and other industry practices, to defect to Aon. This, in turn, coupled with Karasaki's unique knowledge of Marsh's clients, program structures, cost structure, pricing plans, and compensation – together with, among other things, Karasaki's knowledge regarding the renewal/expiration dates of Marsh's clients' current programs, tuition reimbursement program included in our revenue and budget, the results of Marsh's confidential client surveys, and Marsh's confidential list of "at risk" clients – will effectively provide Aon with a wealth of crucial and competitively sensitive

information, not otherwise available to Aon, that will enable Aon (and in fact already has enabled Aon) to effectively solicit Marsh's current and former clients.

10. Moreover, Karasaki's knowledge of Marsh's strategic business and marketing plans, including its confidential list of "target" and "in play" clients, can be used by Karasaki and Aon to improve Aon's competitiveness in ways that Aon could not otherwise accomplish by, for instance: (a) providing Aon with the identity of accounts and prospective client contacts that Marsh was approaching as new business opportunities; and (b) identifying for Aon, and providing Aon with an opportunity to cure or otherwise seize upon, identified weaknesses and disclosure of Marsh's consulting and/or advisory products and service offerings if not disclosed to Aon, would offer Marsh greater opportunities to effectively obtain these target businesses.

11. As an example, Marsh had been prospecting AON accounts just prior to his departure. Karasaki was informed of our strategic plans with the Outrigger, TDFood Group and ResortQuest. This information did enable the existing AON service teams to react and reach out to their clients to address their current service issues and program placements. This information has impaired the efforts of Marsh to obtain these accounts.

12. Likewise, Karasaki's knowledge of Marsh's highly-developed practices, methodologies, and "back-room" operations relating to the structuring,

placement, and servicing of construction insurance and owner controlled insurance programs ("OCIPs"), and his use and employment of those practices, methodologies, and procedures on Aon's behalf, threatens to allow Aon to unfairly erode Marsh's long-standing and carefully cultivated competitive edge in this area in Hawaii.

13. Kawailoa was a client that had been handled by Karasaki. The property insurance policy expires December 2008. Karasaki requested a copy of Marsh's marketing report in February 2008 approximately two weeks before his resignation. There are no records of inquiries from underwriters or client that would have necessitated Karasaki requesting a copy of the report. On the other hand, obtaining a copy of this report would be beneficial in preparing for a renewal proposal and could only have been useful to Karasaki for the purpose of gathering data that would assist him in later preparing a renewal proposal for Kawailoa on behalf of Aon, in direct competition with Marsh.

This declaration is made pursuant to 28 U.S.C. § 1746(2). I declare under penalty of perjury that the foregoing is true and correct.

Executed on Wednesday, April 30, 2008 at Honolulu, Hawaii.

*/s/ Rocco Sansone*
ROCCO SANSONE

MARSH USA, INC., etc., et al. v. CHAD W. KARASAKI, (SDNY)
DECLARATION OF ROCCO SANSONE