**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

**MARSH USA INC. AND MARSH & MCLENNAN**
**COMPANIES, INC.,**

                        **Plaintiffs,**

            - against -

**CHAD W. KARASAKI,**

                        **Defendant.**

─────────────────────────────────

**08 Civ. 4195 (JGK)**

<u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

     This is a diversity action brought by the plaintiffs, Marsh USA Inc. and Marsh & McLennan Companies, Inc. (collectively, "Marsh"), to enforce non-solicitation and confidentiality agreements entered into by a former insurance brokerage executive during his employment with Marsh.  Marsh seeks a preliminary injunction enjoining the defendant, Chad W. Karasaki ("Karasaki"), from soliciting the business of any Marsh client or prospective client, performing or supervising the performance of services for any Marsh client or prospective client, and soliciting any Marsh employee to leave employment with Marsh.[1]

─────────────────────

     [1] Marsh's proposed preliminary injunction would also enjoin Karasaki from disclosing or communicating to Aon Risk Services, Inc., or any of its parents, subsidiaries or affiliates (collectively, "Aon") any of Marsh's trade secrets or confidential or proprietary information, prohibit Karasaki from destroying or spoliating any documents of any kind, and direct him to return all materials in his possession which contain Marsh's trade secrets and/or confidential information.  Marsh also asserts that, pursuant to the employment agreements, it is entitled to injunctive relief without having to post a bond, as well as to an award of all reasonable attorneys' fees and costs incurred in the course of enforcing the provisions of the employment agreements.

On March 31, 2008, Marsh filed a Complaint in the United States District Court for the District of Hawaii. On April 14, Marsh moved for a temporary restraining order and preliminary injunction. The following day, Karasaki moved to dismiss for improper venue or, in the alternative, to transfer venue. On April 22, the district court granted Karasaki's motion to dismiss on the grounds of improper venue.

Marsh filed the Complaint in this Court on May 2, 2008. On May 8, 2008, Marsh moved by Order to Show Cause for a preliminary injunction. At a conference held that day, the Court authorized expedited discovery, which was to be completed by July 25, 2008. At another hearing held on September 24, 2008, the Court listened to argument by counsel and afforded the parties the opportunity to present any other evidence in support of or in opposition to the motion. Having reviewed the submissions and considered the arguments of counsel, the Court makes the following Findings of Fact and reaches the following Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) and 65.

## Findings of Fact

### *The Parties*

1.  Plaintiffs Marsh USA Inc. and Marsh & McLennan Companies, Inc. are corporations organized under the laws of

Delaware. (Mishkin Decl. Exs. 1, 2.)[2] Marsh is a leading

insurance broker. (Gavsie Decl. Ex. 6 (Carpenter Decl. ¶ 2,

Apr. 10, 2008 )("Carpenter Decl.").)[3] In Hawaii, Marsh is a

major player in the construction insurance industry and holds

the leading share of Owner Controlled Insurance Programs, a

construction insurance product in which the owner or developer

of a real estate project purchases insurance for the entire

project, covering all contractors and subcontractors. (Gavsie

Decl. Ex. 7 (Williams Decl. ¶ 8-9, Apr. 8, 2008) ("Williams

Decl."); Tarr Decl. Ex. 1 (Sansone Dep. 132, 136, July 22, 2008)

("Sansone Dep.").)[4]

2. Defendant Chad Karasaki is a citizen and resident of

Hawaii. (Compl. ¶ 14; Answer and Countercls. ¶ 14.) Karasaki

began his employment with Marsh in 1986 in Marsh's Oregon

office, and then transferred to Marsh's Hawaii office in 1990,

where he worked as a Client Executive. (Carpenter Decl. ¶ 6.)

In November 2003, Karasaki was promoted to Managing Director.

(Williams Decl. ¶ 11.) In April 2005, he became Head of Marsh's

Hawaii office, a position he held until March 11, 2008, the

_____

[2] Citations to "Mishkin Decl." refer to the Declaration of Jessie
Mishkin, Esq., dated August 15, 2008, submitted by the plaintiffs in support
of their Motion for a Preliminary Injunction.

[3] Citations to "Gavsie Decl." refer to the Declaration of Kenneth P.
Gavsie, dated May 1, 2008, submitted by the plaintiffs in support of their
Order to Show Cause Motion.

[4] Citations to "Tarr Decl." refer to the Declaration of Robin C. Tarr,
dated September 4, 2008, submitted by the defendant in opposition to the
plaintiffs' Motion for a Preliminary Injunction.

effective date of his resignation.  (Williams Decl. ¶ 12;
Carpenter Decl. ¶ 5, 20.)

### *Karasaki's Role at Marsh*

3.    As Head of Marsh's Hawaii office, Karasaki also served
as a Client Executive.  (Mishkin Decl. Ex. F.)[5]  Client
Executives maintain and service existing client relationships,
manage the profitability of their books of business, and acquire
new clients.  (Mishkin Decl. Ex. 4.)  As a Client Executive,
Karasaki performed insurance brokerage services for Marsh
clients, which included, among other things, placing insurance
requested by clients with insurance companies on the best terms
available, advising clients on how to structure their insurance
coverage, managing clients' insurance programs, and helping
clients process insurance claims.  (Carpenter Decl. ¶ 7.)  At
the time of his resignation, Karasaki was the Client Executive
for around thirty Marsh clients.  (Mishkin Decl. Ex. F; Hr'g Tr.
37, Sept. 24, 2008.)  Karasaki worked very closely and developed
strong relationships with his clients.  (Mishkin Decl. Exs. 5,
19.)  He also often met with and developed relationships with
clients assigned to other Client Executives whom he supervised.

---

[5] Karasaki asserts that the Court should disregard Exhibits B through H
of the Mishkin Declaration because they contain summaries of facts which are
not admissible evidence.  However, all seven of these exhibits cite to other
exhibits attached to the Mishkin Declaration, all of which were provided to
Karasaki, and Karasaki does not dispute the admissibility of the evidence
contained in the underlying exhibits.  Therefore, the summaries are
admissible.  <u>Tamarin v. Adam Caterers, Inc.</u>, 13 F.3d 51, 53 (2d Cir. 1993)
("Summary evidence is admissible as long as the underlying documents also
constitute admissible evidence and are made available to the adverse party.")

4

(Tarr Decl. Ex. 4 (Karasaki Dep. 459-67, Jun. 11, 2008, Aug. 5, 2008) ("Karasaki Dep.").)  Karasaki's main focus at Marsh was in the area of construction insurance.  (Gavsie Decl. Ex. 5 (Kelly Decl. ¶ 8, Apr. 10, 2008) ("Kelly Decl."); Carpenter Decl. ¶ 7.)

4.  Marsh provided Karasaki with a charity budget of over $91,000 in 2007, which was used to sponsor charity events and dinners that Karasaki personally attended.  (Uehara Decl. ¶ 3, Apr. 30, 2008.)  Marsh also provided Karasaki with a travel and expense account of over $34,000 for the period between August 2007 and March 2008.  (Uehara Decl. ¶ 4.)

5.  As Head of the Hawaii office, Karasaki supervised or worked directly with most of Marsh's employees in the Hawaii office.  (Mishkin Decl. Ex. J at 13; Karasaki Dep. 244-47, 250.) At the time of his resignation, Marsh's Hawaii office had a total of approximately thirty-six employees.  (Uehara Decl. ¶ 9.)  Eleven of these were brokerage professionals, which included Karasaki, as well as Frank Wirt ("Wirt"), Janet Ng ("Ng"), Marcus Kim ("Kim"), Jeff Case ("Case"), Kathy Dang ("Dang"), and Rocco Sansone ("Sansone"), all Client Executives who reported to Karasaki directly.  (Uehara Decl. ¶ 9.)  Ronald Beers ("Beers") worked as a Placement Specialist and also reported directly to Karasaki.  (Beers Decl. ¶ 1-2, Sept. 11, 2008 ("Beers Sept. 11. Decl."); Karasaki Dep. 243-44.)  Twelve other employees in the office were Client Representatives,

professional level employees who worked directly under and assisted the brokerage professionals. (Uehara Decl. ¶ 9.) These included Gladys Smith ("Smith"), Evelyn Shannon ("Shannon"), Stephanie Tsumoto ("Tsumoto"), Mei Chi Ng ("Mei Chi"), and Irene Fujimoto ("Fujimoto"), all of whom worked directly with Karasaki. (Karasaki Dep. 247-48; Mishkin Decl. Ex. J at 13.) Marissa Mandado ("Mandado"), a Transaction Specialist in the Hawaii Office, also worked directly with Karasaki. (Mandado Decl. ¶ 1, 7, Apr. 30, 2008; Karasaki Dep. 248.)[6]

### *Karasaki's Employment Agreements with Marsh*

6.  On November 25, 2003, in order to receive benefits under Marsh's Discretionary Bonus Plan, Karasaki entered into the Marsh USA Inc. Non-Solicitation Agreement for Participants in the Discretionary Bonus Plan (the "NSA") and the Marsh USA Inc. Confidentiality and Ownership Rights Agreement (the "Confidentiality Agreement"). Section 1 of the NSA provides, in pertinent part:

---

[6] Marsh also submitted evidence showing that Karasaki had access to substantial information about Marsh clients which Marsh considers confidential and proprietary, including customer surveys, client contact information, details about clients' key representatives, pricing of clients' insurance programs, and reports which detailed which clients were at risk of being lost. He was also privy to confidential information regarding all of Marsh's employees in the Hawaii office, including compensation and benefits information and performance evaluations. However, at the September 24 hearing, plaintiffs' counsel conceded that Marsh was not relying upon a misappropriation of confidential information theory to support its breach of restrictive covenant claim. (Hr'g Tr. 13-14, Sept. 24, 2008.)

I agree that if my employment with the Company terminates for any reason, I will not, for a period of one (1) year from date of termination, directly or indirectly, . . . except for the benefit of the Company:

(a) solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for

> (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or

> (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b) solicit any employee of the Company who worked in the same business unit or who worked with me directly to terminate his or her employment with the Company for the purpose of competing with the Company.

(Mishkin Decl. Ex. 2, § 1.)

The Confidentiality Agreement provides, in pertinent part:

"After termination of my employment by the Company, I will not for any purpose whatsoever use, or disclose to any person, Confidential Information."  (Mishkin Decl. Ex. 15, § 3.)

7.   On June 27, 2007, Karasaki entered into a Restrictive Covenants Agreement (the "RCA").  The non-solicitation of clients clause of the RCA provides, in pertinent part:

[T]he employee covenants and agrees that in the event of separation from employment with the Company, whether such

separation is voluntary or involuntary, the Employee will not, for a period of twelve (12) months following such separation, directly or indirectly: (i) solicit clients of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company. This restriction shall apply only to those clients or prospective clients of the Company with which the Employee had contact or about which the Employee obtained confidential information or trade secrets during the last two (2) years of his or her employment with the Company. For purposes of this Section, the term "contact" means interaction between the Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the making of) sales to or performing or providing (or assisting or supervising performance or provision of) services or products for the client on behalf of the Company. For purposes of this Section 2, the term "contact" with respect to a "prospective" client means interaction between the Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company.

(Mishkin Decl. Ex. 1, § 2.) The non-solicitation of employees clause of the RCA provides, in pertinent part:

[B]oth during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained confidential information, to leave employment with the Company.

(Mishkin Decl. Ex. 1, § 3.)

8.   Section 2(c) of the NSA provides:

In recognition of the fact that irreparable injury will
result to the Company in the event of a breach of my
obligations under this Agreement, that monetary damages for
such breach would not be readily calculable, and that the
Company would not have an adequate remedy at law therefore,
I acknowledge, consent and agree that in the event of such
breach, or the threat thereof, the Company shall be
entitled, in addition to any other legal remedies and
damages available, to specific performance of such
obligations and to temporary and permanent injunctive
relief (without the necessity of posting a bond) to
restrain the violation or threatened violation of such
obligations by me and persons acting for or in connection
with me.

(Mishkin Decl. Ex. 2, § 2.)  Section 6(c) of the Confidentiality

Agreement and Section 7 of the RCA contain clauses with language

virtually identical to that in Section 2(c) of the NSA.  Section

7 of the RCA further provides that, in the event of breach, "the

Company shall be entitled . . . to . . . recovery of all

reasonable sums and costs, including attorneys' fees, incurred

by the Company in seeking to enforce the provisions of this

Agreement."  (Mishkin Decl. Ex. 1, § 7.)

9.   The RCA, NSA, and Confidentiality Agreement each

provide that they are to be governed by New York law.  (Mishkin

Decl. Exs. 1, § 12; 2, § 2; 15, § 6.)  In addition the RCA

contains an exclusive choice of forum provision in which the

parties consent to the exclusive jurisdiction of the New York

State Supreme Court, New York County, or the United States

District Court for the Southern District of New York.  (Mishkin Decl. Ex. 1, § 12.)

### *Aon's Recruitment of Karasaki*

10.  Aon Risk Services, Inc., of Hawaii ("Aon") is also a major insurance broker and is Marsh's principal competitor nationwide and in Hawaii.  (Carpenter Decl. ¶ 13; Kelly Decl. ¶ 6.)  In 2007, Aon's Hawaii office had been performing below expectations and had suffered client losses from the departures of several employees.  (Mishkin Decl. Ex. M (Luecht Dep. 144-47, July 25, 2008).)  As part of a plan to stabilize and grow its Hawaii operations, Aon began recruiting Karasaki in August 2007 to leave Marsh and to become the Chairman and CEO of Aon's Hawaii office.  (Tarr Decl. Ex. 8 (Arkley Dep. 62-63, 84-89, July 23, 2008) ("Arkley Dep.").)  Aon believed that Karasaki "would double or triple" the size of its business in Hawaii and increase the profitability of its Hawaii office.  (Arkley Dep. 69-70.)  The compensation package offered to Karasaki built in these expectations and provided that Karasaki would receive stock grants for hitting certain revenue hurdles.  (Mishkin Decl. Exs. 32, 37.)  Karasaki was receptive to Aon's overtures but insisted that Aon indemnify him in the event of litigation. (Karasaki Dep. 37-38, 102; Mishkin Decl. Ex. 36.)  Aon agreed to indemnify him, but did not want to put the agreement in writing. (Arkley Dep. 244-52; Mishkin Decl. Ex. 39.)  In January, Phil

Luecht ("Luecht"), an Aon Regional Sales Leader, spoke with
Karasaki to make preparations for when Karasaki left Marsh.
Luecht suggested that, on the day that Karasaki would resign,
he, Peter Arkley ("Arkley"), who was President and CEO of Aon's
Construction Services Group, and a third Aon executive be in
Hawaii to support Karasaki and to "pursue interviews." (Mishkin
Decl. Ex. 40.) On January 29, Arkley e-mailed Luecht and other
Aon executives: "Spoke with Chad yesterday he is ready to
resign. I told him I would get over asap. There are other
potential candidates we want also. He is a go." (Mishkin Decl.
Ex. 45.)

    11. On March 6, 2008, Karasaki informed Marsh that he was
resigning to become Head of Aon's Hawaii office. (Tarr Decl.
Ex. 17; Kelly Decl. ¶ 4-7.) After he announced his resignation
to the staff of Marsh's Hawaii office, on March 10, 2008, he was
asked to leave the office. (Karasaki Dep. 326.) He commenced
employment with Aon on March 12, 2008. (Karasaki Dep. 54.)

### Karasaki's Solicitation of Marsh Clients and Prospects

    12. On March 7, 2008, Karasaki made a call to Michael
Oxley ("Oxley"). Oxley, a former Marsh Senior Vice President,
had retired from Marsh on March 1, 2007 for health reasons.
Oxley had worked for Marsh for over 30 years and had developed a
substantial number of client relationships, which were
transferred to Janet Ng upon his retirement. Karasaki believes

that he may have asked Oxley to join Aon as a consultant in that conversation. According to Oxley, Karasaki told him: "[Y]ou won't have to do anything. I just want you on my side and we will pay for club dues, give you a small stipend and expenses." (Mishkin Decl. Ex. R (Oxley Dep. 20, July 25, 2008) ("Oxley Dep.").)

On March 11 or 12, Oxley called Janet Ng to notify her that he was aware that Chad had left and that he would be joining Aon as a consultant. (Mishkin Decl. Ex. Q (Ng Dep. 104-05, Jun. 26, 2008) ("Ng Dep.").) He also told her that he had already spoken with her clients, and that they had told him that they would move their business to Aon. (Ng Dep. 105.) In the last two weeks of March and in April, Oxley made calls to a number of his former Marsh clients, including A.C. Kobayashi, Allied Builders ("Allied"), Arisumi Brothers ("Arisumi"), Coastal Construction ("Coastal"), Commercial Plumbing ("Commercial"), Mitsunaga Construction ("Mitsunaga"), Steeltech, Inc. ("Steeltech"), Yamada Consolidated ("Yamada"), and RMY Construction. (Oxley Dep. 37-52.) Oxley told them that Ng, Wirt, and Karasaki had moved to Aon, and that if they wanted them to continue handling their accounts, they would have to call them at Aon. (Oxley Dep. 37-52.) Commercial executed a broker of record ("BOR") letter to transfer its business to Aon on March 19; Arisumi, RMY Construction, and Steeltech did so on March 20, followed by

Yamada on March 21, Allied on March 24, Mitsunaga on March 25, Coastal on April 3 and 9, and A.C. Kobayashi on April 15. (Mishkin Decl. Ex. D.)

13. On March 13, 2008, Karasaki had a breakfast meeting at the Halekulani Hotel with Michael Heffernan ("Heffernan"), an Aon Vice President and Managing Director based out of California. Heffernan asserts that the objective of the March 13 meeting was to "welcome him to the firm and onboard him into the office." (Mishkin Decl. Ex. N (Heffernan Dep. 67, July 24, 2008) ("Heffernan Dep.").) A fair inference from the evidence is that a purpose of the meeting was for Karasaki to plan with Heffernan a strategy to solicit and follow up with Karasaki's former clients at Marsh. Heffernan planned to make "courtesy calls" to Karasaki's former clients at Marsh "to convey the message that Chad had joined our firm." (Heffernan Dep. 69.) Arkley chose Heffernan to meet with Karasaki's former clients because of Heffernan's knowledge of the Hawaiian market, and also "because of his seniority, that the clients would feel like they were being addressed by the proper person." (Karasaki Dep. 357-58.)

Two pages of Heffernan's notes from those days, handwritten on Halekulani Hotel stationery, list names and contact information for thirteen clients, including: Kawailoa Development, Mitsui Fudosan, ABC Stores (dba MNS, Inc.) ("ABC

Stores"), Stanford Carr Development ("Stanford Carr"), Bill
Mills Development ("Mills Group"), Maryl Group, A + B
Properties, Castle & Cooke, Alakai Mechanical, Oahu Plumbing and
Sheet Metal ("Oahu Plumbing"), SHOPO, Hawaiian Dredging, and
Starwood. (Mishkin Decl. Ex. 13.) Ten of these were Marsh
clients, nine of which were Karasaki's former clients. (Mishkin
Decl. Ex. F.) Heffernan testified in his deposition that he
drafted the list as he was gathering information on who to
contact while he was in Hawaii, and that he was "certain" that
he had written some of the notes in his hotel room, and some in
his office. (Heffernan Dep. 80.) It was also Heffernan's
testimony that the only items provided by Karasaki on the two
pages were the names of two contact people at Mitsui Fudosan and
some explanatory detail about SHOPO's insurance program.
(Heffernan Dep. 93-97.) Karasaki testified that Heffernan took
notes during their March 13 breakfast meeting on a hotel memo
pad. (Karasaki Dep. 379-80.) He also testified that he
provided Heffernan with contact information for twelve out of
the thirteen companies listed on the two pages. (Karasaki Dep.
377-85.) Karasaki denied giving Heffernan any client
information beyond names and contact information at the meeting.
(Karasaki Dep. 136-39, 361-62.)

Heffernan's notes also include a page on which "Team
Members" is written at the top, followed by the names Janet Ng,

Frank Wirt, Jeff Case, Marcus Kim, Kathy Dang, and Adele Panui,
and each person's area of practice. (Mishkin Decl. Ex. 13.)
Karasaki testified at his deposition that he did not discuss any
Marsh employees with Heffernan at the breakfast meeting, nor at
any of the subsequent meetings Karasaki had with Heffernan on
March 13 and 14. (Karasaki Dep. 385-86.)

14. On March 13 and 14, Heffernan, William Sandkuhler
("Sandkuhler"), who was an Executive Vice President in Aon's
Hawaii office, and a third Aon employee, made "courtesy calls"
to Karasaki's former Marsh clients to inform them that Karasaki
had left Aon and to ask for their business. To find out how the
meetings were going, Karasaki met with Heffernan at least five
or six times during those two days. (Karasaki Dep. 372-74.)

One of Heffernan's meetings during these two days was with
Mark Richards, the owner of Maryl Group. (Heffernan Dep. 153-
54.) Heffernan's "general theme" for the meeting was:

> I'm sure Chad would like to be here himself communicating
> his own personal reasons for leaving one firm and joining
> another. It was my understanding that he was restricted
> from doing that and that we wanted to be ethical and abide
> by the covenants of whatever agreement he may have entered
> into. So, therefore, being -- attempting to be above
> board, I'm here as a representative of the firm to let you
> know that we have made a significant investment in
> Honolulu. We think it's a great idea, and we hope you do
> too. And we're here to answer any questions you may have
> with respect to Aon.

(Heffernan Dep. 155.) Richards responded, "Wherever Chad is is
where I want to be." (Heffernan Dep. 155.) Heffernan also

testified that his conversation with Richards was "very similar" to the conversation he had with the "15 or so people" with whom he talked over this two-day period. (Heffernan Dep. 155.) Richards called Karasaki a few days later, on March 17. (Karasaki Dep. 191-92, 204; Mishkin Decl. Ex. 165.) Karasaki testified that Richards inquired about Karasaki's situation and told him that Maryl Group was going to execute a BOR letter, and that Karasaki advised him that he had a Non-Solicitation Agreement. (Karasaki Dep. 192-93, 199-202.) Helen Otani, Karasaki's Client Representative at Aon, testified that Karasaki communicated to her that he wanted to have BOR letters sent to Richards by providing her with a post-it with the contact person's e-mail address and an instruction to "please send a broker of record letter, sample letter to Mark Richards." (Mishkin Decl. Ex. U (Otani Dep. 117, Jun. 24, 2008) ("Otani Dep.").) On March 18, Otani e-mailed Richards: "Pursuant to your discussion with Chad Karasaki, enclosed please find three BOR letters for Maryl Group, Kiahuna Kanihiku dba Wainani and TDM Kua etal." (Mishkin Decl. Ex. 69.) Maryl Group executed BORs for all of its businesses on March 20. (Mishkin Decl. Ex. 175.) Heffernan later sent an e-mail stating that Aon had just won the Maryl Group account, which was "produced and managed by new team member, Chad Karasaki." (Heffernan Dep. 152.) Heffernan explained in his deposition that he considered the

account to be Karasaki's because, from his interaction with Richards, "it was apparent that the client's expectation was that Chad was going to be the front-line liaison representing Aon in our capacity as their broker." (Heffernan Dep. 154.)

On either March 13 or 14, Heffernan and Sandkuhler also met with Stanford Carr. At the meeting, Heffernan told Stanford Carr that Karasaki had joined Aon and that Aon was interested in starting a relationship with Stanford Carr. (Mishkin Decl. Ex. S (Sandkuhler Dep. 82, July 23, 2008) ("Sandkuhler Dep.").) Heffernan also suggested that Stanford Carr execute a BOR letter. (Heffernan Dep. 158; Mishkin Decl. Ex. 65.) Stanford Carr agreed to transfer its business to Aon and executed a broker of record letter on March 20. (Heffernan Dep. 158; Mishkin Decl. Exs. 65, 81.)

During this two-day period, Heffernan and Sandkuhler also met with ABC Stores, Inc. (Heffernan Dep. 75; Sandkuhler Dep. 75-76.). In the meeting, Heffernan informed them that Karasaki had moved to Aon, that Aon was interested in developing a business relationship with them, and that they would have to execute a BOR letter to move their account to Aon. (Sandkuhler Dep. 79-80.)

15. On March 17, 2008, Karasaki e-mailed Heffernan the names and contact information for four more of his former Marsh clients: Beachside Roofing, Hilo Bay Hotel, Thurston Pacific,

and Big Save.  (Mishkin Decl. Exs. 13, F.)  On April 9, Karasaki

e-mailed Heffernan to list "accounts we should follow up on":

Oahu Plumbing, Alakai Mechanical, Hilo Bay Hotel, Mills Group,

Big Save, Mitsui Fudosan, and Hawaiian Dredging.  (Mishkin Decl.

Ex. 118.)

16.  On or about March 24, 2008, while Karasaki was on

vacation, he had a telephone call with Ng.  (Mishkin Decl. Ex.

6; Karasaki Dep. 603; Ng Dep. 170-73.)  According to Ng,

Karasaki asked her which Marsh accounts she thought would follow

her to Aon.  (Ng Dep. 170-73.)  On Karasaki's calendar for that

week, Ng's and Case's names and phone numbers are written at the

top, and the date entry for March 24 lists the names of thirteen

Marsh clients, most of which had been Ng's former clients at

Marsh.[7]  (Mishkin Decl. Ex. 6.)  Karasaki testified that he did

not ask her which accounts were going to come over, but rather

explained that he had asked her which of her clients had been

contacted and informed of the fact that she had left.  (Karasaki

Dep. 601-03.)

17.  On March 25, 2008, an executive from ABC Stores called

Deborah Park ("Park"), a Marsh Vice President, and left her a

voicemail, which Park later transcribed:  "I just wanted to, to

let you know that we're going to switch, to Aon, with Chad, so

---

[7] The listed companies were:  Maryl Group, Stanford Carr, Arisumi,
Commercial, Steeltech, Yamada, A.C. Kobayashi, Coastal, Water Resources,
Don's Makiki, Mitsunaga, and RMY Construction.  (Mishkin Decl. Ex. 6;
Karasaki Dep. 604-09.)

we're sending out the letters today." (Park Decl. ¶ 1, 8-9, Apr. 30, 2008.)

18. In early April, Aon engaged in efforts to win Castle & Cooke's business from Marsh. An e-mail dated April 1, sent by Aon Senior Vice President Alan Boring ("Boring"), states that Boring had spoken with Karasaki, Heffernan, and another Aon employee to prepare for an April 3 meeting with Rosy Ku ("Ku"), the Castle & Cooke representative, and that he had "confirmed with [Heffernan] and [Karasaki] that we'll be asking for this piece of the business . . . in this meeting." (Mishkin Decl. Ex. 105.) Karasaki assisted Boring with putting together a "Team Chart, highlighting Chad's role and outlining the supporting positions." (Mishkin Decl. Exs. 105, 108; Karasaki Dep. 409-10.) Karasaki also drafted text for an e-mail and edited a sample BOR letter for Castle & Cooke and instructed Otani to send an e-mail and the letter to Ku, which Otani did on April 4. (Mishkin Decl. Ex. 115; Otani Dep. 117; Karasaki Dep. 345-47.) Ku made a few proposed changes to the BOR and e-mailed the new version to Otani on April 9. (Mishkin Decl. Ex. 119; Otani Dep. 115-17.) On the same day, Otani forwarded the new version to Karasaki for his approval, and Karasaki approved it. (Mishkin Decl. Ex. 119; Otani Dep. 116-17.) Castle & Cooke executed a BOR letter transferring its business to Aon on April 11. (Mishkin Decl. Ex. D.) Upon receipt of Castle & Cooke's

BOR, on April 14, Heffernan forwarded the e-mail to Karasaki with a note saying "Congratulations." (Mishkin Decl. Ex. 130.) In his deposition, Heffernan explained that he wanted to congratulate Karasaki because, in his "personal opinion," he believed "[Karasaki] was instrumental in this client making the decision to move this piece of the business to Aon. They spoke very highly of Chad, and I think that's what put it over the top." (Heffernan Dep. 149-50.)

19. In the first few weeks of his service at Aon, Karasaki devised a system to track those Marsh accounts that were brought over to Aon in "BOR Tracking Logs." (Karasaki Dep. 435; Mishkin Decl. Exs. 9, 109, 122, 151.) On April 2, Karasaki e-mailed a spreadsheet with "Confirmed/Pending BOR's as of 04-02-2008" to Luecht and Arkley, stating: "Fyi, here is where we are right now. First table BOR's taken. Second table BOR's that are likely to come." (Mishkin Decl. Ex. 109.) On April 10, Darlene Amion ("Amion"), an Aon Vice President, e-mailed Otani and another Aon employee, copying Karasaki, Ng, Kim, Wirt, and Case attaching a spreadsheet "BOR Tracking Log" to keep track of new business, which she did "[a]t Chad's request." (Mishkin Decl. Ex. 122.) On April 19, Karasaki sent the "[l]atest updated BOR schedule" to Luecht, Arkley, and John Day ("Day"), another Aon executive, mentioning that they had "[p]icked up a couple more last week," and that "[t]hings continue to be on track."

(Mishkin Decl. Ex. 151.)  On April 21, Day replied to Chad:
"Great going.  Keep up the great work."  (Mishkin Decl. Ex.
151.)

20.  Recent evidence indicates that Aon and Karasaki have
continued their efforts to persuade other Marsh clients to move
their business to Aon.  On August 5, 2008, an executive from the
James Campbell Company told Sansone that someone from Aon had
offered to arrange a meeting with him and Karasaki, Wirt, and
Kim.  (Sansone Decl. ¶ 5, Sept. 12, 2008 ("Sansone Sept. 12
Decl.").)  Sansone also testified that, in a conversation a
contact at Kamehameha Schools had had with Karasaki on August
13, Karasaki had claimed to be the person at Aon in charge of
prospecting Kamehameha Schools, a Marsh client.  (Sansone Sept.
12 Decl. ¶ 7.)

On August 26, a contact from Oahu Plumbing called Beers at
Marsh to advise him that Oahu Plumbing was moving its business
to Aon.  (Beers Sept. 11 Decl. ¶ 9.)  A subsequent e-mail from
an Aon claims consultant about an Oahu Plumbing claim also
copied Karasaki.  (Beers Sept. 11 Decl. ¶ 11.)  On September 8,
2008, a partner from the Mills Group, a real estate developer
and Marsh client, informed Sansone that Karasaki, Wirt and Kim
had been soliciting another Mills Group partner to try to win
its business.  (Sansone Sept. 12 Decl. ¶ 2-3.)

21.   As of September 12, Aon had contacted forty-eight Marsh clients.  (Mishkin Ex. E; Sansone Sept. 12 Decl. ¶ 5, 7.) Twenty-three of those had executed BOR letters to transfer their business to Aon, all but two of whom did so within two months of Karasaki's resignation.  (Mishkin Decl. Exs. D, E; Beers Sept. 11 Decl. ¶ 9, 11.)  Seven of these twenty-three were clients for whom Karasaki had been the Client Executive at Marsh.  (Hr'g Tr. 36-37, Sept. 24, 2008.)  Ten were Ng's clients, nine of whom had previously been serviced by Oxley.  (Mishkin Decl. Exs. D, F; Ng Dep. 82, 90; Oxley Dep. 12-13.)  Two were former clients of Frank Wirt's, one was a former client of Jeff Case, and one was a former client of Marcus Kim.  (Mishkin Decl. Exs. D, F.)  The remaining two were clients of Kathy Dang and another Client Executive named Florence Shelton.  (Mishkin Decl. Exs. D, F.)

22.   Karasaki has admitted that he is currently providing or attempting to provide services to several of his former Marsh clients, including ABC Stores, Beachside Roofing, Castle & Cooke, Maryl Group, Stanford Carr, Dick Pacific Construction, and Mitsui Fudosan.  (Mishkin Decl. Ex. J at 12.)  He has also stated that he supervises Aon employees who provide or attempt to provide services to fourteen other former Marsh clients. (Mishkin Decl. Ex. J at 12.)  He has also admitted that, since March 6, he has had direct contact with nine former Marsh clients, and indirect contact with fourteen others.  (Mishkin

Decl. Ex. J at 9.)  Karasaki also testified at his deposition
that, after joining Aon, he attended meetings with
representatives from A.C. Kobayashi and Coastal.  (Karasaki Dep.
598-99.)  Other evidence indicates that Karasaki also attended a
meeting with representatives from ABC Stores after joining Aon.
(Park Decl. ¶ 12.)

   23.  Marsh had also been prospecting three Aon accounts
just prior to Karasaki's departure:  Outrigger, TDFood Group,
and ResortQuest.  (Sansone Decl. ¶ 11, Apr. 30, 2008 ("Sansone
Apr. 30 Decl.").)  At the September 24 hearing, plaintiffs'
counsel indicated that these were the only three companies
disclosed in the record that would fall into the category of
prospects that Marsh alleges Karasaki may not solicit or service
under the terms of his employment agreements.  (H'rg Tr. 54,
Sept. 24, 2008.)  According to Sansone, Karasaki knew of Marsh's
strategic plans with respect to those three clients and was able
to use this information to retain those clients for Aon.
(Sansone Apr. 30 Decl. ¶ 11.)  Karasaki testified that he had
pitched Marsh's services to ResortQuest just weeks before
resigning from Marsh, and that once he joined Aon, ResortQuest
sent questions to Aon about Karasaki's situation.  (Karasaki
Dep. 473-85.)  Shortly after joining Aon, Karasaki attended two
meetings with ResortQuest representatives to explain the
situation.  (Karasaki Dep. 481-88.)

### *Karasaki's Solicitation of Marsh Employees*

24.     The evidence shows that Aon was recruiting other Marsh employees before Karasaki announced his resignation.  As early as January 29, Arkley mentioned to other Aon executives, "There are other potential candidates we want also."  (Mishkin Decl. Ex. 45.)  Aon appears to have coordinated its efforts to recruit other Marsh employees to follow closely upon Karasaki's departure.  In a March 6 e-mail to Luecht, Arkley asked Luecht to tell Karasaki "to get out fast so we can get some others hired."  (Mishkin Decl. Ex. 50.)

On March 4 or 5, Luecht called Case to arrange a meeting between Case and Arkley.  (Mishkin Decl. Ex. O (Case Dep. 95, Jun. 25, 2008) ("Case Dep.").)  Case met with Arkley on March 7, and Arkley told him that Aon had hired away Karasaki and talked about Aon's plans for its Hawaii business.  (Case Dep. 102-04.) Arkley told Case:  "[W]e're going to empower Chad to invest to turn this office around, and we're probably hiring people." (Case Dep. 104.)  According to Case, at another meeting on March 10, Luecht told Case:  "[I]t's up to Chad to figure out who he wants; but he can't talk to anybody.  So, I'm just trying to see who may be interested."  (Case Dep. 124-25.)  On March 17, Case received a formal offer letter from Aon, accepted the offer, and resigned from Marsh.  (Case Dep. 42, 131-33.)

On March 5 or 6, Luecht called Wirt. (Mishkin Decl. Ex. T (Wirt Dep. 70, Jun. 27, 2008) ("Wirt Dep.").) Similarly to Case, Wirt then had meetings with Arkley and Luecht in which they talked about Aon's plans in Hawaii and told him that Aon was considering extending Wirt an employment offer. (Wirt Dep. 71-73, 77, 80.) On March 15, Wirt sent Karasaki a text message asking Karasaki to call him. (Wirt Dep. 88.) Karasaki called Wirt back, and Wirt's recollection is that they discussed the offer and what stock grants he would receive if he went to Aon. (Wirt Dep. 88-89.) According to Karasaki's phone records, the call lasted thirteen minutes. (Mishkin Decl. Ex. 165.) On March 16, Wirt received a formal offer letter. (Wirt Dep. 104; Mishkin Decl. Ex. 66.) He accepted the offer on March 18 and resigned from Marsh the same day. (Wirt Dep. 105, 108; Mishkin Decl. Ex. 66.)

On March 6, Luecht left Dang a voicemail to set up a meeting between her and Arkley. (Dang Decl. ¶ 6, Apr. 30, 2008.) Dang met with Luecht on March 10, during which Luecht made a pitch for her to join Aon. (Dang Decl. ¶ 11.) Dang ultimately declined the offer. (Dang Decl. ¶ 12.)

On March 10, Luecht called Ng to ask if she would be interested in a position at Aon. (Ng Dep. 41-42.) At a meeting the next day, Luecht asked Ng if she would be interested in coming to Aon and told her that Aon was also interested in Case,

Kim, Wirt, and Beers. (Ng Dep. 50-53.) On March 11 or 12, Ng received the call from Oxley, in which he also encouraged her to take the Aon offer. (Ng Dep. 105-06.) On March 12, Arkley called Ng to ask her what kind of package she would like, and she told him to make her an offer. (Ng Dep. 55-56, 62.) Arkley and Ng had another phone call on March 14 to discuss compensation and came to an agreement. (Ng Dep. 62-63.) Ng received a formal offer letter from Aon on March 16. (Ng Dep. 62, 65; Mishkin Decl. Ex. 62.) Ng accepted the offer on March 17 and resigned from Marsh the next day. (Mishkin Decl. Ex. 62; Ng Dep. 115.)

On March 11, Luecht called Kim about joining Aon. (Mishkin Decl. Ex. 51.) The following day, Kim e-mailed Dang and told her that Aon was also after Dang, Wirt, Beers, Case, and some of Marsh's Client Representatives. (Mishkin Decl. Ex. 56.) Kim met with Arkley and Day on March 20, and Arkley informed him that Aon wanted to make him an offer. (Mishkin Decl. Ex. P (Kim Dep. 58-59, Jun. 30, 2008) ("Kim Dep.").) Earlier that day, Arkley had e-mailed Karasaki to tell him that he would be meeting with Kim later that day. (Mishkin Decl. Ex. 78.) Kim received an offer letter from Aon on March 26 and accepted it on March 28. (Mishkin Decl. Ex. 96; Kim Dep. 65-69.)

Karasaki asserts that Arkley was already well aware of the reputations of Case, Wirt, Ng, and Kim and was responsible for

their recruitment. Case and Ng had worked for Arkley at Aon before they left Aon to work for Marsh. (Arkley Dep. 272.) Wirt had also previously worked for Aon before joining Marsh, and Kim had worked in the industry for ten years before joining Marsh. (Tarr Decl. Ex. 24.) Arkley testified that he had also heard of Dang and Kim before and knew that they were "very capable account executives." (Arkley Dep. 78-80.) According to Arkley, Arkley had Case, Wirt, and Ng on his list, and he called them all himself. (Arkley Dep. 272.) Arkley further testified that he did not tell Karasaki that Case, Wirt, and Ng were on his list as possible recruits until after Karasaki resigned, and that Karasaki's reaction was "positive." (Arkley Dep. 274-75.)

25. On March 20, 2008, Otani called Tsumoto to inquire if Tsumoto and Mei Chi Ng, both Client Representatives who had been supervised by Karasaki, would be interested in joining Aon. (Tsumoto Decl. ¶ 11-12, Apr. 30, 2008; Mei Chi Decl. ¶ 6, Apr. 30, 2008.) Otani offered to have Karasaki give Tsumoto a call, but Tsumoto declined the offer, as well as a meeting with Deborah Redmond, Aon's HR Director. (Tsumoto Decl. ¶ 14, 17, 22-23.) Mei Chi also did not meet with anyone from Aon. (Mei Chi Decl. ¶ 15.) According to Tsumoto and Mei Chi, neither had ever been contacted by anyone from Aon before March. (Tsumoto Decl. ¶ 24; Mei Chi Decl. ¶ 16.)

On April 8, Redmond called Shannon to arrange a meeting with her that day, in which Redmond discussed making an employment offer to her. (Shannon Decl. ¶ 8-10, Apr. 30, 2008.) On April 11, Redmond e-mailed Shannon a formal offer of employment, which she ultimately declined. (Shannon Decl. ¶ 11, 14-15, Ex. A.) Shannon stated that this was the first time that Aon had expressed an interest in hiring her. (Shannon Decl. ¶ 13.)

On April 10, Karasaki e-mailed Redmond: "Just thought I would follow up and see how you were coming on the offer letters." (Mishkin Decl. Ex. 121.) Redmond responded on April 11 with details on each offer:

> The offers letters will go today. Please let me know what you think about the offers, we briefly discussed them when I was in HI but want to make sure you are in total agreement before I send them.
>
> Evelyn Chan [Shannon]
> She is currently earning $[]k with a $[]K Bonus
> We had discussed giving her $[]k with a one time signing bonus of $[]k
> 2 weeks vacation, which is what she has now.
> Title would be Account Specialist, which is a level 7
>
> Irene Fujimoto
> She wouldn't tell me what she was earning but I thought you had said $[]k.
> We had discussed giving her a $[]k salary increase and a $[]k sign on bonus.
>
> . . . .
>
> I was gong [sic] to reach out to Glady's [sic] Smith today and tell her that at this time we are not prepared to make her a job offer. I really believe she would use our offer

to enhance her salary at Marsh, as she didn't express any
interest in joining Aon for anything more than money.  Let
me know if you are okay with me taking this course of
action.

    . . . .

(Mishkin Decl. Ex. 121.)

Karasaki responded the same day, stating:

I am fine with the offers.  Irene will not be an AE, so Sr.
Account Specialist would be fine.

I would offer Gladys $[]k with a $[]k bonus.  Even if she
shops the deal, it would force Marsh to put more money in.
If not, this is not too bad for us.

Marsh is making a big play with the clients regarding our
lack of back office, and we need to move quickly to combat
this assertion.  Chad

(Mishkin Decl. Ex. 121.)  In his deposition, Karasaki stated

that he could not recall telling Redmond how much in salary

Fujimoto was making.  (Karasaki Dep. 532.)

On April 18, 2008, Aon's Amion called Mandado at Marsh and

asked whether she would be interested in joining Aon.  (Mandado

Decl. ¶ 8-9.)  When Mandado refused, Amion replied, "but Chad is

here," and asked whether that changed her mind.  (Mandado Decl.

¶ 10-11.)  Mandado had worked for Aon before joining Marsh in

2001, and had been contacted by Aon once before, in 2003, about

an offer to rejoin.  (Mandado Decl. ¶ 3, 14.)  The April 18 call

was the first time since 2003 that she had been contacted by Aon

about an employment opportunity.  (Mandado Decl. ¶ 14.)

Ng testified in her deposition that Karasaki identified all of the Client Representatives at Marsh that he wanted to have at Aon, including Fujimoto, Mei Chi, and Tsumoto. (Ng Dep. 160-62.) Karasaki admitted that he named Gladys Smith as someone that he wanted to bring over to Aon. (Karasaki Dep. 159-61.) According to Karasaki, however, Otani had already known Tsumoto and Mei Chi through a insurance women's association and had identified those two as potential recruits. (Karasaki Dep. 169.) Likewise, Amion had suggested Mandado and had known her from their time together at Aon. (Karasaki Dep. 169.) Karasaki testified, however, that after Otani and Amion suggested Tsumoto, Mei Chi, and Mandado, Karasaki told them to "[s]ee if they're interested." (Karasaki Dep. 169-70.)

### *Marsh's Response*

26. On March 25, Marsh issued a cease and desist letter to Karasaki informing him that Marsh intended to pursue litigation against him and advising him to retain various categories of documents, media, and data for possible discovery. (Mishkin Decl. Ex. 93.)

27. In early April 2008, Marsh sent letters to clients that had moved to Aon informing them of the restrictive covenants and confidentiality agreements of Karasaki, Case, Wirt, Ng, and Kim, and that those employees were legally prohibited from soliciting, servicing, or supervising the

servicing of their accounts. (Tarr Decl. Exs. 28, 29 (Carpenter Dep. 154, Aug. 19, 2008).) In May, Marsh also issued subpoenas to some of its former clients who had moved to Aon to produce documents in connection with this litigation. (Tarr Decl. Ex. 30.)

## Conclusions of Law

### A.

1.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because of the complete diversity of the parties. The amount in controversy exceeds $75,000, exclusive of interest and costs.

2.   Venue is proper in this district because the defendant is a party to an agreement with Marsh whereby the defendant consented to the filing of an action for breach thereof in this Court.

### B.

3.   The standards that govern the issuance of a preliminary injunction are well established. "A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in

the movant's favor." <u>Doninger v. Niehoff</u>, 527 F.3d 41, 47 (2d Cir. 2008).

C.

4.    "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." <u>Reuters Ltd. v. United Press Int'l, Inc.</u>, 903 F.2d 904, 907 (2d Cir. 1990) (citations and internal quotation marks omitted).  The plaintiff must establish "that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent." <u>Grand River Enterprise Six Nations, Ltd. v. Pryor</u>, 481 F.3d 60, 66 (2d Cir. 2007) (citation and internal quotation marks omitted).  Furthermore, "[i]rreparable harm is 'injury for which a monetary award cannot be adequate compensation.'" <u>Int'l Dairy Foods Assoc. v. Amestoy</u>, 92 F.3d 67, 71 (2d Cir. 1996) (quoting <u>Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)).  If an adequate remedy at law exists, no preliminary injunction may issue. <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004).

5.    Marsh argues that it will suffer irreparable harm in the form of additional lost clients, lost customer goodwill, and additional lost employees in the absence of a preliminary injunction.  Marsh also argues that these injuries are not readily quantifiable and that they are actual and imminent,

pointing to current clients that have recently been pursued by Aon that are "at risk" of being lost. Karasaki argues that any lost client accounts and employees can be adequately compensated by a monetary award.

It is well established in this Circuit that the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm. Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (collecting cases). As the Court of Appeals for the Second Circuit has recognized, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999). The loss of clients and goodwill resulting from Karasaki's alleged breach of his non-solicitation agreements is no exception. The total monetary value of Marsh's loss of client would be very difficult, if not impossible, to calculate with any exactitude. Nor could the lost goodwill that Marsh has built with these clients be easily quantified and compensated.

This case is not like Production Resource Group, LLC v. Oberman, No. 03 Civ. 5366, 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003), or Geritrex Corp. v. Dermarite Industries, LLC, 910 F. Supp. 955 (S.D.N.Y. 1996), which the defendant cites as support

for its argument that any loss of clients suffered by Marsh is readily quantifiable. In Production Resource Group, this Court held that the plaintiff's potential losses did not constitute irreparable harm sufficient for a preliminary injunction, because there was only evidence of one finite contract for which the plaintiff and the defendant competed, and the damages were therefore calculable. 2003 WL 22350939, at *7. Marsh's injury, however, is the loss of ongoing client relationships, not the loss of a finite contract; Production Resource Group therefore does not apply. See also Int'l Creative Mgmt., Inc. v. Abate, No. 07 Civ. 1979, 2007 WL 950092, at *3 (S.D.N.Y. Mar. 28, 2007) (finding that literary agent's contracts to represent clients for specific projects only were not the kind of significant long-term client relationships that merited the protection of a restrictive covenant).

Geritrex is also inapplicable because that case involved the alleged misappropriation of trade secrets, and the court found that the plaintiff was not likely to succeed in proving that the alleged proprietary information constituted trade secrets. 910 F. Supp. at 962. Furthermore, the court in Geritrex noted that because there was no danger of the defendants disseminating the alleged trade secrets, any losses suffered by the plaintiff could be calculated by looking at the

value of lost sales of products during the period of misappropriation. 910 F. Supp. at 965-66.

6. As with the loss of its client relationships, the loss of Marsh employees also constitutes irreparable harm. <u>See</u> <u>Natsource LLC v. Paribello</u>, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (holding that the training of a company's brokers and investment in helping them develop customer relationships constituted unquantifiable assets satisfying the irreparable harm requirement for a preliminary injunction). The departure of Marsh employees deprives Marsh not only of its investment in training and developing those employees, but also, for those who were brokerage professionals, of those employees' clients who follow the employees because of the relationships developed with them at Marsh's expense.[8]

7. Karasaki claims that Marsh cannot establish a claim for injunctive relief because it cannot show that Karasaki's actions caused the harm that Marsh alleges it will suffer. "In order to establish an injury in fact necessary to a claim for injunctive relief, the moving party must demonstrate that a defendant's conduct is causing irreparable harm." <u>Schroedel v.</u>

---

[8] Karasaki also argues that Marsh cannot show irreparable harm without showing misappropriation of trade secrets or other confidential information. At the hearing on September 24, 2008, Marsh conceded that it is no longer relying upon a showing of misappropriation of trade secrets or confidential information to establish a presumption of irreparable harm. However, while it is true that irreparable harm is presumed where a former employee has misappropriated trade secrets or confidential information, the absence of such misappropriation does not preclude the plaintiff from independently showing irreparable harm, as the plaintiff has done here.

New York Univ. Med. Ctr., 885 F. Supp. 594, 598 (S.D.N.Y. 1995).
Karasaki asserts that it was Aon that solicited clients and
employees from Marsh, and that Marsh "contributed to its own
demise" by eliminating perks and sending letters to clients who
had left Marsh for Aon.  The argument has no merit.  As
explained below, Karasaki, in violation of his agreements, has
participated in the direct and indirect solicitation of Marsh
clients and employees and has openly violated his contractual
agreements by working on that business at Aon.  Karasaki has
submitted no evidence in support of his argument that the
clients or employees who left Marsh did so because of Marsh's
elimination of perks or any letters sent to them by Marsh.

8.    Finally, Karasaki claims that Marsh's decision to take
two and a half months for expedited discovery weighs against its
irreparable harm argument.  While a delay does undercut the
urgency of the alleged harm upon which a request for a
preliminary injunction is based, a short delay does not weigh
against a finding of irreparable harm if there was good reason
for the delay.  Weight Watchers Int'l, Inc. v. Luigino's, Inc.,
423 F.3d 137, 144-45 (2d Cir. 2005).  Here, Marsh filed its
original Complaint within two weeks of the first employee
departures and BOR letters.  It then re-filed its Complaint in
this Court ten days after its original Complaint was dismissed
for improper venue.  Marsh did request expedited discovery,

although it asked for seventy-five days in which to conduct it. Two months then elapsed between the close of discovery and oral argument, during which the parties briefed the motion and the Court reviewed the submissions. Given the evidence and number of witnesses located in Hawaii and California, and that the parties agreed to litigate the action exclusively in New York rather than in Hawaii, where the majority of the witnesses and evidence were located, two and a half months for expedited discovery is not unreasonable. Moreover, at the May 8 hearing, defendant's counsel acknowledged that there were many witnesses and significant travel involved, indicated that defense counsel wanted to take discovery as well, and agreed to a period of seventy-five days for expedited discovery. (Hr'g Tr. 9, May 8, 2008.) Therefore, under all the circumstances, the period of time to complete the briefing on the preliminary injunction is not so substantial as to eliminate the showing of irreparable injury.

Marsh has therefore carried its burden of showing that it will suffer irreparable harm in the absence of an injunction.

**D.**

9.   Whether Marsh has shown a likelihood of success on the merits of its breach of restrictive covenant claim depends first on whether the employment agreements were valid and enforceable. Under New York law, "[t]he issue of whether a restrictive

covenant not to compete is enforceable by way of an injunction
depends in the first place upon whether the covenant is
reasonable in time and geographic area." Ticor Title Ins. Co.,
173 F.3d at 69 (citing Reed, Roberts Assocs. v. Strauman, 353
N.E.2d 590 (N.Y. 1976)).  In determining whether a restrictive
covenant is reasonable, courts must balance the employer's
legitimate business concerns with New York's strong public
policy against causing a person to lose the ability to earn a
livelihood.  Id. at 69.  Additionally, "[a] restraint is
reasonable only if it: (1) is *no greater* than is required for
the protection of the *legitimate interest* of the employer, (2)
does not impose undue hardship on the employee, and (3) is not
injurious to the public." BDO Seidman v. Hirshberg, 712 N.E.2d
1220, 1223 (N.Y. 1999) (emphasis in original).

**1.**

10.  The defendant does not dispute that the one-year
period of restriction is reasonable.  Indeed, New York courts
have routinely found one-year restrictions to be reasonable, see
Silipos, Inc. v. Bickel, No. 06 Civ. 2205, 2006 WL 2265055, at
*6 (S.D.N.Y. Aug. 8, 2006), and have found restrictions of
greater than one year in the same or similar professions to be
reasonable as well, see, e.g., Willis of New York, Inc. v.
DeFelice, 750 N.Y.S.2d 39, 41-42 (App. Div. 2002) (finding two-

year non-solicitation agreement for high-level insurance broker to be reasonable).[9]

11.  The defendant does claim that the NSA and RCA are overbroad in that they do not contain any geographic restriction and would restrict Karasaki from working anywhere in the world in the insurance brokerage industry.  However, New York state courts have upheld non-solicitation agreements imposing client-based restrictions without geographic limitation as reasonable in scope.[10]  <u>Malcolm Pirnie, Inc. v. Werthman</u>, 720 N.Y.S.2d 863 (App. Div. 2001); <u>Mallory Factor Inc. v. Schwartz</u>, 536 N.Y.S.2d 752, 754 (App. Div. 1989); <u>Bates Chevrolet Corp. v. Haven Chevrolet, Inc.</u>, 213 N.Y.S.2d 577, 581 (App. Div. 1961). Likewise, the client-based restrictions in Karasaki's employment agreements are also reasonable in scope because they are no broader than necessary to protect Marsh's asserted interest in protecting its client base and do not prevent Karasaki from working in the insurance brokerage business in Hawaii or elsewhere, so long as he adheres to the bar on soliciting his former clients and the clients of other Marsh employees that were supervised by him.

---

[9] Notably, the non-compete agreement that Aon uses for its own insurance brokers applies a two-year restriction, although the agreement is governed by Illinois law.  (Tarr Decl. Ex. 31.)

[10] Aon's non-compete agreement also employs client-based restrictions and does not contain a general geographic restriction.  (Tarr Decl. Ex. 31.)

12.  If the scope of a restrictive covenant is reasonable in time and geographic area, "enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." Ticor, 173 F.3d at 70 (citing Purchasing Assocs. v. Weitz, 196 N.E.2d 245 (N.Y. 1963)).  "Furthermore, whether viewed conceptually as a type of special service, an offshoot from an employer's interest in safeguarding customer information, or as a distinct cognizable interest, it is now clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense." Johnson Controls, 323 F. Supp. 2d at 534; see also BDO Seidman, 712 N.E.2d at 1224-25.  In Ticor, the Court of Appeals found that an insurance company could enforce a restrictive covenant against a former senior vice president in charge of several major sales contracts for a period of six months following his employment based on his special relationships with his clients.  173 F.3d 63.

13.  The employer's legitimate interest, however, is only in the protection of client relationships acquired during the

course of employment and which the employer has invested its resources--through the employee--to cultivate. BDO Seidman, 712 N.E.2d at 1224-25. It does not extend to clients with whom the employee never acquired a relationship through the resources provided by the employer, nor to client relationships that the employee developed independently and without the benefit of any expenditure of effort or resources by the employer. Id. at 1225.

Karasaki argues that his relationships with his former Marsh clients are personal and based on the clients' desire to work specifically with him, and that they therefore fall within the BDO Seidman exception to the employer's protectible interest in its client relationships. There is no question that many of Karasaki's former clients at Marsh were more loyal to him than to Marsh, but that is beside the point. The question is whether Karasaki developed those relationships independently of any efforts or expenditures made by Marsh, and there is no evidence that he did. BDO Seidman, 712 N.E.2d at 1224-25; see also Johnson Controls, 323 F. Supp. 2d at 535-36. Karasaki conceded that he did not bring any clients with him when he first began working at Marsh's Hawaii office. (Karasaki Dep. 646.) At least seven of Marsh's former clients who defected to Aon had been Marsh clients from before Karasaki joined the Hawaii office in 1990. (Uehara Decl. ¶ 6.) He entertained clients through a

generous expense account provided to him by Marsh, and through charity events funded by Marsh's charity budget. He serviced client accounts with the support of other Marsh employees. Not least of all, he performed these activities in the course of his employment, for which Marsh paid him a salary and discretionary bonuses. Marsh has thus shown that it likely has a legitimate interest in protecting its client relationships to justify enforcement of the agreements.

14. New York courts have also recognized that an employer's interest in protecting client relationships developed by a former employee extends to clients of other employees who were supervised by the former employee. See Johnson Controls, 323 F. Supp. 2d at 542 (granting a preliminary injunction to enforce a non-solicitation agreement which prohibited the defendants from directly or indirectly servicing any of the plaintiff's customers who had been served or solicited by the defendants, or by another employee under the defendants' supervision); Spinal Dimensions, Inc. v. Chepenuk, No. 4805-07, 2007 WL 2296503, at *6 (N.Y. Sup. Ct. Aug. 9, 2007) (holding that the employer's legitimate interest in protecting its client relationships extended to clients of sales representatives whom the defendant supervised). Therefore, to the extent that Marsh can show that Karasaki solicited or serviced any of the clients who were serviced by Case, Wirt, Ng, or Kim, Marsh has shown

that it likely has a legitimate interest in the relationships between clients and former employees who Karasaki supervised at Marsh.

15. "The protection of client relationships, however, does not justify enforcement of the portions of the non-compete clauses relating to *potential* clients of [the employer] who [are] merely *solicited* at the direction of [the employee]." Johnson Controls, 323 F. Supp. 2d at 540. An employer does not forge a protectible client relationship with a prospective customer simply by sending the company a business proposal or making a pitch for its business in a sales meeting. See id. And if the law were to provide otherwise, it would be difficult, if not impossible, to draw the appropriate line for how much contact the employee must have had with a prospective customer to establish a protectible client relationship.

However, restrictions on soliciting prospective clients can be justified by the need to protect trade secrets and confidential information. Id. For purposes of the preliminary injunction, however, Marsh has not shown that Karasaki used confidential information about clients Marsh had prospected while he was employed by Marsh.

**3.**

16. Karasaki also contends that the NSA and RCA are unreasonable because their enforcement would prevent him from

earning a living as an insurance broker.  However, the evidence in the record shows that Karasaki would be able to continue working in the insurance brokerage business in Hawaii, and would even be able to do so at Aon so long as he does not solicit Marsh employees or Marsh clients on which he or those he supervised worked, and does not provide services to those clients.  Within those restrictions, Karasaki could work on pre-existing Aon accounts and on soliciting other clients, provided that they had not been Karasaki's former clients or clients of his direct reports at Marsh within the last two years of his employment.  According to the record, there are at least seven other brokers that compete in Hawaii for the same customers as Aon and Marsh, including Atlas, Noguchi, Monarch, Insurance Factors, Insurance Associates, Hawaii Insurance Consultants, and another firm started by a former Aon insurance broker. (Karasaki Dep. 480; Sansone Dep. 90.)  Karasaki would also be able to solicit and service customers in Guam and Asia, which both he and Arkley identified as one of the reasons why Aon recruited Karasaki to head its Hawaii office.  (Karasaki Dep. 259-60; Arkley Dep. 62-63.)  Considering the wide array of other accounts that are still available to Karasaki under the agreements, and the fact that the non-solicitation provision only applies for one year, Marsh is likely to prevail on its

showing that the agreements do not impose an undue hardship on Karasaki.

**4.**

17. Finally, Karasaki argues that the non-servicing provisions should not be enforced because doing so would result in the public harm of restricting clients' freedom of choice. In support of this argument, Karasaki cites a number of cases decided under New York law which have held that non-competition agreements which prevent a customer from following an employee to the employee's new employer are unreasonable or void as against public policy when there has been no solicitation of the customer by the employee. See Bijan Designer for Men, Inc. v. Katzman, No. 96 Civ. 7345, 1997 WL 65717, at *6 n.9 (S.D.N.Y. Feb. 7, 1997); Prudential Sec., Inc. v. Plunkett, 8 F. Supp. 2d 514, 519-20 (E.D. Va. 1998); First Empire Sec., Inc. v. Miele, No. 20247-07, 2007 WL 2894245, at *4 (N.Y. Sup. Ct. Aug. 10, 2007). However, because Karasaki has engaged in direct and indirect solicitation in contravention of the agreements, as explained in more detail below, these cases do not help Karasaki.[11]

---

[11] There are additional reasons why these cases do not support Karasaki's position. In Katzman, the plaintiff sought to enforce a non-solicitation agreement, but did not base the enforceability of the agreement on its interest in protecting its client relationships or on the uniqueness of the defendant. 1997 WL 65717, at *5-6. Rather, the plaintiff argued that the defendant had misappropriated some confidential information on its clients, and the court found that misappropriation of confidential client

Indeed, numerous courts that have considered restrictive covenants prohibiting the servicing of an employee's former clients have found them to be enforceable, so long as they are otherwise reasonable in scope. BDO Seidman dealt precisely with a non-servicing provision, a "reimbursement clause" that required the defendant to compensate his former employer if he served any client of its Buffalo office within eighteen months of the termination of his employment, which the New York Court of Appeals found to be reasonable and enforceable with respect to former clients of the plaintiff with whom the defendant had acquired a relationship through his employment with the plaintiff. 712 N.E.2d at 1224-26. Similarly, Johnson Controls also recognized the enforceability of a non-servicing provision which restrained the defendant from performing services directly or indirectly for the plaintiff's existing customers who had been served or solicited by the defendant or by someone supervised by the defendant during the defendant's employment. 323 F. Supp. 2d at 529, 536; see also Ticor, 173 F.3d at 72 (affirming issuance of preliminary injunction enforcing non-

---

information would justify enforcement of the agreement. Katzman, 1997 WL 65717, at *6-7.

 Plunkett and Miele also do not apply because those cases both involved securities brokers and professional rules which prohibit restraints on communications between brokers and clients. See Plunkett, 8 F. Supp. 2d at 519-20 (citing New York Stock Exchange rule which provides that firms competing over a single account should coordinate their activities so as to protect customers from losses); Miele, 2007 WL 2894245, at *4 (citing Financial Industry Regulatory Authority rules which do not permit business entities to restrict customers from freely choosing the person or entity with which they wish to do business).

compete clause which barred the defendant from working in the title insurance business in the State of New York); Spinal Dimensions, 2007 WL 2296503, at *12 (finding that plaintiffs were likely to succeed on the merits of enforcing non-solicitation clauses which barred defendants from "contacting, soliciting or otherwise interfering with existing business relationships" with the plaintiff's existing clients); Portware, LLC v. Barot, No. 603738-05, 2006 WL 516816, at *5 (N.Y. Sup. Ct. Mar. 2, 2006) (finding employment agreement that barred defendant from "soliciting, communicating, or transacting business with customers or potential customers with whom he first developed a relationship" through his employment with plaintiff to be valid and enforceable). In prohibiting Karasaki from directly or indirectly providing services to former Marsh clients according to the terms of the agreements, the NSA and RCA go no further than the agreements in BDO Seidman, Johnson Controls, and the multitude of other cases in which non-servicing provisions have been found enforceable. The non-servicing provisions which prohibit Karasaki from supervising the provision of services to his former Marsh clients and those of employees that he supervised are enforceable. Therefore, Marsh has shown a likelihood of success on the merits of enforcing the non-servicing provisions of the agreements.

18.  Marsh has also shown a likelihood of success that it will prove that Karasaki has breached the NSA and RCA.  Karasaki has already conceded that he is currently providing services and supervising the provision of services to many of his former Marsh clients and those of Marsh employees whom he supervised, and therefore Marsh has established a likelihood of prevailing on its claim that Karasaki has breached the non-servicing provisions of the agreements.  Indeed it is difficult to understand how Karasaki could have so openly and defiantly breached these agreements without seeking any declaration that the provisions were unenforceable.  The only reasonable explanation is that he was being indemnified by Aon, although Aon chose not to put its indemnity in writing.  Similarly, it is clear that Karasaki engaged in a small amount of direct solicitation of his prior Marsh clients, and engaged in indirect solicitation of a large number of former clients and employees of Marsh.  Marsh is thus likely to prevail on its client that Karasaki violated the non-solicitation provisions of his agreements.

Marsh alleges that Karasaki's action constituted both direct and indirect solicitation prohibited by the agreements, citing the activities of Heffernan, Sandkuhler, Otani, Oxley, Luecht, Arkley, Redmond, and Amion in soliciting Marsh clients

and employees.  Marsh also cites evidence that Karasaki directly solicited Maryl Group and Frank Wirt.  Karasaki denies that he had direct contact with any Marsh clients or employees other than Maryl Group and Wirt.  He also argues that what indirect contact that he may have had with Marsh clients through other Aon employees did not amount to indirect solicitation.  In support of this proposition, Karasaki cites FTI Consulting, Inc. v. Graves, No. 05 Civ. 6719, 2007 WL 2192200 (S.D.N.Y. July 31, 2007), in which the plaintiff claimed that R. Dean Graves, who had worked as a financial consultant and managing director for the plaintiff, breached an employment agreement which prohibited the direct or indirect solicitation of the plaintiff's clients when he informed the plaintiff's clients that he was leaving.  The court held that even if Graves had informed clients that he was leaving to join a competitor, "this act alone cannot be viewed as sufficient to give rise to an inference that he solicited [the plaintiff's] clients and falls short of establishing contravention of the provision not to solicit clients."  Id. at *7; but see Ecolab, Inc. v. K.P. Laundry Mach., Inc., 656 F. Supp. 894, 896-97 (S.D.N.Y. 1987) (holding that "goodbye notes" informing former clients that the defendants were leaving to join a competitor constituted the "first step in the solicitation" of those clients).

In this case, Karasaki himself did not make courtesy calls to Marsh clients, but rather provided names and contact information to Heffernan and Sandkuhler and hired Oxley so that they could make courtesy calls on his behalf. If Heffernan, Sandkuhler, and Oxley had merely informed Marsh clients that Karasaki had left for Aon, then FTI Consulting suggests that that fact alone would not establish breach of a non-solicitation agreement. However, Heffernan, Sandkuhler, and Oxley not only informed clients that Karasaki had left Marsh, but they also actively solicited their business. And the evidence shows that at least Maryl Group, Castle & Cooke, and the clients contacted by Oxley were told or led to believe that Karasaki would service their accounts if they moved to Aon.

The evidence also shows that Karasaki played a central role in orchestrating the pursuit of his former clients and those of other Marsh employees whom he had supervised. He ensured that these clients were contacted by someone from Aon, as is evidenced by his March 17 and April 9 e-mails to Heffernan and his call with Ng on March 24, and he anticipated that these contacts would translate into new business, reflected in his frequent meetings with Heffernan on March 13 and 14, the BOR tracking logs that he devised, the various e-mails exchanged between him and other Aon employees, and the fact that the equity grants in his compensation package would be triggered by

meeting various revenue hurdles.  And although no evidence
indicates that Karasaki initiated any personal contact with his
former clients, he did communicate with at least Maryl Group
before it became a client of Aon and prepared documents for its
review which were then forwarded to Maryl Group by Otani at
Karasaki's direction.

Karasaki maintains that because he did not directly
participate in any of the meetings and did not initiate contact
with any of his former clients, he did not violate the non-
solicitation provision of the agreement with respect to clients.
This argument, however, overlooks the facts that the NSA and RCA
bar indirect as well as direct solicitation.  It is plain that
Karasaki played a central role in organizing the solicitation of
his former clients.  He indirectly solicited those clients by
organizing others to attend the meetings and make the
presentations, as he well knew he could not do so directly.  The
agreements prevented him from indirectly soliciting his prior
clients and that is precisely what he did.  He cannot escape
liability simply because another Aon executive attended the
meetings for him.  Taking into account the evidence that third-
parties solicited Karasaki's former Marsh clients using the lure
of his name, that Karasaki closely managed the initiation,
follow-up, and tracking of solicitation activity, and that he
directly communicated with and prepared solicitation documents

for at least one client, Marsh has shown a likelihood of success
in proving that Karasaki has breached the non-solicitation
provision of the agreements with respect to former Marsh
clients.

19.  Marsh has also shown a likelihood of success on the
merits of its claim that Karasaki has breached the non-
recruitment provisions of the agreements.  The evidence shows
that he spoke directly to Wirt about how Wirt would be
compensated if he accepted Aon's offer of employment, and that
he was responsible for identifying and approving targets amongst
Marsh Client Representatives and was involved in the preparation
of offers to them.  While Arkley was familiar with Marsh
employees and had identified potential recruits before Karasaki
arrived at Aon, Luecht made it clear to Case that it was up to
Karasaki to decide who Karasaki wanted.  It is also plain that
Karasaki directly or indirectly solicited Wirt, Tsumoto, Mei
Chi, Shannon, Fujimoto, and Mandado.

20.  Marsh, however, has not shown a likelihood of success
on the merits of its claim with respect to prospective clients
Outrigger, TDFood Group, and ResortQuest.  Here, Marsh must show
that Karasaki misappropriated confidential client information
that he then used to directly or indirectly solicit their
business.  Marsh has alleged that Karasaki was privy to Marsh's
"strategic plans" for winning ResortQuest's business, but does

not explain what these plans were and why they were confidential or proprietary.  Therefore, Marsh has failed to show that it is likely to succeed on its claim that the provisions of the NSA and RCA concerning the non-solicitation of prospective clients are enforceable, or that Karasaki has violated them.

21.  Although the NSA and RCA are marginally overbroad with respect to the non-solicitation of prospective clients, the agreements are nevertheless partially enforceable.  Under New York law, a restrictive covenant may be partially enforced if the employer can demonstrate "an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing . . . ."  BDO Seidman, 712 N.E.2d at 1226; see also Karpinski v. Ingrasci, 268 N.E.2d 751 (1971).  Neither overreaching, coercion, nor other anti-competitive misconduct is present here, and with the exception of the provision on prospective clients, the agreements are carefully tailored to the boundaries of what courts have found to be reasonable under New York law.  Therefore, partial enforcement of the agreements is warranted.

### E.

22.  Marsh seeks its costs and attorneys' fees incurred in pursuing this motion for a preliminary injunction.  "[C]ourts

applying New York law should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005) (internal quotation marks and citations omitted). Section 7 of the RCA is unmistakably clear that Marsh and Karasaki agreed that, in the event that Karasaki breached the agreement, Marsh would be entitled to the recovery of attorneys' fees and costs incurred by Marsh in seeking to enforce the agreement. Therefore, Marsh is entitled to reasonable attorneys' fees and costs that it has incurred in bringing this motion.

23. Given that Karasaki has been in flagrant breach of the agreements since his resignation, the Court grants a preliminary injunction enforcing the entire one-year agreement, as limited above, beginning from the date that an Order issuing the preliminary injunction is filed. See New York Real Estate Institute, Inc. v. Edelman, 839 N.Y.S.2d 488 (App. Div. 2007).

24. Because Karasaki has not made a request for a bond, Marsh is also entitled to a preliminary injunction without having to post a bond. See Clarkson Co., Ltd. v. Shaheen, 544 F.2d 624, 632 (2d Cir. 1976). Moreover, the parties agreed in Section 7 of the RCA that no bond would be required for any temporary or permanent injunction, and the parties may agree to

waive the bond requirement. See Helene Curtis v. Nat'l

Wholesale Liquidators, Inc., 890 F. Supp. 152, 160-61 (E.D.N.Y.

1995).

## Conclusion

The foregoing constitutes this Court's Findings of Fact and

Conclusions of Law pursuant to Rules 52(a) and 65 of the Federal

Rules of Civil Procedure. For the reasons explained above,

Marsh's motion for a preliminary injunction is **granted in part**

and **denied in part**.[12]  The Court will issue the preliminary

injunction as a separate Order.

**SO ORDERED.**

**Dated: New York, New York**
      **October 30, 2008**

John G. Koeltl
United States District Judge

---

[12] This Opinion and Order was originally issued on October 16, 2008 but was filed under seal to provide the parties the opportunity to indicate to the Court whether there were portions of these findings that contained confidential or proprietary information that should remain sealed. Because there are no portions of this Opinion and Order that contain information that would justify that information remaining under seal, and the parties having pointed to no findings that should remain under seal, the sealing order with respect to the Opinion and Order dated October 16, 2008 is lifted.